Disney Vacation Club    EXHIBIT A

Disney's Animal Kingdom Villas

# NOTE AND TRUTH-IN-LENDING DISCLOSURE STATEMENT
## Disney's Animal Kingdom Villas

Borrower(s) Name and Home (Street) Address:

**SHEREE PINCKNEY**
7806 HAINES RD
CHELTENHAM  PA 19012-1008

**MALLORY J. PINCKNEY**
7806 HAINES RD
CHELTENHAM  PA 19012-1008

### DISCLOSURES REQUIRED BY FEDERAL LAW

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The amount you will have paid after you have made all payments as scheduled. | TOTAL SALE PRICE The total cost of your purchase on credit, including your down payment of *$1,950.00* is: |
|---|---|---|---|---|
| 12.00% | $9,642.63 | $13,343.34 | $22,985.97 | $24,935.97 |

Your payment schedule will be:

| # of Payments | Amount of Payments | When Payments are Due |
|---|---|---|
| 1 | $204.61 (s) | *December 1, 2014* (e) |
| 118 | $191.44 (s) | Payable Monthly Commencing *January 1, 2015* (e) |
| 1 | $191.44 (e) | Final payment due *November 1, 2024* (e) |

(s)Estimate. The amount of payments, the payment due dates and the date that interest begins to accrue are estimates based upon a projected closing date of **October 29, 2014**. If the actual closing date is different from the projected closing date, these estimates may change accordingly.

[ X ]    If checked the Borrower has agreed to participate in the Automatic Financial Institution Account Payment Program (the "Program") which requires the Borrower to make loan payments by electronic direct debit, in which case the following provisions apply (if N/A or not checked, the Variable Rate and Rate Change Limit provisions do not apply):

**Variable Rate:** As a result of the Borrower's participation in the Program, the interest rate being charged on this transaction is *One Half of One percentage point (0.5%)* less than it would be if Borrower did not participate in the Program. Your participation in the Program will terminate and the annual percentage rate will increase during the term of this transaction if (1) the Automatic Financial Institution Account Payment Program (the 'Program') has been terminated or your right to participate in the Program has been terminated; (2) you terminate your participation in the Program; or (3) your financial institution does not complete, or has denied or returned to Lender any request by the Lender for payment under the Program where (a) such adverse action was not due to an electronic funds transfer system failure and (b) you do not cause your financial institution or substitute institution to accept such request for payment within ten (10) days of Lender's notice of non-payment to you.

**Rate Change Limit:** Any increase in the rate as a result of termination of your participation in the Program shall not exceed *One Half of One percentage point (0.5%)* more than the annual percentage rate disclosed above. Accordingly, the interest rate will not increase above **12.50%**.

Effect of increase: Any increase will take the form of higher payment amounts.

EXAMPLE:

If your regular monthly payments are *$191.44* at *12.00%* and, as a result of your participation in the Program being terminated, the rate increases to *12.50%*, your regular monthly payments will increase to *$195.31*.

**Insurance:** Credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided. Casualty insurance will be provided by the condominium association.

**Security Interest:** You are giving a security interest in the property being purchased.

Rev. 11/2012
©Disney

**Filing fees** and other closing costs are apportioned between Buyer and Seller as reflected in your Good Faith Estimate or Settlement Statement. Please refer to the Good Faith Estimate or the Settlement Statement for more details.

**Late Charge:** If a payment is late, you will be charged 5% of the payment and an administrative fee of $50.00.

**Prepayment:** If you pay off your loan early, you will not have to pay a penalty.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before scheduled date, and prepayment rebates and penalties.

---

## PROMISSORY NOTE

FOR VALUE RECEIVED, the undersigned (hereinafter 'Borrower', whether one or more), jointly and severally, if more than one, promise to pay to the order of **DISNEY VACATION DEVELOPMENT, INC.**, a Florida corporation (such corporation or other person or entity who holds this Note and Truth-In-Lending Disclosure Statement (the 'Note') from time to time being hereinafter called 'Holder'), at 1390 Celebration Boulevard, Celebration, Florida 34747, or at such other place as Holder shall designate in writing, in lawful money of the United States of America which shall at the time of payment be legal tender for the payment of all debts, public or private, the principal sum of **Thirteen Thousand Three Hundred Forty-Three And 34/100 Dollars ($13,343.34)**, together with interest thereon at the per annum rate hereinafter set forth.

1. <u>Initial Interest Rate.</u> The unpaid principal balance due hereunder shall bear interest at the simple interest rate of **Twelve and 50/100 percent (12.50%)** per annum (hereinafter the 'Standard Rate').

[ X ] check here if Borrower has agreed to participate in the Automatic Financial Institution Account Payment Program which requires the Borrower to make monthly loan payments by electronic direct debit, in which case the provisions of Section 2 apply (if N/A or not checked, Section 2 does not apply)

2. <u>Automatic Financial Institution Account Payment Program.</u>

The Standard Rate shall be reduced by **One Half of One percentage point (0.5%)** per annum to **12.00%** (hereinafter the 'Automatic Payment Rate') because Borrower has agreed to participate in the Automatic Financial Institution Account Payment Program. The Automatic Payment Rate shall commence on the first day of calendar month following the date Holder receives from Borrower a valid Automatic Payment Program Authorization under Holder's Automatic Financial Institution Account Debit Program. The Automatic Payment Rate shall end (and the Standard Rate shall apply to the unpaid principal balance) on the date twenty-five (25) days after Holder has sent notice to Borrower that: (i) the Automatic Payment Program has been terminated or Borrower's right to participate therein has been terminated by Holder; (ii) Holder has received Borrower's Notice of Automatic Payment Program Authorization termination; or (iii) Borrower's financial institution has not completed, or has denied or returned to Holder any request by Holder for payment under the Automatic Payment Program where (a) such adverse action was not due to any electronic funds transfer system failure, and (b) Borrower did not cause the financial institution or substitute entity to accept such request for payment within ten (10) days of Holder's notice of non-payment to Borrower. The interest rate reduction described in this Section 2 shall not apply if Borrower's Automatic Payment Program Authorization relates to automatic charges to Borrower's credit card or other line of credit rather than Borrower's deposit account at an approved financial institution.

If Automatic Rate ceases to apply, and as a result, the Standard Rate applies, a corresponding increase will be made to the monthly installments due. The amount of the monthly installment that would be sufficient to pay interest which accrues at the Standard Rate instead of the Automatic Rate through the end of each calendar month and to repay in full, over the remaining term of this Note, the unpaid principal as of the date the new rate of interest becomes effective (the 'Change Date') will be calculated and will be the new amount of the monthly installment. The new monthly installment will be paid from the first monthly installment date after the Change Date until the amount of the monthly installment changes again.

Holder will notify Borrower of the new monthly installment amount not less than ten (10) days before the first monthly installment in the new amount is due.

3. <u>Monthly Installment.</u> Principal and interest due under this Note shall be due and payable as follows: One payment of principal and interest in the amount of **Two Hundred Four And 61/100 Dollars ($204.61)** shall be due on the **1st** day of **December, 2014**, and thereafter **119** consecutive monthly installments of principal and interest in the amount of **One Hundred Ninety-One And 44/100 Dollars ($191.44)**, shall be due commencing on the **1st** day of **January, 2015** and continuing on the **1st** day of each month thereafter up to and including **November 1, 2024**, subject to any change required under this Note. The amount of payments, the payment due dates and the date that interest begins to accrue are estimates based upon a projected closing date of **October 29, 2014**. If the actual closing date is different from the projected closing date, these estimates may change accordingly. Holder will notify Borrower of any changes in the payment amounts or payment due dates.

4. <u>Prepayment Privilege.</u> Borrower may prepay the principal indebtedness evidenced hereby in whole or in part at any time. No prepayment shall postpone the due date of any installment of principal or interest due hereunder. In the event Borrower shall execute and deliver any further note(s) or mortgage agreement(s) in favor of Holder in connection with the acquisition of any additional ownership interests from Holder, any payments received by Holder from Borrower in respect of the indebtedness owed by Borrower to Holder shall, at Holder's sole option and discretion, be applied first to the indebtedness evidenced by the note first executed and delivered by Borrower in favor of Holder, and thereafter in the successive chronological order of execution and delivery of each of said further note(s), all in accordance with applicable payment terms.

5. Collateral. This Note is secured by a Short Exhibit Mortgage Agreement of even date herewith executed by Borrower in favor of Holder (the 'Mortgage'), covering all of Borrower's right and interest in the 'Property' (as defined in the Mortgage).

6. Default. If Borrower fails to pay when due any amount payable under this Note within fifteen (15) days after same shall be due, or if Borrower shall otherwise be in default under the Mortgage, then Borrower shall be in default under this Note, subject to applicable electronic funds transfer notice requirements in the event of an electronic funds transfer system failure. In the event Borrower shall be in default under this Note, at the option of Holder and without demand or notice of any kind, the entire unpaid principal balance of this Note, together with accrued but unpaid interest thereon, may be declared and thereupon immediately shall become due and payable, and Holder, at the option of Holder and without demand or notice of any kind, may exercise any and all rights and remedies provided for or allowed by the Mortgage or provided for or allowed by law or in equity. In the event Borrower (or any party comprising Borrower or of which Borrower is comprised) executes and delivers any further note(s) or mortgage agreement(s) in favor of Holder in connection with the acquisition of any additional ownership interests from Holder, or for some other purpose, then Borrower agrees that: (i) any default or event of default under any such further note(s) or mortgage(s) shall automatically and without further notice constitute a default under this Note as fully as if such default or event of default arose directly under this Note; and (ii) any default or event of default under this Note shall automatically and without further notice constitute a default under any such further note(s) and mortgage(s) as fully as if such default or event of default arose directly under such further note(s) and mortgage(s).

7. Late Charge, Administrative Fee and Collection; Non-sufficient Funds Fee. To the extent permitted by applicable law, Borrower shall pay, as a late charge, an amount equal to five percent (5%) of any monthly installment or other sum due hereunder if such installment or other sum is not paid within fifteen (15) days after the date same shall become due. In addition to the foregoing, if the Borrower shall be in default under this Note or the Mortgage, then, to the extent permitted by applicable law, Holder shall be entitled to charge Borrower an administrative fee in the amount of Fifty And 00/100 Dollars ($50.00). The late charge and the administrative fee, if accrued, may be deducted first from any subsequent payments received from Borrower before application of any such amount to accrued interest or principal. Borrower shall also pay all costs of collection and enforcement, including without limitation, reasonable costs of attorneys and legal assistants and costs of trial and appellate proceedings, and all of such fees and expenses shall be and become part of the indebtedness evidenced hereby. If Borrower makes a payment by check or electronic direct debit that is returned unpaid by Borrower's bank or other depository institution, to the extent permitted by applicable law, Borrower will be charged a $25.00 non-sufficient funds fee.

8. Time. Time is of the essence in the performance of each and every obligation represented by this Note.

9. Demand. Demand, presentment, notice, protest and notice of dishonor are hereby waived by Borrower and by each and every co-maker, endorser, guarantor, surety and other person or entity primarily or secondarily liable on this Note.

10. Forbearance. No delay, omission or forbearance by Holder in exercising any of Holder's rights or remedies shall operate as a waiver of such rights or remedies.

11. Governing Law and Severability. THIS NOTE SHALL BE GOVERNED BY, CONSTRUED UNDER AND INTERPRETED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA AND THE COURTS OF THE STATE OF FLORIDA IN THE COUNTY OF ORANGE SHALL BE THE EXCLUSIVE COURTS OF JURISDICTION AND VENUE FOR ANY LITIGATION OR OTHER PROCEEDING THAT MAY BE BASED ON, ARISE OUT OF, UNDER OR IN CONJUNCTION WITH THIS NOTE, UNLESS OTHERWISE REQUIRED BY LAW. HOLDER AND BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONJUNCTION WITH THIS NOTE, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR HOLDER EXTENDING THE LOAN EVIDENCED BY THIS NOTE. Wherever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

12. Terms. The word 'Borrower' as used herein shall include the heirs, legal representatives, successors and assigns of Borrower as if so specified at length throughout this Note and all indebtedness and liabilities of Borrower under this Note shall be binding upon and enforceable against the heirs, legal representatives, successors and assigns of Borrower. The word 'Borrower' as used herein shall also include all makers of this Note, and each of them, who shall be jointly and severally liable under this Note, should more than one maker execute this Note, and shall include all endorsers, guarantors, sureties and other persons or entities primarily or secondarily liable on this Note, and each of them; and shall include the masculine, and feminine genders, regardless of the sex of Borrower or any of them; and shall include partnerships, corporations and other legal entities. The word 'Holder' as used herein shall include the transferees, legal representatives, successors and assigns of Holder as if so specified at length throughout this Note, and all rights of Holder under this Note shall inure to the benefit of the transferees, legal representatives, successors and assigns of Holder.

13. Usury. It is the intention of Borrower and Holder to conform strictly to the applicable usury laws. It is, therefore, agreed that (i) in the event that the maturity of this Note is accelerated by reason of an election by Holder or if this Note is prepaid prior to maturity, all unearned interest, if any, shall be canceled automatically, or, if theretofore paid, shall either be refunded to Borrower or credited on the unpaid principal amount of this Note, whichever remedy is chosen by Holder; (ii) the aggregate of all interest and other charges constituting interest under applicable law and contracted for, chargeable or receivable under this Note or otherwise in connection with this loan transaction shall never exceed the maximum amount of interest, or produce a rate in excess of the maximum non-usurious rate of interest, that Holder may charge Borrower under applicable law and in regard to which Borrower may not successfully assert the claim or defense of usury; and (iii) if any excess interest is provided for or collected, it shall be deemed a mistake and the same shall either be refunded to Borrower or credited on the unpaid principal amount hereof, and this Note

shall be automatically deemed reformed so as to permit only the collection of the maximum non-usurious rate and amount of interest allowable under applicable law.

14. Notices. All notices, requests, demands and other communications under this Note shall be in writing and shall be deemed to have been duly given, if provided in accordance with the provisions of the Mortgage.

**CAUTION – IT IS IMPORTANT THAT YOU THOROUGHLY READ THIS PROMISSORY NOTE BEFORE YOU SIGN IT.**

IN WITNESS WHEREOF, Borrower has executed this Note and Truth in Lending Disclosure Statement under seal and has delivered the Note to Holder, all effective as of the day and year set forth below.

*September 29, 2014*

_____    _____
SHEREE PINCKNEY                      MALLORY J. PINCKNEY

IF APPLICABLE, FLORIDA DOCUMENTARY STAMPS HAVE BEEN PAID IN THE PROPER AMOUNT AND HAVE BEEN AFFIXED TO THE MORTGAGE.

The following notice is taken substantially from 16 C.F.R. 433.2(b):

Notice

**Any holder of this document is subject to all claims and defenses which the debtor could assert against the seller of goods and services (if any) obtained with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder.**

Disney Vacation Development, Inc. does not believe that applicable law requires the above notice to be included in this document and reserves the right not to include such notice in any future document from or with any borrower.

EXHIBIT B



Contract No:
**Disney's Animal Kingdom Villas**

INSTRUMENT PREPARED BY AND RETURN TO:
Disney Vacation Development, Inc.
Compliance Department
1390 Celebration Boulevard
Celebration, FL 34747
c/o Yvonne Chang



DOC# 20140542996 B: 10824 P: 6870
10/23/2014 03:49:45 PM   Page 1 of 1
Rec Fee: $10.00
Deed Doc Tax: $0.00
DOR Admin Fee: $0.00
Intangible Tax: $26.69
Mortgage Stamp: $46.90
Martha O. Haynie, Comptroller
Orange County, FL

## SHORT FORM MORTGAGE AGREEMENT

**THIS SHORT FORM MORTGAGE AGREEMENT** (this 'Mortgage' or this 'Agreement') is executed on *September 29, 2014* between undersigned Mortgagor (hereinafter 'Borrower') whose address is, for the purposes of this Agreement, c/o Disney Vacation Development, Inc., 1390 Celebration Boulevard, Celebration, Florida 34747, and **DISNEY VACATION DEVELOPMENT, INC.,** a Florida corporation, as Mortgagee (hereinafter 'Lender') whose address is 1390 Celebration Boulevard, Celebration, Florida 34747.

**WHEREAS**, Borrower is indebted to Lender in the principal sum of *Thirteen Thousand Three Hundred Forty-Three And 34/100 Dollars ($13,343.34)*, which indebtedness is evidenced by Borrower's Note of even date herewith (hereinafter 'Note'), providing for monthly installments of principal and interest, with the balance of indebtedness, if not sooner paid, due and payable on *November 1, 2024*. The maturity date is estimated based on a projected close date. If the actual closing date is different from the projected closing date, the maturity date may change accordingly and Lender will promptly notify Borrower of the actual maturity date in writing, but in no event shall the actual maturity date be later than 180 days from *November 1, 2024*.

**TO SECURE** to Lender (a) the repayment of the indebtedness evidenced by the Note, with interest thereon, and the payment of all other sums, with interest thereon, advanced in accordance herewith and (b) the repayment of any future advances, with interest thereon, made to Borrower by Lender pursuant to paragraph 23 of the Master Mortgage Agreement, as defined below, and to protect the security of this Short Form Mortgage Agreement and the performance of the covenants and agreements of Borrower contained herein and in the Master Mortgage Agreement, Borrower does hereby mortgage, grant and convey to Lender the following described property.

An undivided *0.6139%* interest in Unit *113D* of *Disney's Animal Kingdom Villas*, a leasehold condominium, according to the Declaration of Condominium thereof as recorded in Official Records Book 9077, Page 4292, Public Records of Orange County, Florida, and all amendments thereto.

**TOGETHER** with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, proceeds, royalties, mineral, oil and gas rights and profits, water, water rights, and water stock and all fixtures now or hereafter attached to the property, all of which, including replacements and additions thereto, shall be deemed to be and remain part of the property covered by this Short Form Mortgage Agreement; and all of the foregoing, together with said property are hereinafter referred to as the 'Property'. Borrower covenants that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, that the Property is unencumbered, and that Borrower will warrant and defend generally the title to the Property against all claims and demands whatsoever, subject to any declarations, easements or restrictions listed in a schedule of exceptions to coverage in any title insurance policy issued on or prior to the date hereof and insuring Lender's interest under this Short Form Mortgage Agreement in the Property.

If Borrower fails to make timely payments under the obligations secured by this Mortgage, or is otherwise deemed in uncured default of this Mortgage, the lien against the property created by this Mortgage may be foreclosed in accordance with either a judicial foreclosure procedure or a trustee foreclosure procedure and may result in Borrower's loss of the property. If Lender initiates a trustee foreclosure procedure, Borrower shall have the option to object and Lender may proceed only by filing a judicial foreclosure action.

Borrower and Lender hereby agree to be bound by and expressly adopt and incorporate by reference into this Short Form Mortgage Agreement, as if set forth at length herein, the covenants and agreements contained in that certain Master Mortgage Agreement recorded on June 30, 2010, in Official Records Book 10058, Page 7101, of the Public Records of Orange County, Florida ('Master Mortgage Agreement').

Borrower has executed this Short Form Mortgage Agreement under seal on the day and year first written above.

_____
SHEREE PINCKNEY

_____
MALLORY J. PINCKNEY

STATE OF FLORIDA)
COUNTY OF ORANGE)

The foregoing instrument was acknowledged before me this September 29, 2014, by SHEREE PINCKNEY and MALLORY J. PINCKNEY who is/are personally known to me or who has produced a Pennsylvania driver's license, and a Pennsylvania driver's license as identification.

NOTARIAL SEAL/STAMP

JOSE W BENITEZ
Commission # FF 0F
My Commission
Mar 2?

(Notary Signature)
Notary Print Name
I am a Notary Public of the State of
and my commission expires:

JOSE W BENITEZ
Commission # FF 08457
My Commission Expires
March 14, 2018



EXHIBIT C

This instrument prepared by and return to:

John McGowan, Esquire
c/o Compliance Department
Disney Vacation Development, Inc.
200 Celebration Place Celebration, FL 34747
(407) 566-3000

INSTR 20070050562
OR BK 09077 PG 4252 PGS=110
MARTHA O. HAYNIE, COMPTROLLER
ORANGE COUNTY, FL
01/23/2007   02:03:37 PM
REC FEE 936.50

## DECLARATION OF CONDOMINIUM
## OF
## DISNEY'S ANIMAL KINGDOM VILLAS
## A LEASEHOLD CONDOMINIUM

**Document recorded as presented.
Orange County, FL Comptroller**

### PREAMBLE

DISNEY VACATION DEVELOPMENT, INC., a Florida corporation, whose address is 200 Celebration Place, Celebration, Florida 34747, the lessee of those certain lands located in Orange County, Florida, and more particularly described in this Declaration of Condominium of Disney's Animal Kingdom Villas, a leasehold condominium, and in its exhibits, does the 18th day of January, 2007, submit its interest described in Article 2.2 below, together with the improvements on such property, to the condominium form of ownership in accordance with the provisions of Chapter 718 (as defined below) and the following provisions:

1.  **DEFINITIONS.** The terms used in this Declaration and in its exhibits are defined in accordance with the provisions of Chapter 718 (as defined below), Chapter 721 (as defined below) and as follows unless the context otherwise requires:

    1.1  <u>Ad Valorem Real Estate Taxes</u> means those real property taxes and special assessments assessed against the Units and their respective undivided interests in the Common Elements by a political subdivision of the State of Florida, including, without limitation, Orange County, Florida and Reedy Creek Improvement District, respectively. The Association will serve as the agent of the Owners of Units committed to the Vacation Ownership Plan for the purpose of collection of Ad Valorem Real Estate Taxes as provided in Section 192.037, <u>Florida</u> <u>Statutes</u>.

    1.2  <u>Articles of Incorporation</u> means the Articles of Incorporation of the Association, as they may be amended from time to time. A copy of the initial Articles of Incorporation is attached as Exhibit "B" and incorporated in this Declaration by reference.

    1.3  <u>Association</u> means DISNEY'S ANIMAL KINGDOM VILLAS CONDOMINIUM ASSOCIATION, INC., a not-for-profit Florida corporation, and its successors, which is responsible for the operation of the Condominium. If the Property Management Agreement terminates for any reason, the name of the Association will, at the option of DVD or DVCMC and without any action to be taken by the Board, simultaneously and automatically be changed to THE SAVANNAH CONDOMINIUM ASSOCIATION, INC. If the name "THE SAVANNAH CONDOMINIUM ASSOCIATION, INC." is unavailable for use by the Association, the Board will be empowered to select an alternative name for the Association; provided, however, that prior to the use of any name to identify the Association, such name will be submitted to WDWHRC for its consent. WDWHRC may consent or withhold its consent to the use of such name in its sole, absolute and unfettered discretion and, if given, the consent will be set forth in writing.

    1.4  <u>Association Property</u> means all real and personal property owned by the Association. All personal property related to the Home Resort Reservation Component and the DVC Reservation Component made available

©Disney

to the Condominium, including all computer hardware and software and intellectual property, is not Association Property and is and always will be the personal property of the owner of such property.

1.5     BVTC means Buena Vista Trading Company, a Florida corporation, its successors and assigns. BVTC is an exchange company registered under Chapter 721.

1.6     Board means the board of directors of the Association, as it is constituted from time to time.

1.7     Bylaws means the Bylaws of the Association, as they are amended from time to time. A copy of the initial Bylaws is attached as Exhibit "C" and incorporated in this Declaration by reference.

1.8     Chapter 718 means the provisions of the Condominium Act, Chapter 718, Florida Statutes, as the same is constituted on the date of the recording of this Declaration, except when specifically noted otherwise. Any reference to a provision or specific article, section, paragraph, sub-article, sub-section, or sub-paragraph of Chapter 718 shall be a reference to the same as it is constituted on the date of the recording of this Declaration in the Public Records of Orange County, Florida.

1.9     Chapter 721 means the provisions of Chapter 721, Florida Statutes, as the same is constituted on the date of the recording of this Declaration, except when specifically noted otherwise. Any reference to a provision or specific article, section, paragraph, sub-article, sub-section, or sub-paragraph of Chapter 721 shall be a reference to the same as it is constituted on the date of the recording of this Declaration in the Public Records of Orange County, Florida.

1.10     Club or Disney Vacation Club means the Disney Vacation Club. The Club is not a legal entity or association of any kind, but rather is a service name for the services and benefits appurtenant to and the restrictions imposed on the use and enjoyment of Ownership Interests. These services presently include, among other things, the operation of a central reservation system consisting of the Home Resort Reservation Component and the DVC Reservation Component.

1.11     Commercial Unit means a Unit together with an undivided share in the Common Elements, as set forth in Exhibit "D" attached to this Declaration, intended and designed for the conduct of a business enterprise to serve its Owner, the Owner's lessees, guests, invitees, licensees and such other persons who may lawfully be entitled to come on the Condominium Property and refers to all of the Commercial Units set forth in Exhibit "A". Unless the context requires otherwise and except with respect to the Vacation Ownership Plan and the Club, all references to "Unit" include the Commercial Units.

1.12     Commercial Unit LCE means those Limited Common Elements, if any, identified in the survey materials attached as part of Exhibit "A" or in survey materials attached as part of any amendment to this Declaration adding a phase to the Condominium in accordance with Article 18, and labeled as Commercial Unit LCEs. Commercial Unit LCEs are governed as Limited Common Elements and all references to "Limited Common Elements" include Commercial Unit LCEs, except where specifically noted otherwise and except with respect to the Vacation Ownership Plan and Club, and in accordance with Article 22.

1.13     Common Elements include:

1.13.1     All of those items defined in Chapter 718 as Common Elements and those items declared in this Declaration to be included within the Common Elements.

1.13.2     All Association Property.

1.13.3     All canals, lakes and waterways located within the Condominium Property.

2

1.13.4    DVD's interest in the Ground Lease for that portion of the property described in the Ground Lease that is declared as part of this Condominium. The Association will assume the obligations of DVD under the Ground Lease to the extent of that portion of the property described in the Ground Lease that is declared as part of the Condominium.

1.13.5    Membership in the Disney Vacation Club pursuant to the terms and conditions set forth in the Condominium Documents. Notwithstanding anything to the contrary set forth in this Declaration, none of the Condominium Documents may be amended or terminated except in accordance with terms and conditions of each such document

1.14    Common Expenses shall include (i) expenses declared Common Expenses by the provisions of the Declaration, the Condominium Documents, Chapter 721 or Chapter 718.for the operation, maintenance, repair, replacement, or protection of the Common Elements and Association Property, costs of carrying out the powers and duties of the Association, (ii) any past due and uncollected ad valorem taxes assessed against the Condominium pursuant to Section 192.037, Florida Statutes, (iii) any expenses incurred by the Association in the performance of its duties, and (iv) any other expense, whether or not included in the foregoing, designated as Common Expense by Chapter 721, Chapter 718, or the Condominium Documents.

1.15    Common Surplus means any excess of all receipts of the Association over the amount of Common Expenses.

1.16    Concierge Lounge means that certain concierge lounge contemplated to be constructed and declared in a subsequent phase of the Condominium, which shall be a Limited Common Element appurtenant to, and reserved to the use of, the Concierge Units.

1.17    Concierge Units means those Units to which the use of the Concierge Lounge is reserved. The Concierge Units are contemplated to be constructed, declared and identified in a subsequent phase of the Condominium.

1.18    Condominium means Disney's Animal Kingdom Villas, a leasehold condominium.

1.19    Condominium Documents means this Declaration together with all exhibits attached to this Declaration and all other documents expressly incorporated in this Declaration by reference, as the same may be amended from time to time.

1.20    Condominium Parcel means a Unit together with the undivided share in the Common Elements and Common Surplus which are appurtenant to the Unit as set forth in Exhibit "D", and together with all other appurtenances to the Unit including membership in the Disney Vacation Club, which is an appurtenance to each Ownership Interest in accordance with the terms of this Declaration, the Membership Agreement, and the DVC Resort Agreement.

1.21    Condominium Property means the lands, leaseholds, easements and personal property that are subjected to the condominium form of ownership from time to time as part of the Condominium, whether or not contiguous, and all improvements located on such property and all easements and rights appurtenant to such property and intended for use in connection with this Condominium.

1.22    Condominium Rules and Regulations means the rules and regulations concerning the use of Condominium Property as may be promulgated and amended from time to time by the Board in the manner provided by the Bylaws. A copy of the initial Condominium Rules and Regulations  is attached as Exhibit "E" and incorporated in this Declaration by reference.

3

1.23    Cotenant means the owner of an Ownership Interest and includes all other Cotenants who own Ownership Interests in that Unit as tenants in common.

1.24    Declaration means this Declaration of Condominium of Disney's Animal Kingdom Villas, a leasehold condominium, as it may lawfully be amended from time to time pursuant to the provisions of this Declaration.

1.25    DVCMC means Disney Vacation Club Management Corp., a Florida corporation, its successors and assigns.

1.26    DVC Reservation Component means the exchange component of the Club central reservation system through which accommodations in any DVC Resort may be reserved using DVC Vacation Points pursuant to priorities, restrictions and limitations established by BVTC from time to time.

1.27    DVC Resort means each resort, including the Condominium, which is entitled to access and use the DVC Reservation Component and other applicable Club services and benefits provided by BVTC by virtue of and pursuant to the terms and conditions of a DVC Resort Agreement.

1.28    DVC Resort Agreement means the agreement pursuant to which a resort becomes and remains a DVC Resort in accordance with the terms and conditions of such agreement. A copy of the Condominium's initial DVC Resort Agreement is attached as Exhibit "H" and incorporated in this Declaration by reference.

1.29    DVC Vacation Points means Vacation Points utilized by a Club Member to make a reservation through the DVC Reservation Component at a DVC Resort.

1.30    DVD means Disney Vacation Development, Inc., a Florida corporation, its successors and assigns. No party other than DVD shall exercise the rights and privileges reserved in this Declaration to DVD unless such party receives and records in the official records of Orange County, Florida, a written assignment from DVD of all or a portion of such rights and privileges.

1.31    Ground Lease means that certain Ground and Improvements Lease by and between WDWHRC as lessor and DVD effective the 5th day of March , 2007, a short form of which is described in that certain Memorandum of Ground Lease effective the 18th day of January , 2007, and recorded in Official Records Book 9077 , Page 4221 of the Public Records of Orange County, Florida. A copy of the Memorandum of Ground Lease is attached as Exhibit "I" and incorporated in this Declaration by reference.

1.32    Home Resort means any DVC Resort in which an owner owns an Ownership Interest which is symbolized by Home Resort Vacation Points.

1.33    Home Resort Priority Period means the period of time at each DVC Resort during which only owners having an Ownership Interest at that DVC Resort are entitled to request a reservation for the accommodations at that DVC Resort through that DVC Resort's Home Resort Reservation Component.

1.34    Home Resort Reservation Component means the component of the Club central reservation system through which Vacation Homes may be reserved using Home Resort Vacation Points pursuant to the priorities, restrictions and limitations of the Vacation Ownership Plan and as set forth in this Declaration and the Membership Agreement.

1.35    Home Resort Vacation Points means Vacation Points symbolizing an Ownership Interest at a Home Resort and which Vacation Points may be utilized to reserve accommodations at that Home Resort where that Ownership Interest is held.

4

1.36    <u>Limited Common Elements</u> means those Common Elements reserved for the use of a certain Unit or Units to the exclusion of other Units. Those physical areas designated as Limited Common Elements are shown and located on the attached Exhibit "A" or to subsequent phase amendments to this Declaration. In addition, Limited Common Elements include all furnishings and other personal property contained within each Unit committed to the Vacation Ownership Plan that are not the property of individual Owners. The Board has the right, in its sole, absolute and unfettered discretion and without the approval of the Owners, to maintain, repair, alter, rearrange, improve, and replace any or all furnishings and other personal property contained within each Unit committed to the Vacation Ownership Plan that are not the property of individual Owners from time to time. The Commercial Unit LCEs are Limited Common Elements and are also governed by Article 22. Unless the context otherwise requires and except with respect to the Vacation Ownership Plan and the Club and in accordance with Article 22, all references to "Limited Common Elements" include Commercial Units LCEs.

1.37    <u>Management Company</u> means DVCMC or any entity engaged to manage the Condominium.

1.38    <u>Master Declaration</u> means the Master Declaration of Covenants, Conditions and Restrictions as recorded in Official Records Book _9077_ , Page _4175_ , Public Records of Orange County, Florida.

1.39    <u>Master Declaration Property</u> means the lands, leaseholds, easements and all improvements on such property that are subject to Master Declaration from time to time, whether or not contiguous.

1.40    <u>Membership Agreement</u> means the Disney Vacation Club Membership Agreement for Disney's Animal Kingdom Villas, as amended from time to time. The Membership Agreement provides for the operation of the Vacation Ownership Plan and the Home Resort Reservation Component. A copy of the initial Membership Agreement is attached as Exhibit "G" and incorporated in this Declaration by reference.

1.41    <u>Mortgagee</u> means DVD (and any successor in interest to DVD as to a purchase-money mortgage), the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, or any trust, savings and loan association, credit union, mortgage company, bank, insurance company, or other commercial loan company, to the extent that any of the same hold a first mortgage encumbering any Unit or any Ownership Interest.

1.42    <u>Owner</u> means the owner of a Unit. Unless the context requires otherwise, the term Owner includes Cotenants but does not include owners of Ownership Interests at DVC Resorts other than the Condominium.

1.43    <u>Ownership Interest</u> means the property interest in a DVC Resort. In the case of the Condominium, an Ownership Interest is an undivided percentage interest in a Unit and in the Unit's undivided interest in the Common Elements and Common Surplus.

1.44    <u>Property Management Agreement</u> means the agreement between the Association and any Management Company pursuant to which the Association assigns its responsibilities and duties relating to the management and operation of the Condominium to the Management Company.

1.45    <u>The TWDC Companies</u> means TWDC and all subsidiaries of TWDC, including, without limitation, DVD, DVCMC, WDWHRC and BVTC.

1.46    <u>TWDC</u> means The Walt Disney Company, a Delaware corporation, its successors and assigns.

1.47    <u>Unit</u> means a condominium unit as that term is defined in Chapter 718 and in Article 5 of this Declaration and refers to that portion of the Condominium Property which is subject to exclusive ownership by one or more persons. Unless the context requires otherwise and except with respect to the Vacation Ownership Plan and Club, all references to "Unit" include the Commercial Units.

5

1.48    Utility Services means electric power, water, steam, heat, fuel, gas, hot water, refuse water, fire alarm services, garbage and sewage disposal, telephone service, and cable television or other cable provided services, and all other public service and convenience facilities servicing the Condominium Property.

1.49    Vacation Home means and refers to those portions of a Unit designed and intended for separate use and occupancy.

1.50    Vacation Ownership Plan is the arrangement pursuant to Florida law, this Declaration and the Membership Agreement where an Owner receives an Ownership Interest under which the exclusive right of use, possession or occupancy of all Units in the Condominium circulates among the various Owners of Ownership Interests on a recurring basis during the term of the plan.

1.51    Vacation Point means the symbolic unit of measuring the respective rights of an owner of an Ownership Interest to enjoy the benefits of the Ownership Interest within the Club.

1.52    Voting Certificate means a document that designates one of the Cotenants in a Unit, when the Unit is owned by more than one Owner, as the authorized representative to vote on behalf of the Unit and to represent the Unit in all Association matters.

1.53    Voting Representative means the Owner or Cotenant (as designated in a Voting Certificate) who is authorized to vote on behalf of the Unit and to represent the Unit in all Association matters, except as may be limited by the provisions of a Voting Certificate where applicable.

1.54    WDWHRC means Walt Disney World Hospitality & Recreation Corporation, a Florida corporation, its successors or assigns, and the lessor under the Ground Lease.

2.    **NAME AND LEGAL DESCRIPTION.**

2.1    Name. The name of this Condominium is DISNEY'S ANIMAL KINGDOM VILLAS, A LEASEHOLD CONDOMINIUM. If the Property Management Agreement terminates for any reason, the name of this Condominium will, at the option of DVD or DVCMC and without requiring any action to be taken by the Board or the Association, simultaneously and automatically be changed to SAVANNAH, A LEASEHOLD CONDOMINIUM. If the name "THE SAVANNAH, A LEASEHOLD CONDOMINIUM" is unavailable for use by the Condominium, the Board is empowered to select an alternative name for the Condominium; provided, however, that prior to the use of any name to identify the Condominium, such name will be submitted to WDWHRC for its consent. WDWHRC may consent or withhold its consent to the use of such name in its sole, absolute and unfettered discretion and, if given, the consent must be in writing. If the name of the Condominium is changed and the name of the Association is changed, as set forth in Section 1.3 above, because of the termination of the Property Management Agreement, the Board and all Owners are prohibited from using the name "Disney" (or any other form thereof) in any manner whatsoever and are immediately required to:

2.1.1    Remove all signs containing the name "Disney" (or any other form thereof) from the Condominium Property and from any offsite location to the extent the sign refers to the Condominium;

2.1.2    Destroy all stationery, descriptive literature or printed or written matter bearing the name "Disney" other than books and records of the Association;

2.1.3    Cease and desist from using the name "Disney" (or any other form thereof) orally or in writing in referring to the Association or the Condominium;

2.1.4    Take immediate action to effect changes to the names of the Association and the documents of the Condominium reflecting the name "Disney" (or any other form thereof) to eliminate the use of

· 6

such names in any manner; and Remove any architectural or landscaping features from the Condominium Property which contain the "Disney" name or any "Disney" caricature, fanciful character, logo or other trademarked symbol registered by any of The TWDC Companies, unless otherwise approved by WDWHRC. In this regard, the Association is responsible for repairing or replacing the structure or landscaping from which any such symbol has been removed so as to ensure that the structural integrity of such structure or landscaping is not jeopardized and that the appearance of the structure or landscaping remains consistent with the surrounding area.

The provisions of this Section 2.1 may be enforced by any remedy at law or equity, including mandatory or prohibitory injunctions, and by accepting a deed which incorporates this Declaration, each Owner acknowledges that in the event of non-performance of any of the above-described restrictions, remedies at law for The TWDC Companies, is deemed inadequate to enforce the terms of this Section 2.1.

2.2.    <u>Leasehold Interest and Legal Description</u>. DVD is the lessee of that certain real property in Orange County, Florida, more particularly described in the Ground Lease. The Ground Lease will expire on January 31, 2057 unless sooner terminated in accordance with the terms of the Ground Lease. The Condominium automatically terminates upon the expiration or sooner termination of the Ground Lease, unless the Ground Lease and the Condominium are extended in accordance with the Ground Lease and this Declaration.

This Declaration is subject to the terms and conditions of the Ground Lease, and the provisions of the Ground Lease control and supersede any inconsistent provisions contained in this Declaration. This Declaration and the Ground Lease are subject to the terms, conditions and restrictions of the Master Declaration, which Master Declaration places additional restrictions on the Condominium Property. The provisions of the Master Declaration control and supersede any inconsistent provisions contained in this Declaration and in the Ground Lease and the terms of the Ground Lease control and supersede any inconsistent provisions contained in this Declaration; provided, however, that the provisions of the Master Declaration governing the Condominium Property may not be inconsistent with Chapter 721 or Chapter 718 (except to the extent permitted by Chapter 721).

The property that is submitted to the condominium form of ownership under this Declaration of Condominium consists of that portion of the land demised in the Ground Lease that is more particularly described as Phase 41A in Exhibit "A" attached and incorporated in this Declaration, together with those easements more specifically described in Article 4 and described on Exhibit "A". No other phases are being submitted to the condominium form of ownership at this time.

2.3.    <u>Vacation Ownership Plan</u>.

**A VACATION OWNERSHIP PLAN WILL BE CREATED WITH RESPECT TO UNITS IN THE CONDOMINIUM.**
The degree, quantity, nature and extent of the Vacation Ownership Plan that will be created is defined and described in detail in this Declaration. This Condominium is also a DVC Resort as described in detail in this Declaration.

3.    **EXHIBITS.** The Exhibits referred to in this Declaration include the following:

3.1    <u>Exhibit "A"</u>. The legal description of the first phase of the Condominium (identified as Phase 41A), and a survey and plot plan of the land and improvements comprising the first phase of the Condominium, together with a graphic description of the Units, the Vacation Homes, easements, and recreational areas and facilities located in the first phase of the Condominium which, together with this Declaration, are of sufficient detail to identify the Common Elements and each Unit and their relative locations and approximate dimensions located in the first phase of the Condominium. As set forth in Exhibit "A," each Unit is identified by a Unit number so that no Unit bears the same designation as any other Unit. All Commercial Units located in the first phase of the Condominium are so designated on the attached Exhibit "A".

3.2     Exhibit "B". The initial copy of the Articles of Incorporation of the Association.

3.3     Exhibit "C". The initial copy of the Bylaws of the Association.

3.4     Exhibit "D". Percentage Interest in the Common Elements.

3.5     Exhibit "E". The initial copy of the Condominium Rules and Regulations.

3.6     Exhibit "F". The initial copy of the Property Management Agreement.

3.7     Exhibit "G". The initial copy of the Disney Vacation Club Membership Agreement.

3.8     Exhibit "H". The initial copy of the DVC Resort Agreement.

3.9     Exhibit "I".    The Memorandum of Ground Lease.

4.     **EASEMENTS.** The following easements are expressly reserved or have been granted:

    4.1     General Easements. Non-exclusive easements over, across and under the Condominium Property are expressly provided for, reserved, and granted, in favor of DVD and the Owners, and their respective lessees, successors, assignees, guests, exchangers and invitees, as follows:

        4.1.1     Utility Easements Reserved by DVD. Easements in favor of DVD and its successors and assignees, are reserved over, across and under the Condominium Property as may be required for the construction or maintenance of Utility Services in order to adequately serve the Condominium, the Master Declaration Property, or any properties located adjacent to the Condominium or Master Declaration Property that are designated by DVD; including easements providing for such access rights as are necessary to utilize and service any lift station or utility transformer boxes located within the Condominium Property. Specific utility easements that exist on the Condominium Property are set forth in Exhibit "A". All cable television and telephone lines servicing the Condominium Property, including all trunk lines but excluding the portions of any lines that are contained within a Unit, are owned by DVD.

        4.1.2     Encroachments. If any Unit encroaches on any of the Common Elements or on any other Unit, or if any Common Element encroaches on any Unit, then an easement exists to permit such encroachment so long as the encroachment exists.

        4.1.3     Traffic.

            4.1.3.1 Traffic Easements Reserved by DVD. A non-exclusive easement exists for pedestrian traffic over, through and across sidewalks, paths, walks, halls, lobbies, and other portions of the Common Elements as may be from time to time intended and designated for such purpose and use; and for vehicular and pedestrian traffic over, through and across such portions of the Common Elements as may from time to time be paved and intended for such purposes; and for vehicular parking on such portions of the Common Elements as may from time to time be paved, intended, and designated for such purposes. Such easements are for the use and benefit of the Owners, the owners of interests in the Master Declaration Property, the owners of interests in properties located adjacent to the Condominium that are designated by DVD, and those claiming by, through or under such persons; provided, however, that nothing in this Declaration is to be construed to give or create in any person the right to park any vehicle on any portion of the Condominium Property except to the extent that the space may be specifically designated and assigned for parking purposes as determined by the Board and approved by DVD with respect to DVD's rights to park on the Condominium Property. Easements also exist for ingress and egress over streets, walks and other rights of way serving the Units as are necessary to provide for reasonable access to the public ways. In addition, an easement exists for ingress and egress over such streets, walks and other rights of way

8

serving the Condominium as is necessary to provide for delivery and pickup services, fire protection, emergency services, United States mail carriers, police and other authorities of the law.

4.1.3.2 Access Easements Granted to DVD. Non-exclusive access easement agreements exist for vehicular and pedestrian ingress and egress to the Condominium Property over and across property situated adjacent to the Condominium Property, as more specifically set forth in those certain Non-Exclusive Access Easement Agreements as recorded in Official Records Book 9077, Page 4234, and Official Records Book 9077, Page 4243, all in the Public Records of Orange County, Florida.

4.2    Association Easements. Except as limited by this Article and by Section 718.111(10), Florida Statutes, the Board may grant, modify, or move easements from time to time over the Common Elements or association real property without obtaining the approval of the Owners; provided, however, that the Board does not have the power to grant easements over the Commercial Unit LCEs. Prior to the relocation, termination or modification of any easement or right granted to or reserved by DVD, the Board must receive the written approval of DVD. Further, the Board may not make any grant to or reservation in favor of DVD prior to receiving DVD's written approval. The Board also may enter into easements or licenses benefiting all or a portion of the Condominium Property or association real property, with all costs incurred in connection with such easements or licenses to be Common Expenses. For so long as DVD owns a Unit or an Ownership Interest in a Unit, such powers may only be exercised with the approval of DVD.

4.3    DVD's Easements. DVD reserves the following exclusive easements (except as specifically designated as non-exclusive) and rights to grant easements, without obtaining the approval of Owners:

4.3.1    Marketing, Sales and Rental. DVD reserves exclusive easement rights over and across the Condominium Property, including any Unit, Vacation Home or Common Element, for the purpose of marketing, sales, rentals, and resales of Units and Ownership Interests in the Vacation Ownership Plan and in other DVC Resorts described in Article 12 of this Declaration, or other related hospitality, realty, or consumer products, and for the purpose of leasing Vacation Homes in Units that have not yet been declared as part of the Condominium. Such rights may include, but are not limited to, the right to establish models; conduct property tours; conduct sales presentations; conduct closings; and to erect, post, maintain, and relocate signs, notices, advertisements, and other promotional information on the Condominium Property. Lessees of DVD-owned Vacation Homes in non-declared Units have, for the term of their leases, the same easement rights over and across the Condominium Property and for the use of the recreational areas and facilities of the Condominium as are reserved for Owners.

4.3.2    Governmental Requirements. DVD, for so long as DVD holds an Ownership Interest in any Unit subject to this Declaration, reserves the right to grant such easements or enter into such development or conservation agreements, from time to time, as may be required by any government agency. Such easements or agreements specifically include any environmental easements or agreements required by state or federal environmental agencies, and such easements or agreements are binding on the Association and all Owners.

4.3.3    Recreational Areas and Commonly Used Facilities. DVD reserves the right to grant such easements, from time to time, to any other third party for the purpose of providing such parties with the same use rights over and across the Condominium Property and the recreational areas and commonly used facilities as those reserved for Owners.

4.3.4    DVD Easements. DVD reserves unto itself and grants to The TWDC Companies, their successors, assigns, lessees, guests, licensees and invitees, the same easement rights granted to Owners under this Declaration and specific easement rights over and across the Condominium Property as DVD or The TWDC Companies may deem necessary or desirable in their sole, absolute and unfettered discretion for their use from time to time, including, without limitation, easement rights to provide boat launches and concessions

9

(including, without limitation, hairwrapping services, "penny press" machines, ATM machines, vending machines or operations, and newspaper machines) or other ventures profitable to DVD or The TWDC Companies.

4.3.5    Construction Easements. DVD reserves easement rights over, under and across the Condominium Property as is necessary, from time to time, for the purpose of constructing improvements located on portions of the Master Declaration Property that have not yet been, and may never be, declared to the Condominium.    DVD also reserves exclusive easements over, under and across (a) the first phase of the Condominium Property pursuant to this Declaration, and (b) all future phases of the Condominium Property, to access, ingress, egress, excavate, construct and complete construction of any Units, Vacation Homes, recreational facilities or other commonly used facilities ("**Incomplete Improvements**") that have not been completed in the first phase of the Condominium prior to recordation of this Declaration or in any phase of the Condominium prior to the recording of the amendment to this Declaration submitting such phase to the Condominium Property, as the case may be.    In accordance with Florida law, DVD reserves the right to close on the sale of Ownership Interests in Units within a given phase of the Condominium (including, without limitation, the first phase of the Condominium Property) prior to completion of construction of Incomplete Improvements located within that phase.    As such, to the extent that there are Incomplete Improvements in (y) the first phase of the Condominium Property at the time of recordation of this Declaration or (z) any future phases at the time the amendment to this Declaration adding such phase to the Condominium Property is recorded, it is intended that the Units and Vacation Homes shall encompass the airspace delineated on Exhibit "A" to this Declaration (in the case of the first phase) or in Exhibit "A" to the amendments (in case of future phases) prior to completion of the Incomplete Improvements.    DVD shall have the right, upon completion of construction of the Incomplete Improvements within a given phase, to unilaterally record an amendment to this Declaration substituting the previously recorded description of such phase with a survey showing the "as-built" location of all promised Incomplete Improvements within such phase, together with a certificate of surveyor attesting to the completion of construction as required by §718.104, Florida Statutes, at which time the easements set forth in this Section with respect to the given phase shall terminate.    During construction and until a certificate of occupancy is obtained, Owners are not permitted and shall be prohibited from accessing any Units within any Phases of the Condominium Property containing Incomplete Improvements, except as specifically permitted by DVD and only in those areas designated by DVD.

4.4    WDWHRC's Easement. Pursuant to the Master Declaration, WDWHRC has reserved unto itself a non-exclusive easement over and across all Common Element access areas, recreational areas and commonly used facilities of the Condominium Property for the purpose of providing owners of interests in the Master Declaration Property and their guests, invitees and licensees, with the use of such Common Element access areas, recreational areas and commonly used facilities.    In addition, as more specifically provided in the Master Declaration, WDWHRC has reserved unto itself easement rights over, under and across all Common Elements for the purpose of constructing, maintaining and supporting a monorail, boat launch, and/or a street or other right-of-way servicing properties owned by WDWHRC or the TWDC Companies as part of the larger Walt Disney World® Resort transportation system.    DVD, WDWHRC, and the TWDC Companies do not contemplate that any monorail constructed pursuant to such easement rights will stop within or otherwise service the Condominium Property.    In the event the easement rights described in this Article 4.4 are exercised, it may result in noise or light levels in excess of that typically occurring in areas consisting solely of residential accommodations and may result in an obstruction of views.    Nothing contained in this Declaration shall prohibit the exercise of such easement rights.

4.5    Utility Easements Granted to Reedy Creek Improvement District. Non-exclusive easements exist in favor of Reedy Creek Improvement District, the local municipal provider of certain utility services, for construction, inspection, replacement, operation, maintenance and repair of certain underground utilities, including, without limitation, electricity, potable water and sanitary sewer, as more specifically set forth in those certain Non-Exclusive Utility Easement Agreements dated of even date herewith and recorded in the Public Records of Orange County, Florida.

10

4.6    Other Easements.    Other easements may have been granted over the Condominium Property, including, without limitation, the easements contained in the Master Declaration and the easements, if any, identified on the survey contained in Exhibit "A" attached to this Declaration.

5.    **UNITS.**

5.1    Description of Units, Vacation Homes and Commercial Units.

5.1.1    Units and Vacation Homes.    Each Unit declared to the Condominium will consist of all or a portion of an improvement that lies within the boundaries of the Unit. The upper and lower boundaries and the perimeter boundaries of each Unit contained in the first phase of the Condominium are described in the attached Exhibit "A." The upper and lower boundaries and the perimeter boundaries of each Unit contained in any future phase of the Condominium must be described in the amendment to this Declaration adding such phase to the Condominium. As set forth in Exhibit "A" for the first phase of the Condominium and as will be set forth in each amendment to this Declaration adding a future phase to the Condominium, each Unit is or will be identified by a Unit number so that no Unit bears the same designation as any other Unit. For administrative convenience, each Vacation Home within each Unit is also or will also be identified by a number.

5.1.2    Commercial Units.    Each Commercial Unit designated in Exhibit "A" to this Declaration or any phase amendment includes that area containing the Unit that lies within the boundaries as described in Exhibit "A" attached to this Declaration or any phase amendment.

5.2    Limited Common Elements.    Those Common Elements reserved for the use of a certain Unit, to the exclusion of other Units, are designated as Limited Common Elements. Those physical areas designated as Limited Common Elements are shown and located on the attached Exhibit "A". As may be shown in the attached Exhibit "A" or in survey materials attached as exhibits to an amendment to this Declaration declaring a phase to the Condominium in accordance with Article 18, the Commercial Unit LCEs are Limited Common Elements of a specific Commercial Unit. The use and maintenance of the Commercial Unit LCEs and the allocation of costs associated with the Commercial Unit LCEs will be governed by Article 22.

5.3    Concierge Lounge.    The Concierge Lounge is a Limited Common Element reserved for the use of the Concierge Units. The Concierge Lounge shall be operated and maintained by or on behalf of the Association. The Concierge Lounge is subject to certain easement rights granted to WDWHRC (and its guests, invitees and licenses) pursuant to the Master Declaration; and the costs of operating and maintaining the Concierge Lounge shall be shared between WDWHRC and the Association pursuant to the terms of the Master Declaration, and the Association's share of such expenses shall be a Common Expense.    Notwithstanding the foregoing, if WDWHRC elects, pursuant to the terms of the Master Declaration, to terminate its easement rights with respect to the Concierge Lounge, from and after such election, the Association shall be solely responsibility for all costs and expenses incurred in operating and maintaining the Concierge Lounge, all such costs and expenses being Common Expenses; provided, however, that upon WDWHRC's election to terminate its easement rights, the Association shall be entitled to (i) allow additional Owners (in addition to the Owners staying in the Concierge Units) to use the Concierge Lounge upon payment of a fee determined by the Association in its discretion; or (ii) discontinue the provision of concierge services from the Concierge Lounge provided that the Concierge Lounge will continue to be open and available to Owners staying in the Concierge Units.

5.4    Conversion Warranty and Warranty Limitation.    Portions of the Common Elements and some Units (including Units containing Vacation Homes) (collectively the "Existing Improvements") of the Condominium (more particularly described on Exhibit C of the Memorandum of Ground Lease) have been developed by converting existing improvements which were previously used as portions of a hotel.    Original construction of the Existing Improvements was completed in 2001 and the renovations of these Existing Improvements are estimated to be complete in 2007.    No other portions of the Condominium have been converted.    Pursuant to Section 721.03(3)(e)3.

11

and Section 718.618(6), Florida Statutes, DVD grants Owners an implied warranty of fitness and merchantability for the Existing Improvements for their intended uses and purposes as to the roof and structural components of the Existing Improvements; as to fireproofing and fire protection systems within the Existing Improvements; and as to mechanical, electrical and plumbing elements serving the Existing Improvements (except mechanical elements serving only one (1) Unit). This implied warranty of fitness and merchantability shall only be for the period of time required by Section 718.618(6), Florida Statutes.

**EXCEPT FOR THOSE WARRANTIES REQUIRED BY SECTION 718.203 AND SECTION 718.618(6) FLORIDA STATUTES, NONE OF THE TWDC COMPANIES, INCLUDING, BUT NOT LIMITED TO, DVD, MAKE ANY WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AND EACH OF THE TWDC COMPANIES HEREBY DISCLAIMS ANY AND ALL WARRANTIES, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO THE CONSTRUCTION OF THE UNITS AND THE COMMON ELEMENTS AND WITH RESPECT TO THE PERSONAL PROPERTY LOCATED WITHIN THE UNITS OR ON THE CONDOMINIUM PROPERTY, AND THE OWNERS ASSUME ALL RISK AND LIABILITY RESULTING FROM THE USE OF THIS PROPERTY.**

6.    **APPURTENANCES.**

6.1    Appurtenant Interests. Each Unit and each Commercial Unit have as an appurtenance, that undivided share of the Common Elements and Common Surplus as more specifically described in the attached Exhibit "D" and by this reference incorporated in this Declaration. The Owner of each Unit is liable for that share of the Common Expenses which equals the percentage interest in the Common Elements and Common Surplus appurtenant to the Owner's Unit. Each Unit shall also have those further appurtenances more specifically described in Chapter 718 and in Section 1.18 above.

6.2    Partition of Common Elements. The share of the undivided percentage interest in the Common Elements appurtenant to each Unit must remain undivided, and no Owner may bring, or have any right to bring, any action for partition or division of same.

6.3    Partition of Units or Vacation Homes. No action for partition of any Unit, any appurtenance to a Unit, or any Vacation Home may be brought.

6.4    Disney Vacation Club. Membership in the Disney Vacation Club, being a Common Element, is an appurtenance to each Ownership Interest, which is conveyed by virtue of the execution and delivery of a deed, in accordance with and subject to the terms of this Declaration, the Membership Agreement and the DVC Resort Agreement. Upon recording of the deed, the Club Member is automatically entitled to enjoy the services and benefits associated with membership in the Club. As an appurtenance, the Club membership, as it is comprised from time to time, may not be partitioned, hypothecated, bought, sold, exchanged, rented or otherwise transferred separately from each Ownership Interest.

The Club does not own any property or assets. Members of the Club do not acquire any legal or beneficial interest in The TWDC Companies or their assets, including the Club, and no right or interest in the property, contract rights or business of The TWDC Companies. Members of the Club will not be entitled to any share of income, gain or distribution by or of The TWDC Companies and will not acquire any voting rights with respect to The TWDC Companies.

The terms and conditions governing the use of the Home Resort Reservation Component, including rights to terminate the Membership Agreement and Owners' rights to access the Home Resort Reservation Component of the Club upon the termination of the Membership Agreement, are set forth in and governed by the Membership Agreement. An initial copy of the Membership Agreement is attached as Exhibit "G" and incorporated in this Declaration by this reference. The terms and conditions governing the use of the DVC Resort Component, including rights to terminate the DVC Resort Agreement and Owners' rights to access the DVC Resort Reservation

12

Component upon termination of the DVC Resort Agreement, are set forth in and governed by the DVC Resort Agreement, an initial copy of which is attached as Exhibit "H" and incorporated in this Declaration by this reference.

Provided that an Owner complies with all restrictions on the transfer of an Ownership Interest, if any, the transferee of such Ownership Interest automatically becomes a member of the Club. Membership in the Club automatically terminates for a given Owner upon the occurrence of any of the following:  (i) the Owner voluntarily or involuntarily transfers the Owner's Ownership Interest and owns no other Ownership Interest; (ii) the Owner no longer owns an Ownership Interest as a result of assessment lien or mortgage foreclosure proceedings; (iii) this Declaration terminates or the Unit in which the Owner owns an Ownership Interest is removed from the Condominium by virtue of a casualty or eminent domain action where the Unit is not reconstructed or replaced; or (iv) both the Membership Agreement and the DVC Resort Agreement terminate.

7.    **MAINTENANCE, ALTERATION AND IMPROVEMENT.** Responsibility for the maintenance of the Condominium Property, and restrictions on its alteration and improvement, are as follows:

7.1    Units and Common Elements.

7.1.1    By the Association. Except as set forth in Paragraph 7.1.2 below, the Association is to maintain, repair and replace at the Association's expense:

7.1.1.1 The interior of each Unit and of each Vacation Home, except as otherwise provided in the Condominium Documents.

7.1.1.2 Subject to the provisions of the Master Declaration concerning maintenance, repair and replacement of Building Shared Components and Shared Areas, all conduits, ducts, plumbing, wiring, and other facilities for the furnishing of Utility Services.

7.1.1.3 All incidental damage caused to a Unit or a Vacation Home in a Unit by reason of maintenance, repair and replacement accomplished pursuant to the provisions of subparagraphs 7.1.1. (a) and (b) above.

7.1.1.4 The Association has the responsibility to maintain, repair, renovate and replace all Common Elements and Limited Common Elements, subject to the provisions of the Master Declaration concerning maintenance, repair and replacement of Building Shared Components and Shared Areas.   Notwithstanding the maintenance and repair responsibilities of the Association set forth in this Article, prior to the commencement of any construction, reconstruction, alteration, renovation, restoration, repair or replacement of any Common Element or Limited Common Element, or any portion of any Common Element or Limited Common Element, the Association must obtain the written approval of DVD, which approval DVD may grant or withhold in its sole, absolute and unfettered discretion. Pursuant to Section 721.13(8), Florida Statutes, the Board has the right, in its sole, absolute and unfettered discretion and without the approval of the Owners, to make material alterations or substantial additions to the Units, Common Elements, Limited Common Elements, and Association-owned real property, subject to the prior written approval of DVD, in its sole, absolute and unfettered discretion, for so long as DVD owns a Unit or Ownership Interest. Furthermore, the Board has the right, in its sole, absolute and unfettered discretion and without the approval of the Owners, to maintain, repair, alter, rearrange, improve, remove, or replace any or all personal property or furnishings that are part of the Condominium Property and are not the property of individual Owners from time to time, subject to the prior written approval of DVD, in its sole, absolute and unfettered discretion for so long as DVD owns a Unit or an Ownership Interest. In addition, the Board shall have the power, in its sole, absolute and unfettered discretion and without the approval of Owners, but subject to the prior written approval of DVD in its sole, absolute and unfettered discretion, for so long as DVD owns a Unit or an Ownership Interest, to lease the Common Elements and Limited Common Elements; to enter into agreements to acquire leaseholds, memberships, and other possessory or use interests in lands or facilities, including, without limitation, country clubs, golf courses, marinas,

and other recreational facilities; and to acquire, convey, lease, or mortgage Association property. The Board shall have the power to charge a use fee against Owners for the use of Common Elements, Limited Common Elements or Association property, subject to the approval of the DVD in its sole, absolute and unfettered discretion, for so long as DVD owns a Unit or an Ownership Interest. Except as described in the preceding sentence, all costs associated with the foregoing shall be Common Expenses.  The Master Declaration sets forth additional requirements relating to alterations and required approvals.

        7.1.2      <u>By the Owner</u>. The responsibility of the Owner for maintenance, repair and replacement is as follows:

        7.1.2.1  To not paint or otherwise decorate or change the appearance of any portion of the Condominium Property without the prior written approval of the Association.

        7.1.2.2  To promptly report to the Association any defect or need for repairs for which the Association is responsible.

        7.1.2.3  To bear in their entirety any expenses of repairs or replacements to the Condominium Property, including, a Unit, a Vacation Home in a Unit, or its components, furnishings, carpeting, appliances, or other property, real, personal or mixed, occasioned by the specific use or abuse by any Owner or any lessee, guest, exchanger, tenant, or invitee of said Owner. The Association shall have a lien on any such Owner's Unit or Ownership Interest for such expenses of repairs or replacements which is more fully described in, and shall be enforced pursuant to, Paragraph 8.3.2 below.

        7.2      <u>Property and Vacation Ownership Plan Management</u>. As set forth in Article 9.8 below, the Association may enter into such management agreements, from time to time, as it deems necessary to engage the services of a management company to carry out all or any part of the maintenance or operational duties and obligations of the Association in accordance with this Declaration, including the operation of the Vacation Ownership Plan for the Condominium. In this regard, the Association has engaged DVCMC as the Management Company for the purposes of performing the duties and obligations contemplated for the Association under Chapter 718 and Chapter 721 and as set forth in the Property Management Agreement, an initial copy of which is attached as Exhibit "F" to this Declaration. If the Property Management Agreement is terminated, the maintenance duties and other obligations of the Condominium, as set forth in the Property Management Agreement, will be the responsibility of the Association. In addition, DVCMC has been engaged by the Association to operate the Vacation Ownership Plan for the Condominium as set forth in the Membership Agreement, an initial copy of which is attached as Exhibit "G" to this Declaration. If the Membership Agreement is terminated, the operation of the Vacation Ownership Plan for the Condominium will be the responsibility of the Association.

        7.3      <u>Association's Access to Units and Vacation Homes</u>. The Association has the irrevocable right of access to each Unit and each Vacation Home whenever necessary for: (i) inspecting, maintaining, repairing, replacing or operating the Condominium Property; (ii) making emergency repairs necessary to prevent damage to the Common Elements or to any Unit or Vacation Home; and (iii) determining compliance with the provisions of the Condominium Documents.

        7.4      <u>Maintenance Period</u>. Pursuant to the requirements of the Property Management Agreement, DVCMC, as the initial Management Company, has the obligation as the agent of the Association to maintain and repair each Vacation Home in each Unit during those time periods made available to it for such purpose pursuant to the Vacation Ownership Plan as set forth in the Membership Agreement. If the Property Management Agreement is terminated for any reason, the Association will have the obligation to schedule all required maintenance within each Unit and Vacation Home as a priority over the use of such Units and Vacation Homes by the Owner(s) of such Units and Vacation Homes.

<div align="center">14</div>

8.    **ASSESSMENTS AND COMMON EXPENSES.**

8.1    Common Expenses. Owners are responsible for their share of the Common Expenses. Common Expenses include the following:

8.1.1    Expenses of administration and management of the Condominium Property, and of the Association, including compensation paid by the Association to managers, accountants, attorneys, or other employees or independent contractors.

8.1.2    Expenses of maintenance, operation, repair and replacement of the Common Elements, Limited Common Elements and Association Property, as determined by the Board from time to time, as well as all other costs and expenses properly incurred by the Association.

8.1.3    Expenses declared Common Expenses by the provisions of this Declaration, the Condominium Documents or Chapter 718.

8.1.4    Any valid charge or assessment against the Condominium Property as a whole.

8.1.5    All costs and expenses arising under the Master Declaration and assessed against the Condominium Property, Association Property or the Association, including such costs and expenses contemplated under Article 7 of the Master Declaration.

8.1.6    All costs and expenses incurred by the Association in connection with regulatory compliance.

8.1.7    All reserves for replacement and maintenance of the Condominium Property as required by Chapter 718.

8.1.8    Casualty, flood, liability and/or any other type of insurance on the Association Property, Common Elements and Limited Common Elements.

8.1.9    All costs and expenses assessed against the Association pursuant to the Ground Lease; provided, however, that neither the Association nor the Owners are liable for payment of any rent under the Ground Lease, all rent charged thereunder being payable by DVD to WDWHRC.

8.1.10    All costs and expenses relating to transportation to, from and around the WALT DISNEY WORLD® Resort for the use and benefit of the Owners, which may be charged to the Association by TWDC or any affiliate or subsidiary from time to time.

8.1.11    All costs and expenses associated with any master antenna television system, duly franchised cable television service, or satellite service obtained pursuant to a bulk contract by the Association or on behalf of the Association.

8.2    Additional Common Expenses. In addition to those items defined as Common Expenses above, Common Expenses for Units committed to the Vacation Ownership Plan include the following:

8.2.1    Repair and maintenance of the interior of a Unit for normal wear and tear;

8.2.2    Repair and replacement of furniture, fixtures, appliances, carpeting and deferred maintenance and replacement reserves for the same;

15

8.2.3       Insurance coverage relating to the interior of a Unit and any other insurance relating to the operation of the Vacation Ownership Plan, including business interruption or loss of use insurance if obtained by the Board;

8.2.4       Utility Services for the Units;

8.2.5       All costs relating to the operation of the Club that are allocated to the Condominium;

8.2.6       Any other expenses incurred in the normal operation and maintenance of the Units which cannot be attributed to a particular Owner;

8.2.7       Expenses declared Common Expenses of the Vacation Ownership Plan by Chapter 721;

8.2.8       Uncollected Ad Valorem Real Estate Taxes assessed against each Unit committed to the Vacation Ownership Plan so long as Section 192.037, <u>Florida Statutes</u>, or its successor, prohibits the county tax collector from collecting less than the entire amount of Ad Valorem Real Estate Taxes assessed against the vacation ownership development from the managing entity; and All reserves for replacement and maintenance of the Condominium Property as required by Chapter 718.

8.3    <u>Assessments</u>. The mailing and collection of assessments against each Owner for Common Expenses, for the costs or expenses for which an individual Owner may be solely responsible pursuant to the terms of the Condominium Documents, and for reserves as may from time to time be established by the Association, are, pursuant to the Bylaws of the Association, subject to the following provisions:

8.3.1       <u>Interest; Late Charges; Application of Payments</u>. Assessments and installments on such assessments paid on or before fifteen (15) days after the date when due will not bear interest, but all sums not paid on or before fifteen (15) days after the date when due will bear interest at the highest rate permitted by Florida law from the date when due until paid. In addition to such interest, the Association may charge an administrative late charge on delinquent accounts in an amount equal to the highest amount permitted under Florida law. The Association is further authorized to utilize the services of a collection agency for collection of delinquent accounts and to charge and impose a lien against the delinquent Owner for such costs in accordance with Chapter 718 and Chapter 721. All payments on accounts will be first applied to interest that has accrued, then to any late charges, then to any costs and reasonable attorneys' fees incurred in collection (including any incurred in bankruptcy and probate proceedings), and then to the assessment payment first due. The Board has the discretion to increase or decrease the amount of the administrative late fee or interest rate within the limits imposed by law; provided, however, that such increase or decrease will be made effective by amending the Condominium Rules and Regulations and notifying the Owners of same by regular mail addressed to each Owner at the last known address of each Owner as set forth in the Association's books and records. Notwithstanding any provision of this Section 8.3 to the contrary, the Association has the right to waive any interest or late fees that accrue as a result of delinquent payment.

8.3.2       <u>Lien for Assessments</u>. The Association has a lien against each Unit or Ownership Interest, as applicable, for any unpaid assessments, or expenses incurred pursuant to Subparagraph 7.1.2.(c) above ("**Repair Expenses**"), and for interest and late charges accruing on such unpaid assessments or Repair Expenses, which lien also secures reasonable attorneys' fees and costs incurred by the Association incident to the collection of such assessment or Repair Expenses or enforcement of such lien, whether or not legal proceedings are initiated and including those incurred in all bankruptcy and probate proceedings, and all sums advanced and paid by the Association for taxes and payments on account of superior mortgages, liens, or encumbrances which may be advanced by the Association in order to preserve and protect its lien. The lien is effective from and after recording a claim of lien in the Public Records of Orange County, Florida, stating the legal description of the Unit or Ownership

16

Interest, as applicable, the name of the Owner of record, the amount claimed to be due and the due dates. The lien is to continue in effect until all sums secured by the lien have been fully paid or until such time as is otherwise permitted by law. Such claims of lien must be signed and verified by an officer of the Association, or by an authorized agent of the Association. Upon full payment, the party making payment is entitled to a recordable satisfaction of lien, to be prepared by and recorded at such party's expense. All such liens are subordinate to any mortgage recorded prior to the date of recording the claim of lien, and all such liens may be foreclosed by suit brought in the name of the Association in the same manner as a foreclosure of a mortgage on real property, or as otherwise provided by applicable law. The Association may also sue to recover a money judgment for unpaid assessments or Repair Expenses without waiving any claim of lien.

8.3.2.1 <u>Mortgagee Liability</u>. If a Mortgagee (or its successors or assigns) obtains title to a Unit or an Ownership Interest as a result of the foreclosure of its first mortgage, or if such Mortgagee obtains title to a Unit or an Ownership Interest as the result of a conveyance in lieu of foreclosure of such first mortgage, the Mortgagee shall be exempt from liability for the Common Expenses or assessments chargeable to the Unit or Ownership Interest in the Unit, or the Owner of such Unit or Ownership Interest, which became due prior to the acquisition of title by such Mortgagee. Any such unpaid Common Expenses, or assessments shall be deemed a Common Expense to be paid in the same manner as other Common Expenses by all of the Owners.

8.3.2.2 <u>Rights of Association</u>. Nothing contained in this Declaration is to be construed as a modification of any rights or remedies of the Association related to assessments pursuant to Chapter 718 or Chapter 721, except to the extent that the Condominium Documents allow additional remedies to those expressly set forth in Chapter 718 or Chapter 721 and to the extent that such additional remedies are permitted by said statutes.

8.3.3    <u>Personal Liability for Unpaid Assessments</u>. Each Owner is personally liable for all assessments made against the Unit pursuant to this Declaration and Chapter 718, and the Association may bring an action for a money judgment against a delinquent Owner to collect all sums due the Association, including interest, late charges, costs and reasonable attorneys' fees. If a Unit is owned by more than one person or entity such owners are jointly and severally liable for all assessments made against the Unit.  The Association may deny the use of a Vacation Home to any Owner who is delinquent in the payment of any assessments or ad valorem real estate taxes in accordance with Chapter 721.

8.3.4    <u>Payments of Assessments</u>. No Owner may withhold payment of any regular or special assessment or any portion of any regular or special assessment because of any dispute which may exist between that Owner and another Owner, the Association, the Board, the Management Company or DVD or among any of them, but rather each Owner must pay all assessments when due pending resolution of any dispute.

8.3.5    <u>Partial Redemption</u>. If the Association places a lien against an entire Unit for all or a portion of unpaid assessments for that Unit, the Association may, in its sole, absolute and unfettered discretion, accept a partial payment from a Cotenant in that Unit, which partial payment is deemed to remove the lien as to that Cotenant's Ownership Interest in that Unit. The Association's acceptance of a partial payment does not preclude the Association from enforcing the remaining portion of the lien against the Unit nor does it preclude the Association from making a special assessment to cover all other unpaid assessments for the Unit.

8.4    <u>Common Surplus</u>. Each Owner owns a share of the Common Surplus attributable to each Unit owned in accordance with Exhibit "D" attached.

8.5    <u>Refunds of Common Surplus</u>. If the Association refunds all or a portion of any Common Surplus to the Owners for any fiscal year in which DVD paid any assessment, such refund will be prorated as of the date of closing of any sale of a Unit or Ownership Interest upon which the sale was closed by DVD during such year, and the prorated amount allocable to the period of time of DVD's ownership will be refunded directly to DVD by the

Association. Except as to the DVD, on transfer of a Unit or an Ownership Interest, the transferor shall not be entitled to any Common Surplus existing at the time of the transfer, which shall remain with the Association.

8.6    Certificate. Any Owner may require from the Association a certificate showing the amount of unpaid assessments against the Owner or the Owner's Unit or Ownership Interest. The holder of a mortgage or other lien has the same right as to any interest on which it has a lien. Any person who relies on such certificate is protected by such reliance.

8.7    Fines. For each violation of any of the Condominium Documents, the Board may levy against the offending member a sum of up to one hundred dollars ($100.00) per violation or such higher amount as may be then allowed by applicable law. This remedy is in addition to and not in lieu of the remedies provided in the Condominium Documents or applicable law. A member against whom a fine is sought to be levied will be afforded an opportunity for hearing if and to the extent required by Florida law.

8.8    DVD Guarantee. Pursuant to Chapter 718 and Chapter 721, DVD has the option, in its sole, absolute and unfettered discretion, to guarantee to each Owner in the Condominium, on a yearly basis, the Common Expenses, exclusive of Ad Valorem Real Estate Taxes. If, in a particular year, DVD elects to implement this guarantee, then such guarantee will be disclosed on the budget for the applicable year. In consideration of this guarantee, DVD shall be excused from the payment of its share of the Common Expenses which otherwise would have been assessed against its unsold interests in the Condominium during the term of the guarantee. As a consequence of this exemption, DVD shall pay any difference between actual expense and assessments collected from all Owners and income from other sources. Depreciation expense related to real property shall be excluded from the calculation of the Developer obligation except that for real property used for the production of fees, revenue or other income depreciation expense shall be excluded only to the extent they exceed such income DVD will pay such expense as needed to meet the expenses of the Association as the expenses are incurred each year while the guarantee is in effect. However, any Common Expenses incurred during the guarantee period resulting from a natural disaster or an act of God, which are not covered by insurance proceeds from the insurance maintained by the Association, will be assessed against all Owners owning Ownership Interests on the date of such natural disaster or act of God, including DVD; provided that during any period of time DVD controls the Association pursuant to Section 718.301, Florida Statutes, the Association maintains all insurance coverages required by Section 721.165, Florida Statutes. DVD reserves the right, but not the obligation, in its sole, absolute and unfettered discretion, to extend and increase this guarantee for one or more periods of one year each after the expiration of the initial guarantee period, as permitted by Florida law.

9.    **THE ASSOCIATION.** The Association is responsible for the operation of the Condominium and must fulfill its functions pursuant to the following provisions:

9.1    Membership in Association. Each Owner becomes a member of the Association pursuant to the provisions of the Articles of Incorporation and Bylaws. Each Unit has one (1) vote in the Association. The vote of the Unit must be cast by its Voting Representative. Where a Unit is owned by more than one Owner, the Cotenants must file a Voting Certificate with the Association, in accordance with the Articles of Incorporation and Bylaws, setting forth which Cotenant is designated as the Voting Representative for that Unit. Commercial Units do not have any votes in the Association.

9.2    Articles of Incorporation. A copy of the initial Articles of Incorporation is attached as Exhibit "B" and incorporated in this Declaration by reference.

9.3    Bylaws. A copy of the initial Bylaws is attached as Exhibit "C" and incorporated in this Declaration by reference.

18

9.4      Limitation On Liability of Association. Notwithstanding the duty of the Association to maintain and repair portions of the Condominium Property, the Association is not liable to Owners for injury or damage, other than for the cost of maintenance and repair, caused by any latent condition of the property to be maintained and repaired by the Association, or caused by the elements or other Owners or persons.

9.5      Association Powers On Merger; Operation of Other Condominiums. If this Condominium is merged, pursuant to Chapter 718 and Article 19 of this Declaration, with another independent and separate condominium to form a single condominium, the Association is expressly empowered to manage and operate the resulting single condominium as provided for in Chapter 718 and this Declaration. The Association is also specifically empowered to manage, operate and maintain any other separate and independent condominiums that the Board elects to manage, operate and maintain from time to time in accordance with Chapter 718, this Declaration and the declaration of condominium of such other separate and independent condominium.

9.6      Restraint on Assignment of Shares and Assets. Each Owner's share in the funds and assets of the Association cannot be assigned, hypothecated or transferred in any manner except as an appurtenance to the Owner's Unit or Ownership Interest.

9.7      Transfer of Control of Association. Owners other than DVD are entitled to elect members of the Board at such times as are prescribed by Section 718.301, Florida Statutes. Notwithstanding the transfer of control requirements prescribed by Section 718.301, Florida Statutes, DVD is entitled, in its sole, absolute and unfettered discretion, to perpetuate or retain control of the Association if permitted to do so pursuant to Florida law, as it may be amended from time to time.

9.8      Property Management Agreement. The Association, on behalf of the Owners, is authorized to contract for management of the Condominium and to delegate to such contractor all powers and duties of the Association except such as are specifically required by Florida law or the Condominium Documents to have approval of the Board or members of the Association. A copy of the initial agreement for the management of the Association with the Management Company is attached as Exhibit "F".    Notwithstanding any provisions contained in this Declaration to the contrary, it is the intent of this Declaration that the Board does not have the power to independently terminate the Property Management Agreement except as set forth in the Property Management Agreement. The Property Management Agreement may only be terminated in accordance with it own terms or by the vote of the Owners in accordance with Florida law.

9.9      Vacation Ownership Plan. The Association, on behalf of the Owners, is authorized to contract for the operation of the Vacation Ownership Plan and to delegate to such contractor all powers and duties of the Association in this regard. A copy of the initial agreement for the operation of the Vacation Ownership Plan with DVCMC is attached as Exhibit "G".    Notwithstanding any provisions contained in this Declaration to the contrary, it is the intent of this Declaration that the Board does not have the power to independently terminate the Membership Agreement except as set forth in the Membership Agreement. The Membership Agreement may only be terminated in accordance with it own terms.

9.10      Possession and Use of Vacation Homes. The Association, on behalf of the Owners, is authorized to arrange for the assignment of the possession and use of Vacation Homes by owners from other resorts, including other DVC Resorts, and the possession and use of accommodations at other resorts by Owners. In this regard and with respect to the DVC Reservation Component, the Association has entered into the DVC Resort Agreement for the Condominium, an initial copy of which is attached as Exhibit "H."    Notwithstanding any provisions contained in this Declaration to the contrary, it is the intent of this Declaration that the Board does not have the power to independently terminate the DVC Resort Agreement except as set forth in the DVC Resort Agreement. The DVC Resort Agreement may only be terminated in accordance with its own terms.

19

9.11    Board's Authority Respecting DVD Easements and Rights. The Board does not have the authority to grant, modify, terminate or move any easement or right granted to or reserved by DVD, with respect to this Declaration or the Condominium Property, without the prior approval of DVD.

9.12    Title to Property. The Association has the power to acquire title to and hold, convey or mortgage non-Condominium Property and Condominium Property, including Association Property and Common Elements; provided, however, that the Association first obtains approval of a majority of the total voting interests and written approval of DVD. The Board has the authority to (a) lease (or obtain easements to) non-Condominium Property for the Association as lessee (or grantee), and (b) lease (or grant easements to) Condominium Property, including Association Property and Common Elements, for the Association as lessor (or grantor), without first obtaining approval of the Owners; provided, however, that the Board may only exercise such power when it is in the best interests of the Owners and on receipt of the prior written approval of DVD. Neither the Association nor the Board has the power to convey, mortgage or lease any Unit not owned by the Association. In addition, neither the Association nor the Board may convey, mortgage or lease any Limited Common Elements or Commercial Unit LCEs without the approval of the Owners of the Unit or Commercial Unit to which the Limited Common Element or Commercial Unit LCE is appurtenant.

10.    **INSURANCE.** The insurance, other than title insurance, if any, that is to be carried on the Condominium Property will be governed by the following provisions:

10.1    Authority to Purchase; Named Insured. All insurance policies on the Condominium Property will be purchased by or on behalf of the Association from a fiscally responsible company authorized to do business in the State of Florida and must have a minimum term of one (1) year. The named insured will be the Association individually and as agent for the Owners, without naming them, and as agent for their Mortgagees, without naming them. Notwithstanding the certain types of insurance and amounts of coverage required to be obtained pursuant to this Article, in obtaining insurance the Board may consider such factors as availability of types of insurance and the market for insurance premiums in deciding which type of insurance and the amounts of coverage to obtain.

Provisions must be made for the issuance of Mortgagee endorsements and memoranda of insurance to the Mortgagees of Owners on request. Such policies must provide that payments by the insurer for losses must be made to the Association or the Insurance Trustee designated below, and all policies and endorsements on such policies must be deposited with the Association or the Insurance Trustee.

10.2    Personal Property of Owners. If desired, Owners may obtain property insurance coverage on their personal property at their own expense and for their own personal liability and living expenses. Such insurance is not the responsibility of the Association. Insurance policies issued to individual Owners shall provide that the coverage afforded by such policies is primary over the amount recoverable under any other policy covering the same property and shall include a waiver of subrogation in favor of the Association.

10.3    Coverage.

10.3.1    Shared Building. Pursuant to the Master Declaration, WDWHRC shall keep the Shared Building (as that term is defined in the Master Declaration and which term includes, without limitation, portions of the Condominium Property) insured against loss or damage normally covered by a "Special Perils" policy with extended coverage, vandalism and malicious mischief endorsements in an amount equal to the full replacement value thereof in accordance with the requirements set forth in Article 4 of the Master Declaration, less any applicable deductibles. Such casualty insurance shall also contain a Building Code or similar endorsement providing coverage for costs associated with compliance and conformance with applicable federal, state and local codes at the time of reconstruction, and shall name the Association as an additional insured. Notwithstanding the foregoing, if WDWHRC elects, pursuant to Article 4 of the Master Declaration, not to maintain insurance on those portions of the

20

Condominium included within the Shared Building, the Association shall obtain or shall cause to have obtained such insurance. The Association shall annually inspect the insurance certificates to assure such coverage is maintained. In the event that such insurance is not properly maintained or in the event that WDWHRC elects, pursuant to Article 4 of the Master Declaration, not to maintain insurance coverage for those portions of the Condominium included within the Shared Building, the Association shall, as required by law, acquire such insurance and, to the extent that WDWHRC breaches its obligations under the Master Declaration, pursue such other remedies set forth in the Master Declaration.

        10.3.2    <u>Non-Shared Buildings</u>. The Association shall keep all buildings (other than the Shared Building) and improvements on the Condominium Property, and all personal property owned by the Association insured against loss or damage normally covered by a "Special Perils" policy with extended coverage, vandalism and malicious mischief endorsements in an amount equal to the full replacement value thereof, less any applicable deductibles, and shall contain a Building Code or similar endorsement providing coverage for costs associated with compliance and conformance with applicable federal, state and local codes at the time of reconstruction, all as determined from time to time by the Board. All such coverage, including the coverage amount and the insurance company providing the coverage, is subject to the approval of the Mortgagee holding the greatest dollar amount of first mortgages against Units and Ownership Interests in Units. Such approval is conclusively deemed given if such Mortgagee fails to notify the Association otherwise within ten (10) days of being notified by the Association of the proposed coverage amount and insurance company. Coverage must afford protection against such other risks as from time to time are customarily covered with respect to buildings similar in construction, location and use as the buildings on the Condominium Property.

        10.3.3    <u>Liability Insurance</u>. Pursuant to the Master Declaration, WDWHRC and the Association are each required to maintain and keep in full force and effect commercial general liability insurance policies with minimum limits of $15,000,000 each occurrence and automobile liability insurance policies with $5,000,000 combined single limit protecting WDWHRC and its parent, related, affiliated and subsidiary companies and the Association against claims for bodily injury, death or property damage occurring upon, in or about the Master Property. These requirements provide that WDWHRC (and its parent, related, affiliated and subsidiary companies) and the Association, as the case may be, shall be made an additional insured, respectively, on each such insurance policy and each policy shall include a waiver of subrogation in favor of the additional insureds. The Board shall ensure that the appropriate commercial general liability insurance is maintained to satisfy the foregoing and in such additional amounts and with such additional coverage as required by the Board from time to time. Wherever and whenever it is possible and economically feasible to do so, the Board must ensure adequate insurance protection is obtained in reasonably prudent coverages. Except as required in this Declaration, nothing in this Declaration is to be construed to require the Board to obtain such coverage as a condition precedent to the Association conducting business. WDWHRC may obtain and maintain such insurance for the benefit of the Condominium and in such event the Association shall be made a named insured. The Association's share of the cost of any such insurance shall be a Common Expense.

        10.3.4    <u>Worker's Compensation</u>. Worker's compensation insurance is to be carried to the extent necessary to meet the requirements of law.

        10.3.5    <u>Fidelity Bond</u>. At a minimum, fidelity insurance coverage will be carried in the name of the Association for all persons who control or disburse funds of the Association. As used in this Paragraph 10.3.5, the term "all persons who control or disburse funds of the Association" means those persons authorized to sign Association checks, and the president, secretary and treasurer of the Association. The total amount of fidelity bond coverage required for each person must be in the amount not less than the amount required by Section 718.111(11)(d), <u>Florida</u> <u>Statutes</u>.

        10.3.6    <u>Flood Insurance</u>. If the Condominium is located within an area having special flood hazards for which flood insurance has been made available under the National Flood Insurance Program (**"NFIP"**),

then the Association will obtain and pay, as a Common Expense, the premiums on a "master" or "blanket" policy of flood insurance on the buildings and any other Condominium Property covered by the required form of policy (**"insurable property"**), in an amount deemed appropriate, but not less than the lesser of: the maximum coverage available under the NFIP for all buildings and other insurable property within any portion of the Condominium located within a designated flood hazard area; or One hundred percent (100%) of current "replacement cost" of all such buildings and other insurable property.

Such policy will be in a form that meets the criteria set forth in the most current guidelines on the subject issued by the Federal Insurance Administration.

10.3.7    Business Interruption. If obtainable and economically feasible, the Board may obtain business interruption or loss of use insurance on any or all Vacation Homes. The named insured must be the Association individually and as agent for the Owners, without naming them, and as agent for the Mortgagees as their interests may appear.

10.3.8    Other. Such other insurance may be carried as the Board determines from time to time to be desirable.

10.4    Premiums and Deductibles. Premiums on insurance policies purchased by the Association (and/or prorated shares of the premiums on insurance policies purchased by or on behalf of WDWHRC under the Master Declaration to the extent such insurance covers the Condominium and/or the Association) are to be paid by the Association as a Common Expense. Any insurance policy required hereunder may include reasonable deductibles as determined by the Board.  Any deductible required to be paid, if any, on insurance policies purchased by the Association shall be paid by the Association as a Common Expense.

10.5    Insurance Trustee; Share of Proceeds. All insurance policies purchased by the Association are to be for the benefit of the Association, WDWHRC, the Owners, and any Mortgagees as their interests may appear, and must provide that all proceeds covering property losses are to be paid to the Association or, at the election of WDWHRC, to a named Insurance Trustee (referred to as the **"Insurance Trustee"**). All references to an Insurance Trustee in this Declaration apply to WDWHRC if WDWHRC elects not to appoint an Insurance Trustee.  Any Insurance Trustee (other than the WDWHRC) will be a commercial bank with trust powers authorized to do business in Florida or another entity acceptable to WDWHRC. The Insurance Trustee is not liable for payment of premiums or for the failure to collect any insurance proceeds. The duty of the Insurance Trustee is to receive such proceeds as are paid and hold the proceeds in trust for the purposes stated in this Declaration for the benefit of the Association, WDWHRC, the Owners, and any Mortgagees in the following shares; provided, however, that such shares need not be set forth on the records of the Insurance Trustee:

10.5.1    Proceeds on Account of Damage to Common Elements and Limited Common Elements. Proceeds on account of damage to Common Elements and Limited Common Elements, when such Common Elements and/or Limited Common Elements are not to be restored, is to be held in undivided shares for each Owner, such share being the same as the undivided share in the Common Elements and Limited Common Elements appurtenant to each Unit.

10.5.2    Proceeds on Account of Damage to Units. Proceeds on account of damage to Units shall be held in the following undivided shares:

10.5.2.1 When the Condominium Property is to be Restored. For the Owners of damaged Units in proportion to the cost of repairing the damage suffered by each Owner, which cost shall be determined by the Board.

22

10.5.2.2When the Condominium Property is not to be Restored. An undivided share for each Owner, such share being the same as the undivided share in the Common Elements appurtenant to that Owner's interest in that Unit.

10.5.3    Mortgagees. If a Mortgagee endorsement has been issued, any share for the Owner will be held in trust for the Mortgagee and the Owner as their interests may appear; provided, however, that no Mortgagee has the right to determine or participate in the determination as to whether or not any damaged property is reconstructed or repaired, and no Mortgagee has any right to apply or have applied to the reduction of a mortgage debt any insurance proceeds except distributions of such insurance proceeds made to the Owner and Mortgagee pursuant to the provisions of this Declaration. Notwithstanding the foregoing, the Mortgagee has the right to apply or have applied to the reduction of its mortgage debt any or all sums of insurance proceeds applicable to its mortgaged interest if the damaged property is not reconstructed or repaired as permitted under this Declaration.

10.6    Distribution of Proceeds. Proceeds of insurance policies received by the Insurance Trustee are to be distributed to or for the benefit of the beneficial owners of such proceeds in the following manner:

10.6.1    All expenses of the Insurance Trustee are to be paid first or provisions made for such payment.

10.6.2    If the damage for which the proceeds are paid is to be repaired or reconstructed, then the remaining proceeds are to be paid to defray the cost of such repair or reconstruction as provided in this Declaration. Any proceeds remaining after defraying such cost will be added to the Association's capital reserve accounts.

10.6.3    If it is determined in the manner provided in this Declaration that the damage for which proceeds are paid will not be reconstructed or repaired, the remaining proceeds are to be distributed to the Owners and Mortgagees; remittances to Owners and their Mortgagees being payable jointly to them. This is a covenant for the benefit of, and may be enforced by, any Mortgagee. In this regard any insurance proceeds resulting from the failure to reconstruct or replace a Unit (or from an eminent domain action as set forth in Section 11.6 below) will be disbursed to affected Owners for their share of the non-reconstructed or replaced Unit resulting in their withdrawal from participation in the Home Resort Reservation Component and the DVC Reservation Component so that members of the Club will not be attempting to make reservations for available DVC Resort Vacation Homes on a greater than "one-to-one purchaser to accommodation ratio," as that term is defined in Section 721.05(23), Florida Statutes.

10.6.4    In making a distribution to Owners and their Mortgagees, the Insurance Trustee may rely on a certificate of the Association made by its president and secretary as to the names of the Owners and their respective shares of the distribution.

10.7    Association as Agent and Attorney-in-Fact. The Association is irrevocably appointed agent and attorney-in-fact for each Owner, Mortgagee, or other lienholder or owner of any other interest in the Condominium Property to adjust all claims arising under the insurance policies purchased by the Association and to execute and deliver releases on the payment of a claim.

11.    **RECONSTRUCTION OR REPAIR AFTER CASUALTY OR EMINENT DOMAIN.**

11.1.1    Obligation to Reconstruct or Repair.  Except as provided in the Master Declaration with respect to the Shared Building, if any part of the Condominium Property, including any Unit, Vacation Home, Common Element, Limited Common Element or Association Property, is damaged or destroyed by casualty, then the Association has the obligation to promptly reconstruct, replace or repair the damaged property to the extent the

23

insurance proceeds cover the cost of the reconstruction, replacement or repair. If such proceeds are insufficient, the Association has the obligation to impose and collect a special assessment as provided for in Section 11.4 below.

The Insurance Trustee may rely on a certificate of the Association made by its president and attested by its secretary as to whether or not the damaged property is to be reconstructed or repaired.

11.2    Plans and Specifications. Any reconstruction, replacement or repairs must be in accordance with the provisions of the Master Declaration and substantially in accordance with (i) the plans and specifications for the damaged property as originally constituted or (ii) plans and specifications approved by the WDWHRC in accordance with the Master Declaration.

11.3    Estimates of Cost. Immediately after the Association determines the need to rebuild, replace or repair damaged property for which the Association has the responsibility of reconstruction, replacement and repair, the Association must obtain reliable and detailed estimates of the cost to rebuild, replace or repair.

11.4    Assessments. The amount by which an award of insurance proceeds to the insurance trustee is reduced on account of a deductible clause in an insurance policy will be assessed against all Owners in proportion to their shares in the Common Elements. If the proceeds of insurance are not sufficient to defray the estimated costs of reconstruction, replacement or repair by the Association, or if at any time during reconstruction, replacement or repair or on completion of reconstruction, replacement or repair, the funds from insurance for the payment of the costs of reconstruction, replacement or repair are insufficient, special assessments are to be made against all Owners in sufficient amounts to provide funds for the payment of such costs. Such special assessments will be in proportion to the Owners' respective obligations for Common Expenses.

11.5    Construction Funds. The funds for payment of costs of reconstruction and repair after casualty, which consist of proceeds of insurance held by the Association or the Insurance Trustee and funds collected by the Association through assessments against Owners, will be disbursed in payment of such costs in the following manner:

11.5.1    Association. If the total of assessments made by the Association in order to provide funds for the payment of costs of reconstruction, replacement or repair that are the responsibility of the Association is more than Five Hundred Thousand Dollars ($500,000.00), then the sums paid on such assessments are to be deposited by the Association with the Insurance Trustee. In all other cases the Management Company, on behalf of the Association, is to hold the sums paid on such assessments and disburse them in payment of the costs of reconstruction, replacement or repair.

11.5.2    Insurance Trustee. The proceeds of insurance collected on account of casualty, and the sums deposited with the Insurance Trustee by the Association from collections of assessments against Owners on account of such casualty, constitute a construction fund to be disbursed in payment of the costs of reconstruction, replacement or repair in the following manner and order:

11.5.2.1 Association - Minor Damage. If the amount of the estimated costs of reconstruction, replacement or repair that is the responsibility of the Association is less than Five Hundred Thousand Dollars ($500,000.00), then the construction fund is to be disbursed in payment of such costs on the order of the Board; provided, however, that on request by a Mortgagee that is a beneficiary of an insurance policy, the proceeds of which are included in the construction fund, such fund is to be disbursed in the manner provided for the reconstruction, replacement or repair of major damage.

11.5.2.2 Association - Major Damage. If the amount of the estimated costs of reconstruction, replacement or repair that are the responsibility of the Association is more than Five Hundred Thousand Dollars ($500,000.00), then the construction fund is to be applied by the Insurance Trustee to the payment of such costs, and

24

paid to or for the account of the Association from time to time as the work progresses, in the reasonable discretion of the Insurance Trustee; provided, however, that the Insurance Trustee must make payments on the written request of the Association for withdrawal of insurance proceeds accompanied by a certificate, dated not more than fifteen (15) days prior to such request, signed by a responsible officer of the Association and by an architect in charge of the work, who is to be selected by the Association, setting forth that the sum then requested either has been paid by the Association or is justly due to contractors, subcontractors, materialmen, architects, or other persons who have rendered services or furnished materials in connection with the work, giving a brief description of the services and materials and any amounts paid prior to the request, and stating that the sum requested does not exceed the value of the services and material described in the certificate; that except for the amount stated in such certificate to be due as aforesaid, there is no outstanding indebtedness known to the person signing such certificate after due inquiry, which might become the basis of a vendor's, mechanic's, materialman's or similar lien on such work against the Common Elements or any Unit; and that the cost as estimated by the person signing such certificate of the work remaining to be done subsequent to the date of such certificate does not exceed the amount of insurance proceeds or other funds remaining in the control of the Insurance Trustee after the payment of the sum so requested.

11.5.2.1 <u>Surplus</u>. It is to be presumed that the first monies disbursed in payment of costs of reconstruction, replacement or repair will be from insurance proceeds. If there is a balance in a construction fund after payment of all costs of the reconstruction, replacement or repair for which the fund is established, such balance is to be deposited into the Association's capital reserve accounts.

11.5.2.2 <u>Certificate</u>. Notwithstanding the provisions of this Declaration, the Insurance Trustee is not required to determine any of the following: (i) whether sums paid by the Owners on assessments are deposited by the Association with the Insurance Trustee; (ii) whether the disbursements from the construction fund are to be on the order of the Association or approval of an architect or otherwise; (iii) whether a disbursement is to be made from the construction fund; (iv) the identity of the payee; or, (v) the amount to be paid. Instead, the Insurance Trustee may rely on a Certificate of the Association made by its President and Secretary as to any or all of such matters and stating that the sums to be paid are due and properly payable and stating the name of the payee and the amount to be paid; provided, that when a Mortgagee is required in this instrument to be named payee, the Insurance Trustee must also name the Mortgagee as a payee of any distribution of insurance proceeds to an Owner; and further provided, that when the Association, or a Mortgagee that is the beneficiary of an insurance policy whose proceeds are included in the construction fund, so requires, the approval of an architect named by the Association must be first obtained by the Association prior to disbursements in payment of costs of reconstruction, replacement or repair.

11.6     <u>Eminent Domain</u>.

11.6.1      <u>Shared Building</u>.

11.6.1.1 <u>Total Taking by Condemnation</u>. In accordance with Article XI of the Master Declaration, the Insurance Trustee (as that term is defined in the Master Declaration) shall be entitled to receive payment of damages resulting from the taking of all of the real property and improvements of that portion of the Condominium located within the Shared Building (as that term is defined in the Master Declaration) by the exercise of eminent domain of the sovereign, municipality, or other public or private authority, provided however, the Insurance Trustee shall distribute such damages to the Association in accordance with Article XI of the Master Declaration.

11.6.1.2 <u>Partial Taking by Condemnation</u>. In the event of the taking of less than all of the real property and improvements of that portion of the Condominium located within the Shared Building by condemnation, the Condominium will continue as to those portions of the Condominium Property not taken and the awards for that taking received by the Insurance Trustee (as that term is defined in the Master Declaration) will be deposited with the Association in accordance with this Declaration. In the event of a taking of less than all of the real property and improvements of that portion of the Condominium located within the Shared Building by condemnation,

the size of the Condominium will be reduced, the Owners of condemned Units will be made whole to the extent of the awards received with respect to the condemned Units and charges collected from non-depositing Owners, and portion of the Condominium Property damaged by the taking will be made usable in the manner provided below.

11.6.1.3 Association as Agent.  The Association is irrevocably appointed as the agent, coupled with an interest, for each Owner, Mortgagee, and other holder of a lien on a Unit, and for each Owner of any other interest in the Condominium, to represent them in any condemnation proceedings with respect to the Condominium Property, and to negotiate and settle all of their claims in such proceedings; provided, however, the Association shall exercise its appointment in accordance with the Master Declaration and any other applicable requirements.  Any funds received by the Association as agent for the Owners and as a result of condemnation proceedings will be held in escrow and distributed in accordance with this section.

11.6.2    Condominium Property not in Shared Building.  With respect to that portion of the Condominium Property not located within the Shared Building, the Association is empowered to defend or settle any action or threatened action with respect to the taking in condemnation of any portion of the Common Elements or Limited Common Elements or any Unit or portion of any Unit. Upon obtaining knowledge of such action or threatened action, the Association will notify all affected Mortgagees of record of same.

11.6.2.1 Common Elements and Limited Common Elements. Any award or settlement made as a result of such a taking of all or a portion of the Common Elements or Limited Common Elements is to be made payable to the Association. The Board is responsible for arranging for the reconstruction, replacement or repair of the Common Elements or Limited Common Elements and disbursing to the contractors engaged for such purpose, in appropriate progress payments, as much of the proceeds of such award or settlement as is reasonably necessary to effect reconstruction, replacement or repair. The balance of such proceeds, or all of such proceeds, will be disbursed by the Association in the same manner as insurance proceeds under Section 10.6 above.

11.6.2.2 Units. Due to the unique nature of the Vacation Ownership Plan created with respect to this Condominium, any taking in condemnation which involves a portion of a Unit is deemed a taking of the entire Unit, and any award or settlement must be made on the basis of the taking in condemnation of the entire Unit. Under such circumstances, all interests in any such Unit are deemed conveyed to the governmental or other entity responsible for the taking and the Unit ceases to be part of the Condominium Property. Any award or settlement for the taking in condemnation of a Unit is to be made payable to the Association for the benefit of the Owners of such Unit and any Mortgagees, in proportion to their respective interests in such Unit. Any award or settlement, including any award or settlement received for a temporary taking, is to be disbursed by the Association in the same manner as insurance proceeds under Section 10.6 above.

11.7    Interruption of Use. During any reconstruction, replacement or repair period, Owners may temporarily attempt to make reservations for available Vacation Homes under the Vacation Ownership Plan on a greater than "one-to-one purchaser to accommodation ratio," as that term is defined in Section 721.05(23), Florida Statutes. In no event is the interruption of use to be deemed to relieve affected Owners from any obligation to pay assessments due under this Declaration or from any obligation to make payments due to a Mortgagee.

If the Association has acquired business interruption insurance as contemplated under Paragraph 10.3.6 above, such insurance proceeds may be used, at the Board's election, to secure replacement accommodations or related facilities for Owner use during any reconstruction, replacement or acquisition period. If the Association has not acquired business interruption insurance, the Board, in its sole, absolute and unfettered discretion, has the right to secure, at the Association's expense, alternate accommodations or related facilities for Owner use during any reconstruction, replacement or acquisition period. Should the Board determine to use Association funds to acquire alternate accommodations or related facilities, special assessments may be made against all Owners in sufficient amounts to provide funds for the payment of such costs. Such special assessments are to be in proportion to the Owners' respective obligations for Common Expenses.

12.    **USE RESTRICTIONS.** The use of the Condominium Property is to be in accordance with the following provisions as long as the Condominium exists:

12.1    Personal Use. Except for Units owned by DVD, which may be utilized as provided in this Declaration, each of the Vacation Homes may be occupied only as vacation accommodations.  Except for Units or Ownership Interests owned by DVD, rentals of Vacation Homes to the general public by DVD or the Management Company and use of Vacation Points in connection with external exchange programs, use of the accommodations and recreational facilities of the Condominium is limited solely to the personal use of Owners, their lessees, guests, exchangers and invitees and for recreational uses by corporations and other entities owning Ownership Interests in a Unit. . No Owner of an Ownership Interest may occupy a Unit or Vacation Home, or use any facilities of the Condominium at any time other than during the time that a Vacation Home is properly reserved in accordance with the Condominium Documents.  Except as set forth above, use of Vacation Homes and recreational facilities for commercial purposes or any purposes other than the personal use described in this Declaration is expressly prohibited. "Commercial purpose" includes a pattern of rental activity or other occupancy by an Owner that the Board, in its reasonable discretion, could conclude constitutes a commercial enterprise or practice.  From time to time, to the extent that the board determines that use is occurring that is for a commercial purpose, the Board may in its sole and absolute discretion, adopt policies to provide what constitutes a commercial enterprise, practice or purpose.  No Vacation Home may be divided or subdivided into a smaller Vacation Home. The provisions of this Section 12.1 do not apply to Commercial Units, DVD or the Management Company.

12.2    Common Elements and Limited Common Elements. The Common Elements and Limited Common Elements may be used only for the purposes for which they are intended as contemplated under this Declaration and the Master Declaration, including use in the furnishing of services and facilities for the enjoyment of the personal use of the Owners. The Commercial Unit LCEs may be used and maintained in accordance with Article 22. The provisions of this paragraph do not apply to DVD or the Management Company.

12.3    Nuisances. No nuisance is to be allowed on the Condominium Property or within a Unit or a Vacation Home, or any use or practice that is the source of annoyance to Owners or which interferes with the peaceful possession and proper use of the property by the Owners. All parts of the Condominium are to be kept in a clean and sanitary condition, and rubbish, refuse or garbage are not permitted to accumulate. No fire hazard is allowed to exist. All Common Elements and Limited Common Elements shall be kept free for their intended use, and shall in no event be used as storage areas, either on a temporary or permanent basis. No clothing, towels, bedding, or other similar items may be dried or aired in any outdoor area or hung over or on balconies. No Owner shall make or cause to be made any noises, or use musical instruments, radios, televisions, amplifiers, or other such equipment in a manner that may tend to disturb other Owners. No Owner is permitted any use of a Vacation Home or make or permit any use of the Common Elements or the Limited Common Elements that will increase the cost of insurance on the Condominium Property. This Section 12.3 shall not apply to DVD with respect to its ordinary operation of its commercial activities on the Condominium Property, to the Association or Management Company with respect to its ordinary operation, maintenance or management of the Condominium Property, or to the TWDC Companies.  It is expressly contemplated that Commercial Units, Commercial Unit LCEs, portions of the adjacent Master Property, and nearby properties owned by the TWDC Companies may be operated as commercial spaces containing stores, restaurants, entertainment areas and other public establishments which may have nighttime hours of operation and which may result in noise or light levels in excess of levels typically occurring in areas consisting solely of residential accommodations, including, without limitation, fireworks and concerts.  Nothing contained within this Declaration is to be deemed to prohibit such commercial activity.

12.4    Lawful Use. No immoral, improper, offensive or unlawful use may be made of the Condominium Property, and all valid laws, zoning ordinances and regulations of all governmental bodies having jurisdiction will be observed. The responsibility of meeting the requirements of governmental bodies for maintenance, modification or repair of the Condominium Property will be the same as the responsibility for the maintenance and repair of the property concerned.

27

12.5    Signs. No signs, notices or other displays or advertising may be maintained on any part of the Common Elements, Limited Common Elements, Units or Vacation Homes, except that the right is specifically reserved to DVD to place and maintain signs, notices, and displays related to the advertising and marketing of Ownership Interests on the Condominium Property for as long as it may have Units or Ownership Interests in the Units or any other DVC Resort to sell or rent, except that Owners of Commercial Units may maintain such signs on their Commercial Unit, or any Commercial Unit LCEs, in connection with use of their Commercial Unit, and except as permitted by the Board from time to time.

12.6    Bicycles, Motorcycles, Commercial Trucks, Oversized Vehicles, and Trailers. Bicycles, motorcycles, commercial trucks, oversized vehicles, and trailers may not be stored on the Condominium Property except in such areas, if any, designated for this purpose.

12.7    Condominium Rules and Regulations. Reasonable rules and regulations concerning the use of Condominium Property may be promulgated and amended from time to time by the Board in the manner provided by its Articles of Incorporation and Bylaws. A copy of the initial Condominium Rules and Regulations is attached as Exhibit "E".

12.8    DVD's Use. DVD may make such use of the Common Elements, the Units and the Vacation Homes as it determines and as may facilitate the sale or rental of Units or Ownership Interests in the Units or other DVC Resorts by DVD, including showing of the property and the display of signs and other promotional devices.

12.9    No Pets. All pets are prohibited. No pets of any type are allowed on Condominium Property.

12.10    Antennas. No antennas or satellite transmission receivers of any type designed to serve a Unit or a Vacation Home will be allowed on the Units, Common Elements or Limited Common Elements, except as provided by the Association to serve as a master antenna for the benefit and use of the Condominium. Notwithstanding such restriction, the Owners of Commercial Units may place such antennas or satellite transmission receivers on Commercial Units or Commercial Unit LCEs which are appurtenant to their Commercial Unit with the approval of the Board. No electrical or other equipment may be operated on the Condominium Property which interferes with television signal reception, except for permitted equipment on the Commercial Units or Commercial Unit LCEs.

12.11    Decoration of Units or Vacation Homes. No Owner may alter the furnishings, appliances, personal property or decor of any Unit or any Vacation Home without the prior written consent of the Board. DVD shall only be responsible for declaring a Unit to the Condominium with the furnishings, appliances, personal property or decor within a Unit, or any Vacation Home within that Unit, as represented to the purchasers of Ownership Interests in that Unit. On recording of the first deed of an Ownership Interest in a Unit, the Board shall have the obligation and the authority to determine the interior color scheme, decor and furnishings of the Unit, and each Vacation Home within that Unit, as well as the proper time for redecorating and renovating such Unit, Vacation Home and their contents, and DVD shall have no further obligations in this regard. This authority shall include, but not be limited to, the right to alter, remove or replace any furnishings, appliances, personal property or decor in a Unit and any Vacation Home without the approval of any Owner; provided, however, that no such change shall be made without the approval of DVD so long as it owns an Ownership Interest in such Unit. Except for Commercial Unit Owners as to the Commercial Unit owned and Owners of Units which are not committed to the Vacation Ownership Plan as to those Units, no Owner, guest, invitee, or lessee shall paint or otherwise decorate or change the appearance of any portion of the Condominium Property nor shall any Owner, guest, invitee, or lessee make any additions, alterations, or renovations to the Condominium Property.

12.12    Description of the Disney Vacation Club and the Vacation Ownership Plan. Membership in the Disney Vacation Club, being a common element, is an appurtenance to each Ownership Interest as set forth in Section 6.4 above, which governs the assignment and use of such Ownership Interest. DVCMC and BVTC, respectively, have been engaged by the Association to administer the assignment and use of all Ownership Interests

28

through a central reservation system consisting of the Home Resort Reservation Component and the DVC Reservation Component.

12.12.1    The Vacation Ownership Plan and the Home Resort Reservation Component. Notwithstanding the specific Unit in which an Owner owns an Ownership Interest, it is the express intent of this Declaration, which intent is consented to by each Owner through acceptance of a conveyance hereunder, that all Units committed to the Vacation Ownership Plan will be available for use by all Owners of Ownership Interests in Units committed to the Vacation Ownership Plan at all times on a first come, first served reservation basis, through the Home Resort Reservation Component and in accordance with the provisions of this Declaration and the Membership Agreement, an initial copy of which is attached as Exhibit "G."

12.12.1.1    Operation of Vacation Ownership Plan. In this regard, the Association has entered into the Membership Agreement with DVCMC pursuant to which the Association has delegated all of its responsibilities and obligations for operating the Vacation Ownership Plan for the Condominium to DVCMC. Under this authority, DVCMC has established the reservation rules and regulations governing the Vacation Ownership Plan and the Home Resort Reservation Component as set forth in the Membership Agreement. DVCMC has the right to amend the terms and conditions of the Membership Agreement from time to time as set forth in the Membership Agreement. Owners, their guests, invitees, exchangers and lessees do not receive any special access or entry rights to any attraction or recreational facility located within the WALT DISNEY WORLD® Resort, other than to those recreational facilities made a part of this Condominium, by virtue of the ownership of a Unit or an Ownership Interest.

12.12.1.2    Association's Rights. If either the Property Management Agreement, pursuant to which DVCMC is engaged by the Association to act as the Management Company for the Condominium, or the Membership Agreement are terminated, the Association has the authority to establish reservation rules and regulations for the operation of the Vacation Ownership Plan, which may or may not be identical to the reservation procedures set forth in the Membership Agreement, by which use of the Units and Vacation Homes among all of the Cotenants is determined. In addition, if either the Property Management Agreement or the Membership Agreement terminate, irrespective of whether the termination is voluntary or involuntary and irrespective of the cause of such termination, the Association and all Owners must cease using and thereafter abstain from using all personal property belonging to or used by DVCMC, including all personal property relating to the operation of the Home Resort Reservation Component, and return same to DVCMC within fifteen (15) days from the date of termination.

12.12.1.3    Term of Vacation Ownership Plan. The term of the Vacation Ownership Plan is the term of this Condominium, and the Vacation Ownership Plan automatically terminates upon the termination of the Condominium. If the term of the Condominium is extended in accordance with Section 17.2 below, the term of the Vacation Ownership Plan will also be extended for the additional term, unless the Condominium is sooner terminated in accordance with this Declaration. DVD reserves the right to declare Units to the Condominium without committing such Units to the Vacation Ownership Plan.

12.12.2    DVC Reservation Component. This Condominium is a DVC Resort entitling Owners of Ownership Interests in Units committed to the Vacation Ownership Plan to voluntarily participate in the DVC Reservation Component in accordance with the provisions of the DVC Resort Agreement, an initial copy of which is attached as Exhibit "H." Under the terms of the DVC Resort Agreement, owners at any DVC Resort will be able to access the DVC Reservation Component and use DVC Vacation Points to reserve the use of Vacation Homes and accommodations at other DVC Resorts on a first come, first served basis along with Owners. An Owner has the right to make a reservation for the use of a Vacation Home through the Home Resort Reservation Component using Home Resort Vacation Points during the Home Resort Priority Period without owners at other DVC Resorts being permitted to make a reservation for a Vacation Home. The length of the Home Resort Priority Period for the Condominium is determined by DVCMC and is set forth in the Membership Agreement; however, in no event can DVCMC set a Home Resort Priority Period of less than one (1) month prior to the period during which the owners at the other DVC Resorts have the right to make a reservation for the use of Vacation Homes in the Condominium. An Owner will be

29

able to reserve the use of accommodations at other DVC Resorts on the same first come, first served basis subject to the same priority restrictions in favor of the owners in those DVC Resorts, although such priority restrictions may be of different durations for each DVC Resort.

This Condominium's participation in the DVC Reservation Component will continue until **January 31, 2057**, unless sooner terminated in accordance with the terms and conditions of the DVC Resort Agreement. If the term of this Condominium is extended pursuant to Section 17.2 below, the Condominium's participation in the DVC Reservation Component will automatically be extended for the additional term, unless sooner terminated in accordance with the terms and conditions of the DVC Resort Agreement.

12.12.3    Timeshare Plans, Fractional Plans and Clubs. Except as provided in this Declaration, no timeshare plans, fractional plans, exchange programs or clubs, or travel or vacation clubs comprised of a trust, corporation, cooperative, limited liability company, partnership, equity plan, non-equity plan, membership program, or any such other similar programs, structures, schemes, devices or plans of any kind (a) shall be created, established, operated or maintained with respect to the Condominium Property or the Ownership Interests; (b) shall acquire or accommodate Condominium Property or Ownership Interests; and (c) shall be permitted to incorporate an Ownership Interest into such entity, program, structure, scheme, device or plan, except by DVD or except with the prior written authorization from DVD, which authorization may be given or withheld in DVD's sole, absolute and unfettered discretion, and which authorization shall be evidenced by a written instrument executed by DVD, recorded in the Public Records of Orange County, Florida, and containing a reference to this Declaration.

12.13    Right of Occupancy - Holdover Owners. If any Owner, or an Owner's lessees, guests, exchangers or invitees, fails to vacate a Vacation Home at the expiration of any reserved use period, as may be required by the rules and regulations governing occupancy of the Vacation Home or as otherwise established by the Management Company, such person is deemed a "holdover owner," or, to the extent permitted by law and at the election of the Association or Management Company, such person shall be deemed not to be exercising his/her Ownership Interest but rather be deemed a "trespasser", in which case the Association or Management Company shall be entitled to exercise the remedies available to it under Chapter 509, Florida Statutes. It is the responsibility of the Association to take such steps as may be necessary to remove such holdover owner from the Vacation Home, and to assist the holder of any subsequent reserved use period who may be affected by the holdover owner's failure to vacate, in finding alternate accommodations during such holdover period.

12.13.1    Alternative Accommodations. In addition to such other remedies as may be available to it, the Association has the right to secure, at its expense, alternate accommodations for any holder of a subsequent reserved use period who may not occupy the Vacation Home due to any holdover owner's failure to vacate. Such accommodations must be as near in value as possible to the Vacation Home reserved. The holdover owner will be charged for the cost of such alternate accommodations, any other costs incurred due to the holdover owner's failure to vacate, and an administrative fee of Fifty Dollars ($50.00) per day during this period of holding over. If it is necessary that the Association contract for a period greater than the actual period of holding over in order to secure alternate accommodations as set forth above, the entire period is the responsibility of the holdover owner, however, the Fifty Dollars ($50.00) per day administrative fee ceases on the date that the holdover owner actually vacates. The Association will submit a bill to the holdover owner in accordance with Paragraph 12.13.2 prior to levying a fine against such holdover owner.

12.13.2    Fines; Right to Hearing. Except as otherwise provided by Florida law, including, without limitation, Section 721.15, Florida Statutes, before the Association may levy a fine against a party for violation of any of the provisions of the Condominium Documents, the Association must afford the party reasonable notice of the levy and a right to a hearing as required under Florida law.

30

12.13.3    Association's Rights. The foregoing provisions do not abridge the Association's right to take such other action against a holdover owner as is permitted by law including eviction proceedings or self-help remedies to the extent permitted by law. Further, the foregoing provisions do not limit the Association's right to take any action permitted by Florida law against trespassers who are not Owners.

12.14    No Domiciliary Intent. No person or party may enter, stay or dwell on or about the Condominium Property with the intent or desire to be or become legally domiciled in the State of Florida or any political subdivision of the State of Florida merely as a result of such entrance onto or occupation of the Condominium Property, and all such persons or parties  waive, release and remise any such intent or desire. No person or party may enter, stay or dwell on or about a Unit or Vacation Home with the intent that the Unit or Vacation Home be or become that person's or party's principal dwelling, and such person or party will maintain a principal dwelling at all times at a location other than within the confines of the Condominium Property.

12.15    No Private Watercraft. No boats, jet-skis, waverunners or watercraft of any kind may be used, stored or brought onto the Condominium Property by any Owner, lessee, guest, exchanger or invitee except in such areas and under such conditions as may be determined by the Board from time to time.

12.16    No Feeding the Animals.   The Master Property is designed to encourage observation of Africa's amazing wildlife from either the comfort of your Vacation Home, Common Elements or Shared Areas (ad defined in the Master Declaration) throughout the Master Property.  No person or party may feed the animals or drop items into the habitats.  Failure to abide by this rule shall be cause for removal from the Master Property.  No person or party may attempt to cross the barriers designed for guest and animal safety.   Any person or party that attempts to harm the animals or their habitats will be immediately asked to leave the Master Property.

12.17    No Straws, Lids or Balloons. No person or party may have straws, lids or balloons on the Master Property.  These Items can be a potential health risk to our animals if they are ingested.

## 13.    **ALIENABILITY OF UNITS OR OWNERSHIP INTERESTS.**

13.1    Alienability Restrictions; DVD's Right of First Refusal to Purchase. The right of Owners or Cotenants to sell, transfer, assign or hypothecate their Unit or Ownership Interest is not subject to the approval of the Association. Accordingly, a proper transfer or conveyance of such Unit or Ownership Interest does not require the written approval of the Association. However, if an Owner or Cotenant desires to sell, transfer, assign or hypothecate that Owner's Unit or Ownership Interest, DVD has the right of first refusal to purchase the Unit or Ownership Interest in the Unit under the same terms and conditions as are offered to or by a bona fide third party, including financing. Accordingly, Owners or Cotenants desiring to sell their Unit or Ownership Interest must notify DVD in writing no less than thirty (30) days in advance of the proposed closing date of their intent to sell and must include a copy of the proposed transaction reduced to writing in all respects. On receipt of such written notice, DVD may determine prior to the proposed closing date whether to exercise its right of first refusal set forth in this Article 13. If DVD elects to exercise its right of first refusal, DVD must notify the Owner or Cotenant in writing of such election, and the purchase by DVD must be closed on or before the proposed closing date. If DVD fails to notify the Owner or Cotenant of its election to exercise its right of first refusal prior to the proposed closing date, then the Owner or Cotenant may proceed to close on the transaction with such bona fide third party. In all events, membership in the Disney Vacation Club, in accordance with this Declaration, and DVD's right of first refusal, as set forth above, are covenants running with the land. Furthermore, subject to the Condominium Documents, Membership in the Disney Vacation Club is always a requirement of any successor in title to an Owner or Cotenant and is an appurtenance to each Condominium Parcel. **IN ADDITION, ANY PERMITTED SALE BETWEEN AN OWNER OR COTENANT AND A BONA FIDE THIRD PARTY IS DEEMED TO CONTAIN A PROVISION REQUIRING THAT ANY SUMS DUE TO THE ASSOCIATION AS ASSESSMENTS MUST BE PAID IN FULL AS A CONDITION OF CLOSING OF THE SALE.**

31

13.2    <u>Leasing and Rental Restrictions</u>. All leasing or rental agreements relating to the use, occupancy and possession of any Vacation Home during a reserved use period must be in writing and must set forth an acknowledgment and consent on the part of the lessee-sublessee-tenant to use, occupy and possess such Vacation Home in conformance and compliance with the provisions of this Declaration, as well as the Articles of Incorporation, Bylaws, the Condominium Rules and Regulations and the rules and regulations of the Disney Vacation Club. If an Owner or Cotenant fails to secure a written lease or rental agreement, the Association has the right to require the lessee-sublessee-tenant, prior to the lessee-sublessee-tenant's use, occupancy or possession of any Vacation Home, to execute an acknowledgment to use and occupy the rental or leased Vacation Home in conformance with the Condominium Documents. **ANY LEASE OR RENTAL AGREEMENT IS DEEMED TO CONTAIN A PROVISION REQUIRING THAT ANY SUMS DUE TO THE ASSOCIATION AS ASSESSMENTS MUST BE DEDUCTED FROM THE GROSS RENTALS AND PAID DIRECTLY TO THE ASSOCIATION.**

13.3    <u>Approval of the Management Company</u>. The Management Company has the right to create such reservation approval restrictions as it deems necessary from time to time, and compliance with such restrictions is required before and during possession and occupancy of a Vacation Home.

14.    **RIGHTS OF DVD.** Notwithstanding anything in this Declaration to the contrary, and in addition to any other rights which may be reserved to DVD in this Declaration, DVD has the following rights:

14.1    <u>Alteration of Vacation Home Boundaries and Dimensions</u>. DVD reserves the right to change the interior design and arrangement of a Unit or any Vacation Home so long as DVD owns the entire Unit so changed and altered, and provided such change is reflected by an amendment to this Declaration. Such an amendment for the purpose of altering the interior design or arrangement of a Unit or any Vacation Home may be signed and acknowledged only by DVD and need not be approved by the Association or other Owners, whether or not elsewhere required for an amendment, except that no change may be made by DVD which would conflict with the provisions of Chapter 718 and Section 17.3 below.

14.2    <u>Sharing of Recreational Facilities and Other Common Areas</u>. DVD also reserves the right to unilaterally amend this Declaration to provide for the sharing of the recreational facilities and other common areas of this Condominium with the owners of units in other properties, resorts or condominiums located adjacent to or in near proximity to this Condominium, including the granting of any ingress and egress easements necessary to effectuate same; provided, however, that if this Declaration is so amended, the owners of interests in such other property, resort or condominium will be required to share with the Owners any recreational facilities and common areas existing as a part of their property, resort or condominium. In addition, the owners at each property, resort or condominium will bear their pro rata share of the costs of maintaining all such shared facilities and common areas.

14.3    <u>Hotel</u>. Notwithstanding anything contained in this Declaration to the contrary (including, without limitation, the use restrictions set forth in Section 12 hereof) DVD intends and expressly reserves the right to operate or permit the operation of a nightly rental program or hotel with respect to Ownership Interests and Vacation Points owned or otherwise possessed or controlled by DVD or any TWDC Company and with respect to unsold Units.

15.    **COMPLIANCE AND DEFAULT.**

15.1    <u>Compliance and Default</u>. Each Owner is governed by and must comply with the terms of the Condominium Documents, as they may be amended from time to time. Failure of an Owner to comply with the provisions of the Condominium Documents entitles the Association or other Owners to pursue any and all legal and equitable remedies for the enforcement of such provisions, including an action for damages, an action for injunctive relief, an action for declaratory judgment, or, with respect to Units committed to the Vacation Ownership Plan, suspension of the right of an Owner to access the benefits of the use of such Owner's Ownership Interest as contemplated under this Declaration, the Membership Agreement and the DVC Resort Agreement. All provisions of

32

the Condominium Documents are enforceable equitable servitudes and run with the land and are effective until the Condominium is terminated.

15.2    Costs and Fees. In any proceeding arising because of an alleged failure of an Owner or the Association to comply with the terms of the Condominium Documents, as they may be amended from time to time, the prevailing party is entitled to recover the costs of the proceeding, and recover such reasonable fees for attorneys, paralegals, legal assistants and other professionals as may be awarded by the Court, including all appeals and all proceedings in bankruptcy and probate.

15.3    No Waiver of Rights. The failure of DVD, the Association or any Owner to enforce any covenant, restriction or other provision of Chapter 718, Chapter 721, or the Condominium Documents does not constitute a waiver of the right to do so in the future.

15.4    Injunctive Relief. The Association may seek an injunction from a court of equity to compel compliance or prohibit violation of the Condominium Documents regardless of whether an adequate remedy at law exists.

15.5    Governing Law; Waiver of Jury Trial; Venue of Actions. The Condominium Documents, including this Declaration, are to be governed by, and construed in accordance with, the laws of the State of Florida. The Association, an Owner or Owners, DVD, the Management Company, and any other party claiming rights or obligations by, through, or under the Condominium Documents, or two or more of the foregoing, each  waive any right they may have under any applicable law to a trial by jury with respect to any suit or legal action which may be commenced by or against the others concerning the interpretation, construction, validity, enforcement or performance of the Condominium Documents or any other agreement or instrument executed in connection with this Declaration. If any such suit or legal action is commenced by any party, the other parties agree, consent and submit to the personal jurisdiction of the Circuit Court of the Ninth Judicial Circuit of Florida in and for Orange County, Florida, with respect to such suit or legal action, and each party also consents and submits to and agrees that venue in any such suit or legal action is proper in said court and county, and each party waives any and all personal rights under applicable law or in equity to object to the jurisdiction and venue in said court and county. Such jurisdiction and venue are exclusive of any other jurisdiction and venue.

16.    **AMENDMENTS.**

16.1    By Owners. This Declaration may be amended at any regular or special Association meeting, called and convened in accordance with the provisions of the Bylaws, by the affirmative vote of a majority of the total votes eligible to be voted, unless a different vote is required by the specific provisions of this Declaration. Each such amendment of this Declaration may be evidenced by an instrument in writing, signed and acknowledged by any two (2) officers of the Association, setting forth the full text of such amendment, the appropriate recording data of this Declaration and certifying that such amendment has been approved by the affirmative vote of a majority of the total votes eligible to be voted. Said amendment becomes effective on the recording of the amendment in the Public Records of Orange County, Florida. For so long as DVD owns an Ownership Interest, no amendment by the Owners becomes effective unless and until approved, in writing, by DVD, in its sole, absolute and unfettered discretion. Furthermore, the Owners have no power to enact any amendment to this Declaration which materially affects the rights or security interests of any Mortgagee of record, without first obtaining the written consent of such affected Mortgagee of record, such consent not to be unreasonably withheld.

16.2    By DVD. DVD reserves the right to unilaterally amend this Declaration as it may deem appropriate in its sole, absolute and unfettered discretion or as may be required by any lending institution, title insurance company or public body or as may be necessary to conform the same to the requirements of law or to facilitate the operation and management of the Condominium or the Disney Vacation Club or the sale of Ownership Interests in Units. Any amendments to this Declaration which may be unilaterally made by DVD become effective upon the recording in the

33

Public Records of Orange County, Florida, of an instrument executed solely by DVD, setting forth the text of such amendment in full, together with the appropriate recording data of this Declaration. No amendment of this Declaration permitted to be unilaterally made by DVD is permitted if such amendment would prejudice or impair to any material extent the rights of the Owners as a whole or any Mortgagee of record. DVD may also make other amendments as may be reserved elsewhere in the Condominium Documents.

16.3    <u>Amendments to Units</u>. Subject to DVD's rights as set forth in Article 16.2, no amendment changing the configuration or size of any Unit declared to the Condominium in any material fashion, altering or modifying the appurtenances to such Unit, or changing the proportion or percentage by which the Owner shares the Common Expenses and owns the Common Surplus is permitted unless such amendment is approved by DVD, for so long as DVD owns an Ownership Interest, and approved by a majority of the total voting interests of the Owners. If such amendment is required by any governmental entity, such amendment shall be permitted with the affirmative vote of the Board and approval by DVD, for so long as DVD owns a Unit or Ownership Interest.

16.4    <u>Amendments to Common Elements</u>. DVD, at DVD's capital expense, may, for so long as DVD owns a Unit or Ownership Interest, from time to time, and without the approval of the Association, the Board, or any Owner add facilities to the Condominium Property including recreational areas and facilities. In addition, for so long as DVD owns a Unit or Ownership Interest, DVD, at DVD's capital expense, may substantially, materially or otherwise alter, modify, rearrange, relocate, or replace the Common Elements or real property that is Association property, without the approval of the Association, the Board, or any Owner; provided, however, no amendment may, without the affirmative vote of a majority of the total votes eligible to be voted at any regular or special Association meeting called and convened in accordance with the Bylaws, result in the alteration, modification, rearrangement, relocation, or replacement of the Common Elements or the real property that is Association property in such a manner that such Common Elements or real property that is Association Property no longer provide substantially the same use, function, or experience as the existing Common Elements or real property that is Association property, as DVD determines in its sole, absolute and unfettered discretion. Subject to DVD's approval, for so long as DVD owns a Unit or Ownership Interest, the Owners, at the Association's capital expense, may add property to the Condominium or substantially, materially or otherwise alter, modify, rearrange, relocate, or replace the Common Elements or real property that is Association property with the affirmative vote of a majority of the total votes eligible to be voted at any regular or special Association meeting called and convened in accordance with the Bylaws. Notwithstanding the obligation of DVD or the Association to bear the capital expense of making any addition, alteration, modification, rearrangement, relocation, or replacement authorized under this Section 16.4, the cost of ongoing maintenance, operation, repair, and replacement will be borne by the Association. Any substantial alteration, modification, rearrangement, relocation, or replacement authorized under this Section 16.4 may be made effective by the filing of an amendment to this Declaration in the public records of Orange County, Florida. The provisions of Article 7 govern the maintenance, repair, alteration, rearrangement, improvement, removal, or replacement of any or all personal property or furnishings that are part of the Condominium Property.

17.    **TERMINATION.** The Condominium may be terminated in the following manners, in addition to the manner provided by Chapter 718:

17.1    <u>Agreement</u>. The Condominium may be terminated at any time by the approval in writing of all Owners and all Mortgagees of record. Notice of a meeting at which the proposed termination is to be considered must be given not less than thirty (30) days prior to the date of such meeting.

17.2    <u>Expiration of Ground Lease</u>. Upon the termination or expiration of the Ground Lease, the Condominium automatically terminates and all Ownership Interests and all Mortgagee liens on any Condominium Property terminate. If DVD renews the Ground Lease or enters into another lease of the property underlying the Condominium prior to the expiration or termination of the Ground Lease, DVD may, in DVD's sole, absolute and unfettered discretion, unilaterally elect to continue the Condominium for the duration of such renewal. Such election shall be evidenced by the recording of an amendment to this Declaration. If DVD elects to continue the Condominium

34

for an additional term as contemplated in this Section 17.2 and at the election of DVD, all rights and obligations of Owners and Mortgagees as set forth in this Declaration shall continue in full force and effect for the duration of the extended term.

17.3    Termination Through Condemnation. The Condominium may only be terminated due to condemnation if all of the Condominium Property is taken in condemnation. If less than all of the Condominium Property is taken in condemnation, the Condominium continues as to those portions of the Condominium Property not so taken.

17.4    Certificate. Termination of the Condominium in any of the foregoing manners is evidenced by a certificate of the Association executed by its President and Secretary certifying to the facts effecting the termination, said certificate to become effective upon being recorded in the Public Records of Orange County, Florida.

18.    **PHASE DEVELOPMENT.**

18.1    Description of Phasing. It is the intention of DVD to develop the Condominium in phases in accordance with Chapter 721. The overall boundary of the property which DVD contemplates adding to the Condominium is described in Exhibit "A"; however, DVD reserves the right not to submit any or all of the property described in Exhibit "A" to the Condominium or add additional property to the Condominium which may not be included within the overall boundary described in Exhibit "A." The Common Expense, Common Surplus and Common Element ownership reallocation caused by the proposed phasing plan is set forth in Exhibit "D". DVD reserves the right to submit phases to condominium use in any sequence.

18.2    Reservation of Right to Change Phasing Plan. The phase boundaries, plot plans and floor plans, Unit types (including upper and lower boundaries and perimeter boundaries descriptions), Unit sizes and Unit type mixes and numbers of Units for the first phase are described in Exhibit "A" attached. Pursuant to Chapter 721, DVD reserves the right to change the phase boundaries, plot plans and floor plans, Unit types (including upper and lower boundaries and perimeter boundaries descriptions), Unit sizes and Unit type mixes and numbers of Units for any future phase, in its sole, absolute and unfettered discretion, prior to adding such future phase to the Condominium. DVD specifically reserves the right to declare one or more phases that contain only residential Units, Commercial Units or Common Elements. In addition, DVD specifically reserves the right to declare one or more phases that contain any combination of residential Units, Commercial Units and Common Elements.

18.3    Land. The land which may ultimately become part of the Condominium is described in Exhibit "A;" however, DVD reserves the right, in its sole, absolute and unfettered discretion, not to submit any or all of the property described in Exhibit "A" to the Condominium or to add additional property to the Condominium. Any phase legal description utilized by DVD is for convenience of identifying proposed phases only, and once a phase has been declared to the Condominium, the separate phase legal description is subsumed in the overall legal description of the Condominium Property as then constituted and does not have separate identity.

18.4    Recreational Areas and Facilities. DVD does not intend to declare any recreational areas or facilities to the Condominium other than those areas or facilities contained in the first phase of the Condominium and described in the attached Exhibit "A." DVD expressly reserves the right to add additional recreational areas or facilities to the Condominium as a part of a future phase without the consent of Owners. Any additional recreational areas or facilities will be constructed at DVD's sole expense.

18.5    Impact of Phasing; Change in Ownership of Common Elements and Common Surplus and Share of Common Expenses. The impact, if any, which the completion of subsequent phases would have on the Condominium would be to increase the number of Units and the number of Owners in the general area. The change in ownership of Common Elements and Common Surplus and the change in the share of Common Expenses

35

attributable to each Unit by the addition of subsequent phases is to be determined in accordance with the formula set forth in Exhibit "D".

18.6    <u>Completion of Phases</u>. DVD will submit each successive phase, if at all, to condominium ownership in its sole, absolute and unfettered discretion. The declaration of all phases to the Condominium will be completed within the time limit as determined by DVD, in its sole, absolute and unfettered discretion, although DVD reserves the right not to submit any or all of the subsequent phases to Condominium ownership. DVD also specifically reserves the right to amend this Declaration, without the approval of the Owners, for the purpose of changing any of the items required to be included in this Declaration, by Florida law, for a particular phase.

18.7    <u>Association Membership and Voting</u>. Each Unit, except each Commercial Unit, in each phase is entitled to one (1) vote in the Association. The vote of the Owner of a Unit must be cast by its Voting Representative. Where a Unit is owned by more than one owner, the Cotenants of the Unit will file a Voting Certificate with the Association, in accordance with the Bylaws, setting forth which Cotenant is designated as the Voting Representative for that Unit.

18.8    <u>Disney Vacation Club and Vacation Ownership Plan</u>.

**A VACATION OWNERSHIP PLAN MAY BE CREATED WITH RESPECT TO UNITS IN EVERY PHASE.**

It is DVD's intent that Units in every phase will be declared as part of the Vacation Ownership Plan; however, DVD reserves the right to declare Units to the Condominium that will not be included as part of the Vacation Ownership Plan. The degree, quantity, nature and extent of the Vacation Ownership Plan is described above. Phases declared to this Condominium and included in the Vacation Ownership Plan are also subject to the terms and conditions of the DVC Resort Agreement as described above.

18.9    <u>Notice</u>. DVD is not required to notify Owners of existing Units in the Condominium of the commencement of or decision not to add any subsequent phase.

18.10    <u>Amendment</u>. Phases may be added to this Condominium by the execution of an amendment to this Declaration executed by DVD, its successors or assigns only, and such amendment does not require the execution or consent of any Owners other than DVD.

19.    **MERGER.** This Declaration, the Association and the Common Elements of this Condominium described in this Declaration may be merged with the declaration of condominium, condominium association and common elements of another independent and separate condominium to form a single condominium with the consent of majority of the total number of voting interests and with the approval of all of the record owners of liens on the Units and Ownership Interests in the Units. If such consent and approval is obtained, a new or amended declaration of condominium, articles of incorporation and bylaws of the Association will be recorded and contain such provisions as are necessary to amend and modify the appurtenances to the Units and the percentages by which the Owners share the Common Expenses and own the Common Surplus and Common Elements in order to create a consolidated single condominium.

20.    **COMMERCIAL UNITS.**

20.1    <u>Commercial Unit Rights and Ownership</u>. Commercial Unit owners are entitled to all of the rights and benefits otherwise provided to Owners under this Declaration except for the right to vote at any meeting of the Association as provided for in Article 20 of this Declaration. Commercial Unit owners have the right to apply for or receive any permits necessary for any use of the Commercial Units not inconsistent with this Declaration and the Association must assist Commercial Unit Owners in applying for any permits in this regard. Commercial Units share in the Common Expenses and the Common Surplus in accordance with Exhibit "D". In addition, the owner of a

36

Commercial Unit is solely responsible for all expenses of maintaining, repairing and operating the Commercial Unit. In addition to all appurtenances, easements and other benefits passing with Units as provided in this Declaration, each Commercial Unit has as an appurtenance to the Commercial Unit, the following perpetual nonexclusive easements for the use and benefit of the Commercial Unit owners, their successors and assigns, social guests, lessees, licensees and invitees: an easement for ingress and egress over all Common Elements as the same may exist from time to time for such purposes as permitted by law, including such commercial activities as the Commercial Unit owner may engage in from time to time; an easement for maintenance, repair, replacement, removal and relocation of any items necessary for use of the Commercial Units as permitted in this Declaration; and an easement for ingress and egress from any Commercial Unit to any right of way access to any public beach.

20.2    Rights of Owners of Commercial Units. A Commercial Unit owner may, in its sole discretion and without the consent of any Owner or the Association, subdivide its Commercial Unit, sell or lease all or a portion of the Commercial Unit, or use the Commercial Unit for any lawful use that is not prohibited by Florida law. Notwithstanding the rights to conduct commercial activities in a Commercial Unit, each Commercial Unit owner has the right, in its sole discretion, to not engage in any commercial activity.

20.3    Conveyance. The Owner of a Commercial Unit may convey the Commercial Unit, or any subdivision of a Commercial Unit, to the Association without the consent of any other Owner, and the Association shall be obligated to accept such conveyance. A Commercial Unit conveyed to the Association as contemplated in this Declaration may only be conveyed by the Association to a third party in accordance with the same restrictions which govern the conveyance by the Association of portions of the Common Elements.

21.    **SEVERABILITY AND CONFLICT.**

21.1    Severability. The invalidity in whole or in part of any covenant or restriction, or any article, section, subsection, sentence, clause, phrase or word, or other provision of the Condominium Documents do not affect the validity of the remaining portions.

21.2    Conflict. If it should appear that any of the provisions of this Declaration are in conflict with the Master Declaration or the Ground Lease, then such provisions are deemed inoperative and null and void insofar as they may be in conflict therewith, and are deemed modified to conform to the Master Declaration or the Ground Lease, in that order.

21.3    Plural and Include. Where the context so indicates, a word in the singular form shall include the plural. The term "include" and similar terms (e.g., includes, including, included, comprises, comprising, such as, e.g., and for example), when used as part of a phrase including one or more specific items, are used by way of example and not of limitation.

22.    **COMMERCIAL UNIT LCES.**

22.1    Use of the Commercial Unit LCEs. The use of any Commercial Unit LCE is exclusive to the owner of the Commercial Unit to which the Commercial Unit LCE is appurtenant and to such persons as permitted by the owner of the Commercial Unit from time to time, including Owners, in the owner's sole, absolute and unfettered discretion.

22.2    Maintenance of Commercial Unit LCEs. Maintenance, repair and replacement of any Commercial Unit LCE is to be performed by the Association, at the cost and expense of the Association, in accordance with the provisions of this Declaration addressing the maintenance, repair and replacement of Limited Common Elements.

22.3    Alteration of Commercial Unit LCEs. The owner of the Commercial Unit to which a Commercial Unit LCE is appurtenant has the right to reconstruct, alter, repair, renovate, restore or replace the Commercial Unit LCE, or any portion of the Commercial Unit LCE, without the approval of the Association or any Owner; provided, however,

37

that the owner of the Commercial Unit to which the Commercial Unit LCE is appurtenant has DVD's approval (which may be withheld by DVD in its sole, absolute and unfettered discretion) and provided further that such owner bears all costs associated with such reconstruction, alteration, renovation, restoration or replacement. Neither the Association nor any Owner have the right to reconstruct, alter, renovate, restore or replace the Commercial Unit LCEs without the approval of the owner of the Commercial Unit to which the Commercial Unit LCE is appurtenant.

IN WITNESS WHEREOF, DVD has executed this Declaration on the day and year first above written.

WITNESSES

Print Name: Jeannett Greene

Print Name: Liigh A Nieman

**DISNEY VACATION DEVELOPMENT, INC.,**
a Florida corporation

By:

Print Name: Ted L. Watson

As its: Vice President


STATE OF FLORIDA    )

COUNTY OF Osceola    ).

BEFORE ME, the undersigned authority authorized to take acknowledgments in the state and county aforesaid, personally appeared Ted L. Watson, Vice President of DISNEY VACATION DEVELOPMENT, INC., a Florida corporation, and he acknowledged that he executed the foregoing instrument on behalf of the corporation pursuant to due authority therefrom. He is personally known to me.

WITNESS my hand and seal this 18th day of January, 2007.

(NOTARY SEAL)

J. Greene
My Commission DD282473
Expires February 10, 2008

SIGNATURE OF NOTARY PUBLIC – State of Florida


PRINT NAME OF NOTARY PUBLIC – State of Florida

38

## CONSENT OF LESSOR
## TO DECLARATION OF CONDOMINIUM

THIS CONSENT (this "**Consent**") is made and entered into the _18th_ day of _January_, 200 _7_, by WALT DISNEY WORLD HOSPITALITY & RECREATION CORPORATION, a Florida corporation, whose address is Post Office Box 10,000, Lake Buena Vista, Florida 32830-1000 ("**WDWHRC**").

### R E C I T A L S

A.    WDWHRC is the fee simple owner of that certain property (the "**Master Property**") more particularly described in and subject to the covenants, conditions and restrictions contained in that certain Master Declaration of Covenants, Conditions and Restrictions, as recorded in Official Records Book _9077_, Page _4195_, of the Public Records of Orange County, Florida ("**Master Declaration**");

B.    WDWHRC, as lessor, has leased the Master Property to Disney Vacation Development, Inc., a Florida corporation ("**DVD**"), as lessee, pursuant to that certain Ground Lease by and between WDWHRC and DVD of even date herewith; a short form of which is described in that certain Memorandum of Ground Lease of even date herewith and recorded in Official Records Book _9077_, Page _4221_, of the Public Records of Orange County, Florida (the "**Ground Lease**");

C.    DVD has declared a portion of the Master Property to the condominium form of ownership pursuant to the Declaration of Condominium of Disney's Animal Kingdom Villas, a leasehold condominium, as recorded in Official Records Book _9077_, Page _4252_, Public Records of Orange County, Florida, to which this Consent is attached (the "**Declaration**");

D.    The Ground Lease encumbers the land and the improvements located on such land, inclusive of the first phase of the Condominium as described in the Declaration; and

E.    WDWHRC, as lessor under the Ground Lease, has agreed to consent to the recordation of the Declaration.

NOW, THEREFORE, WDWHRC provides as follows:

1.    <u>Recitals and Definitions</u>. The above recitals are true and correct and are incorporated in this Declaration. All terms used in this Consent have the same meaning as the identical terms used in the Declaration unless the context otherwise requires.

2.    <u>Consent</u>. WDWHRC, as lessor under the Ground Lease and declarant under the Master Declaration, agrees and does consent to the recordation of the Declaration; provided, however, that no amendment to the Declaration is effective against WDWHRC unless WDWHRC has executed a joinder and consent as to such amendment. Pursuant to the requirements of the Ground Lease, by the execution of this Consent, WDWHRC provides DVD, the Association, the Owners and DVCMC with its consent and approval to the following specific matters: a. The provisions of Article 11 of the Declaration regarding reconstruction or repair of the Condominium Property after casualty or eminent domain; b. DVCMC, as the Management Company for the Condominium, and the Property Management Agreement between the Association and DVCMC, an initial copy of which is attached to the Declaration as Exhibit "F;" c. The automatic assumption by the Association of the obligations of DVD as the tenant under the Ground Lease with respect to the property comprising the first phase of the Condominium and as limited pursuant to the terms of the Ground Lease; and d. The use of the name "Disney's Animal Kingdom Villas, a leasehold condominium" to describe the Condominium and the management or operation of the Condominium as set forth in the Condominium Documents, and the use of the name "Disney's Animal Kingdom Villas Condominium Association, Inc." to describe the Association, all subject to the terms and conditions set forth in the Master Declaration, the Ground Lease and the Declaration.

IN WITNESS WHEREOF, WDWHRC has caused this instrument to be executed by its duly authorized officer the day and year first above written.

WITNESS:

Print Name: _Maria A. Maher_
_Maria A. Maher_

Print Name: _John McGowan_
_John McGowan_

WALT DISNEY WORLD HOSPITALITY &

**RECREATION CORPORATION**, a Florida corporation

By: _Lee Schmudde_

Name: _Lee Schmudde_

As its: _Vice - President_

STATE OF FLORIDA )

COUNTY OF ORANGE )

The foregoing instrument was acknowledged before me this _19_ day of _January_, 200_7_ by _Lee Schmudde_, _Vice President_ of WALT DISNEY WORLD HOSPITALITY & RECREATION CORPORATION, a Florida corporation, on behalf of the corporation. He is personally known to me.

(NOTARY SEAL)

Notary Public State of Florida
Maria A Maher
My Commission DD520078
Expires 02/19/2010

_Maria A. Maher_
(Notary Signature)
_Maria A. Maher_
(Notary Name Printed)

J:\DATA\Compliance\DVC RESORTS\ANIMAL KINGDOM VILLAS\POS Docs\Dec of Condo\Declaration of Condominium (5)\[mm comments 1-08-06CLN).DOC

CONDOMINIUM EXHIBIT
BOOK .................... PAGE....................

# DISNEY'S ANIMAL KINGDOM VILLAS A LEASEHOLD CONDOMINIUM EXHIBIT "A"

## SECTIONS 34, TOWNSHIP 24 SOUTH, RANGE 27 EAST, ORANGE COUNTY, FLORIDA. OVERALL SITE PLAN

### LEGAL DESCRIPTION DISNEY'S ANIMAL KINGDOM VILLAS A LEASEHOLD CONDOMINIUM

The Fifth Floor Premises shall consist of that portion of the Animal Kingdom Lodge located on and wholly within the perimeter boundary of the property legal described below, and the boundaries of the Fifth Floor Premises are more particularly described as follows (it being the intent of this description to describe the fifth floor of the Animal Kingdom Lodge):

(1) Upper and Lower Boundaries: The upper and lower boundaries of the Premises shall be the following boundaries extended to an intersection with the perimeter boundaries.

(a) The upper boundary of the Premises is the interior unfinished surface of the fifth floor ceiling.
(b) The lower boundary of the Premises is the interior unfinished surface of the floor slab of the fifth floor.

(2) Perimeter Boundaries: The perimeter boundaries of the Premises are the vertical planes along and coincident with the unfinished interior surface of the perimeter walls of the Animal Kingdom Lodge.

(3) The Fifth Floor Premises are located on and wholly within the following perimeter boundary:

Commence at the West Quarter corner of said Section 34, Township 24 South, Range 27 East, Orange County, Florida, run along the West line of the Southwest 1/4 of said Section 34, S 00°00'19" W, 282.81 feet; thence N 90°00'00" E, 882.34 feet to the Point of Beginning; thence N 85°54'34" E, 37.30 feet; thence S 04°26'59" E, 2.95 feet; thence N 85°33'01" E, 156.56 feet; thence N 06°25'35" E, 91.80 feet; thence S 83°34'29" E, 30.20 feet; thence N 16°25'21" E, 25.00 feet; thence N 63°34'49" W, 30.19 feet; thence N 26°25'11" E, 91.80 feet; thence N 52°41'59" W, 104.89 feet; thence S 37°18'01" W, 3.36 feet; thence N 52°41'59" W, 37.30 feet; thence N 37°18'01" E, 76.91 feet; thence S 52°41'59" E, 37.30 feet; thence S 37°18'01" W, 4.45 feet; thence S 52°41'59" E, 104.89 feet; thence N 48°10'31" E, 92.38 feet; thence N 41°49'29" W, 4.45 feet; thence N 48°10'31" E, 37.30 feet; thence S 41°49'29" E, 76.73 feet; thence S 48°10'31" W, 37.30 feet; thence N 41°49'29" W, 3.18 feet; thence S 48°10'31" W, 103.33 feet; thence N 41°49'29" W, 31.05 feet; thence S 48°09'21" W, 3.06 feet; thence S 41°54'19" W, 6.57 feet; thence S 52°41'59" E, 1.51 feet; thence S 37°18'51" W, 3.06 feet; thence S 52°41'04" E, 1.50 feet; thence S 37°18'01" W, 8.00 feet; thence N 52°42'53" W, 1.50 feet; thence S 37°17'11" W, 3.06 feet; thence N 52°41'59" W, 1.51 feet; thence S 32°41'43" W, 6.57 feet; thence S 26°26'35" W, 3.04 feet; thence S 63°34'08" E, 31.05 feet; thence S 26°25'30" W, 102.76 feet; thence N 63°34'23" W, 30.40 feet; thence S 16°25'34" W, 22.05 feet; thence S 83°34'29" E, 30.40 feet; thence S 06°25'31" W, 102.76 feet; thence N 83°34'10" W, 31.05 feet; thence S 06°24'28" W, 3.05 feet; thence S 00°09'19" W, 6.57 feet; thence N 85°33'01" E, 1.51 feet; thence S 04°26'09" E, 3.06 feet; thence N 85°33'56" E, 1.50 feet; thence S 04°26'59" E, 8.00 feet; thence S 85°32'08" W, 1.50 feet; thence S 04°27'49" E, 3.06 feet; thence S 85°33'01" W, 1.51 feet; thence S 09°03'17" E, 6.57 feet; thence S 15°18'25" E, 3.05 feet; thence N 74°40'12" E, 31.05 feet; thence S 15°19'29" E, 102.78 feet; thence S 74°40'31" W, 30.40 feet; thence S 25°19'43" E, 22.03 feet; thence N 34°40'31" E, 30.40 feet; thence S 35°19'29" E, 52.02 feet to a point on a non-tangent curve concave Westerly having a radius of 24.55 feet, and a central angle of 37°49'38"; thence from a tangent bearing of S 31°37'34" E run Southerly along the arc of said curve, 16.21 feet; thence S 35°17'15" E, 20.95 feet to a point on a non-tangent curve concave Southwesterly having a radius of 23.41 feet, and a central angle of 40°31'12"; thence from a tangent bearing of S 77°14'04" E run Southeasterly along the arc of said curve, 16.56 feet; thence S 54°42'45" W, 10.41 feet; thence S 35°17'15" E, 6.04 feet; thence N 77°21'59" E, 1.19 feet; thence N 09°47'03" W, 0.50 feet to a point on a non-tangent curve concave Northwesterly having a radius of 12.59 feet, and a central angle of 281°45'24"; thence from a tangent bearing of N 79°51'14" E run Southwesterly along the arc of said curve, 61.90 feet; thence S 54°42'45" W, 6.60 feet to a point on a non-tangent curve concave Westerly having a radius of 61.83 feet, and a central angle of 26°44'21"; thence from a tangent bearing of S 29°58'30" E run Southerly along the arc of said curve, 28.86 feet; thence S 59°47'15" E, 7.85 feet; thence N 30°13'55" E, 1.01 feet; thence S 59°49'29" E, 9.32 feet; thence S 30°10'31" W, 1.42 feet to a point on a non-tangent curve concave Southwesterly having a radius of 41.14 feet, and a central angle of 75°36'24"; thence from a tangent bearing of N 80°45'27" E run Southeasterly along the arc of said curve, 54.29 feet; thence S 59°49'29" E, 11.09 feet; thence S 30°10'31" W, 1.00 feet; thence S 59°49'29" E, 7.86 feet to a point on a non-tangent curve concave Southerly having a radius of 61.29 feet, and a central angle of 30°41'11"; thence from a tangent bearing of N 63°33'36" E run Easterly along the arc of said curve, 32.83 feet; thence S 84°19'29" E, 5.87 feet; thence N 05°40'31" E, 4.78 feet; thence N 53°38'30" W, 8.19 feet to a point on a non-tangent curve concave Easterly having a radius of 12.68 feet, and a central angle of 281°53'23"; thence from a tangent bearing of S 41°55'39" W run Northerly along the arc of said curve, 62.37 feet; thence S 84°19'29" E, 7.91 feet; thence N 05°17'50" E, 6.14 feet; thence S 84°19'29" E, 102.75 feet; thence S 05°40'31" W, 30.40 feet; thence N 85°40'45" E, 22.05 feet; thence N 14°19'29" W, 30.40 feet; thence N 75°40'31" E, 102.76 feet; thence S 14°19'10" E, 31.05 feet; thence N 75°39'28" E, 3.05 feet; thence N 69°24'19" E, 6.57 feet; thence N 25°11'59" W, 1.51 feet; thence N 64°48'51" E, 3.06 feet; thence N 25°11'04" W, 1.50 feet; thence N 64°48'01" E, 8.00 feet; thence S 25°12'52" E, 1.50 feet; thence N 64°47'12" E, 3.06 feet; thence S 25°11'59" E, 1.51 feet; thence N 60°11'43" E, 6.57 feet; thence N 53°56'35" E, 3.04 feet; thence N 36°04'29" W, 31.05 feet; thence N 53°55'31" E, 102.78 feet; thence S 36°04'29" E, 30.40 feet; thence N 43°55'29" E, 22.03 feet; thence N 56°04'08" W, 30.40 feet; thence N 33°55'30" E, 102.75 feet; thence S 56°04'30" E, 31.05 feet; thence N 33°54'28" E, 3.05 feet; thence N 27°39'19" E, 6.57 feet; thence N 66°56'59" W, 1.51 feet; thence N 23°03'51" E, 3.06 feet; thence N 66°56'04" W, 1.50 feet; thence N 23°03'01" E, 8.00 feet; thence S 66°57'53" E, 1.50 feet; thence N 23°02'11" E, 3.06 feet; thence S 66°56'59" E, 1.51 feet; thence N 18°26'43" E, 6.57 feet; thence N 12°11'35" E, 3.06 feet; thence N 77°49'29" W, 31.05 feet; thence N 12°10'31" E, 103.33 feet; thence N 77°49'29" W, 3.18 feet; thence N 12°10'31" E, 37.30 feet; thence S 77°49'29" E, 76.73 feet; thence S 12°10'31" W, 37.30 feet; thence N 77°49'29" W, 4.45 feet; thence S 12°10'31" W, 92.38 feet; thence S 66°56'59" E, 104.90 feet; thence N 23°03'01" E, 3.91 feet; thence S 66°56'59" E, 37.30 feet; thence S 23°03'01" W, 76.74 feet; thence N 66°56'59" W, 37.30 feet; thence N 23°03'01" E, 3.73 feet; thence N 66°56'59" W, 104.90 feet; thence S 33°55'33" W, 91.80 feet; thence N 56°04'08" W, 30.20 feet; thence S 43°55'41" W, 24.98 feet; thence S 36°04'29" E, 30.20 feet; thence S 53°55'32" W, 91.82 feet; thence S 25°11'59" E, 156.56 feet; thence N 64°48'01" E, 3.44 feet; thence S 24°47'59" E, 37.30 feet; thence S 64°48'01" W, 76.73 feet; thence N 25°11'59" W, 37.30 feet; thence N 64°48'01" E, 4.45 feet; thence N 25°11'59" W, 156.56 feet; thence S 75°40'31" W, 91.80 feet; thence N 14°19'29" W, 30.20 feet; thence S 85°40'34" W, 25.00 feet; thence S 05°40'31" W, 30.20 feet; thence N 84°19'29" W, 102.76 feet; thence N 05°40'50" E, 31.03 feet to a point on a non-tangent curve concave Southerly having a radius of 59.90 feet, and a central angle of 06°58'31"; thence from a tangent bearing of N 82°16'45" W run Westerly along the arc of said curve, 7.29 feet; thence S 05°40'31" W, 4.05 feet; thence S 84°19'29" E, 1.50 feet; thence S 05°40'31" W, 15.00 feet; thence N 84°20'04" W, 15.09 feet; thence S 30°10'31" W, 89.86 feet; thence S 59°49'29" E, 4.86 feet; thence S 30°10'31" W, 9.75 feet to a point on a non-tangent curve concave Southwesterly having a radius of 5.59 feet, and a central angle of 36°36'55"; thence from a tangent bearing of S 48°01'38" E run Southeasterly along the arc of said curve, 3.57 feet; to a point on a non-tangent curve concave Northwesterly having a radius of 22.24 feet, and a central angle of 77°38'33"; thence from a tangent bearing of S 08°54'57" E run Southwesterly along the arc of said curve, 30.14 feet; to a point on a non-tangent curve concave Northerly having a radius of 5.35 feet, and a central angle of 32°33'24"; thence from a tangent bearing of S 70°02'38" W run Westerly along the arc of said curve, 3.04 feet; thence N 70°48'24" W, 5.36 feet; thence S 30°10'31" W, 11.75 feet to a point on a non-tangent curve concave Westerly having a radius of 52.07 feet, and a central angle of 19°07'39"; thence from a tangent bearing of S 29°20'18" E run Southerly along the arc of said curve, 17.38 feet; thence S 10°16'35" E, 2.49 feet to a point on a non-tangent curve concave Easterly having a radius of 17.14 feet, and a central angle of 18°55'31"; thence from a tangent bearing of S 09°56'00" E run Southerly along the arc of said curve, 5.66 feet; thence N 47°40'31" E, 28.21 feet; thence S 42°19'29" E, 102.75 feet; thence S 47°41'04" W, 27.22 feet; thence S 34°19'29" E, 21.93 feet; thence N 63°40'31" E, 27.22 feet; thence S 26°19'29" E, 102.75 feet; thence S 63°40'31" W, 34.30 feet; thence N 26°19'29" W, 96.88 feet; thence N 33°59'10" W, 30.29 feet; thence N 42°19'29" W, 92.24 feet; thence S 47°40'31" W, 0.75 feet; thence N 42°19'29" W, 6.53 feet to a point on a non-tangent curve concave Easterly having a radius of 24.04 feet, and a central angle of 22°05'13"; thence from a tangent bearing of N 31°21'38" W run Northerly along the arc of said curve, 9.27 feet; thence N 11°48'23" W, 5.11 feet to a point on a non-tangent curve concave Westerly having a radius of 60.83 feet, and a central angle of 07°02'54"; thence from a tangent bearing of N 14°14'56" W run Northerly along the arc of said curve, 7.48 feet; to a point on a non-tangent curve concave Southwesterly having a radius of 21.37 feet, and a central angle of 13°29'23"; thence from a tangent bearing of N 22°22'58" W run Northwesterly along the arc of said curve, 5.03 feet; thence N 35°29'56" W, 16.82 feet to a point on a non-tangent curve concave Southwesterly having a radius of 15.53 feet, and a central angle of 28°57'27"; thence from a tangent bearing of N 36°41'39" W run Northwesterly along the arc of said curve, 7.85 feet; thence S 30°10'31" W, 26.03 feet; thence N 59°49'29" W, 76.58 feet; thence N 30°10'31" E, 25.99 feet; thence N 59°49'29" W, 2.33 feet to a point of curvature of a curve concave Southerly having a radius of 7.50 feet, and a central angle of 50°39'00"; thence run Westerly along the arc of said curve, 6.63 feet; to a point of reverse curvature of a curve concave Northerly having a radius of 68.00 feet, and a central angle of 29°27'22"; thence run Westerly along the arc of said curve, 34.96 feet; thence N 77°09'33" W, 14.14 feet; thence N 10°14'24" E, 0.77 feet; thence N 77°30'11" W, 6.66 feet; thence N 77°19'29" W, 84.19 feet; thence S 12°40'31" W, 0.75 feet; thence N 77°19'29" W, 5.93 feet; thence N 77°19'29" W, 0.58 feet; thence S 12°40'31" W, 0.77 feet; thence N 85°19'29" W, 18.34 feet; thence N 03°19'29" W, 0.77 feet; thence S 87°02'33" W, 6.56 feet; thence N 03°19'29" W, 0.71 feet; thence S 86°40'31" W, 19.60 feet; thence S 03°19'29" E, 28.80 feet, thence S 86°40'31" W, 77.21 feet; thence N 03°19'29" W, 63.10 feet, thence N 86°40'31" E, 102.75 feet; thence S 03°19'29" E, 27.22 feet; thence S 85°19'29" E, 21.93 feet; thence N 12°40'31" E, 27.22 feet, thence S 77°19'33" E, 102.73 feet; thence S 12°39'12" W, 28.02 feet to a point on a non-tangent curve concave Northerly having a radius of 60.90 feet, and a central angle of 32°01'34"; thence from a tangent bearing of S 73°43'18" E run Easterly along the arc of said curve, 34.04 feet; thence N 30°10'31" E, 2.48 feet; thence N 59°49'29" W, 7.89 feet to a point of curvature of a curve concave Easterly having a radius of 5.69 feet, and a central angle of 162°08'55"; thence run Northerly along the arc of said curve, 16.10 feet; thence N 30°10'31" E, 118.08 feet; thence N 59°49'29" W, 10.72 feet to a point on a non-tangent curve concave Easterly having a radius of 31.21 feet, and a central angle of 32°20'24"; thence from a tangent bearing of N 28°29'35" W run Northerly along the arc of said curve, 17.62 feet; thence S 54°40'31" W, 3.43 feet; thence N 35°19'34" W, 102.76 feet; thence N 34°40'26" E, 30.20 feet; thence N 25°19'31" W, 24.98 feet; thence S 74°40'31" W, 30.20 feet; thence N 15°19'29" W, 91.82 feet; thence S 85°33'01" W, 156.56 feet; thence S 04°26'59" E, 4.45 feet; thence S 85°33'26" W, 37.30 feet; thence N 04°26'59" W, 76.73 feet to the Point of Beginning, containing 3.966 Acres, more or less

### VICINITY MAP

The Sixth Floor Premises shall consist of that portion of the Animal Kingdom Lodge located on and wholly within the perimeter boundary of the property legal described below, and the boundaries of the Sixth Floor Premises are more particularly described as follows (it being the intent of this description to describe the sixth floor of the Animal Kingdom Lodge):

(1) Upper and Lower Boundaries: The upper and lower boundaries of the Premises shall be the following boundaries extended to an intersection with the perimeter boundaries.

(a) The upper boundary of the Premises is the interior unfinished surface of the sixth floor ceiling.
(b) The lower boundary of the Premises is the interior unfinished surface of the fifth floor ceiling.

(2) Perimeter Boundaries: The perimeter boundaries of the Premises are the vertical planes along and coincident with the unfinished interior surface of the perimeter walls of the Animal Kingdom Lodge.

(3) The Sixth Floor Premises are located on and wholly within the following perimeter boundary:

Commence at the West Quarter corner of said Section 34, Township 24 South, Range 27 East, Orange County, Florida, run along the West line of the Southwest 1/4 of said Section 34, S 00°00'19" W, 707.42 feet; thence N 90°00'00" E, 1142.71 feet to the Point of Beginning; thence N 30°00'00" E, 18.98 feet; thence N 59°31'04" W, 22.48 feet to a point of curvature of a curve concave Southeasterly having a radius of 7.03 feet, and a central angle of 164°07'37"; thence run Northeasterly along the arc of said curve, 20.13 feet; thence N 29°50'30" E, 117.34 feet; thence N 60°09'30" W, 10.37 feet to a point on a non-tangent curve concave Easterly having a radius of 32.75 feet, and a central angle of 31°59'49"; thence from a tangent bearing of N 28°22'07" W run Northerly along the arc of said curve, 18.29 feet; to a point of compound curvature of a curve concave Southeasterly having a radius of 14.88 feet, and a central angle of 120°35'44"; thence run Northeasterly along the arc of said curve, 31.32 feet; to a point of compound curvature of a curve concave Southwesterly having a radius of 27.29 feet, and a central angle of 59°51'18"; thence run Southeasterly along the arc of said curve, 28.51 feet; thence N 85°15'46" E, 7.12 feet; thence S 04°44'14" E, 3.05 feet; thence S 60°00'00" E, 15.94 feet to a point on a non-tangent curve concave Southwesterly having a radius of 41.90 feet, and a central angle of 81°42'52"; thence from a tangent bearing of N 79°08'34" E run Southeasterly along the arc of said curve, 59.76 feet; thence S 60°00'00" E, 37.79 feet; thence S 30°00'00" W, 99.21 feet; thence S 60°00'00" E, 5.07 feet; thence S 30°00'00" W, 9.78 feet to a point on a non-tangent curve concave Southwesterly having a radius of 4.90 feet, and a central angle of 40°38'37"; thence from a tangent bearing of S 48°57'33" E run Southeasterly along the arc of said curve, 3.48 feet; to a point of compound curvature of a curve concave Northwesterly having a radius of 23.73 feet, and a central angle of 70°57'19"; thence run Southwesterly along the arc of said curve, 29.39 feet; to a point of compound curvature of a curve concave Northerly having a radius of 4.90 feet, and a central angle of 41°37'06"; thence run Westerly along the arc of said curve, 3.56 feet; to a point of compound curvature of a curve concave Northeasterly having a radius of 58.54 feet, and a central angle of 30°42'10"; thence run Northwesterly along the arc of said curve, 31.37 feet; thence S 30°00'00" W, 30.91 feet; thence N 59°54'04" W, 81.50 feet to the Point of Beginning, containing 22805 square feet, more or less.

A parcel of land lying in Section 34, Township 24 South, Range 27 East, Orange County, Florida, and being more particularly described as follows:

Commence at the West Quarter corner of said Section 34, run along the West line of the Southwest 1/4 of said Section 34, S 00°00'19" W, 218.20 feet; thence N 90°00'00" E, 202.80 feet to the Point of Beginning; thence N 64°10'08" E, 173.85 feet; thence N 67°54'44" E, 88.21 feet; thence N 67°01'51" W, 101.55 feet to a point of curvature of a curve concave Easterly having a radius of 85.00 feet, and a central angle of 143°29'47"; thence run Northerly along the arc of said curve, 212.88 feet, to a point of reverse curvature of a curve concave Northwesterly having a radius of 206.92 feet, and a central angle of 25°29'30"; thence run Northeasterly along the arc of said curve, 92.06 feet; thence N 43°08'28" W, 140.57 feet; thence N 18°55'14" W, 151.65 feet; thence N 05°26'40" W, 38.12 feet to a point on a non-tangent curve concave Southeasterly having a radius of 49.00 feet, and a central angle of 98°11'00"; thence from a tangent bearing of S 85°36'24" W run Southwesterly along the arc of said curve, 83.97 feet, to a point of compound curvature of a curve concave Northeasterly having a radius of 489.24 feet, and a central angle of 30°30'00", thence run Southeasterly along the arc of said curve, 260.44 feet, to a point on a non-tangent curve concave Southerly having a radius of 139.00 feet, and a central angle of 58°53'32"; thence from a tangent bearing of N 70°11'07" W run Westerly along the arc of said curve, 142.87 feet; thence N 39°04'39" W, 35.11 feet to a point of curvature of a curve concave Southwesterly having a radius of 45.00 feet, and a central angle of 50°04'04"; thence run Northwesterly along the arc of said curve, 39.32 feet; thence N 89°08'43" W, 18.77 feet to a point of curvature of a curve concave Northeasterly having a radius of 53.00 feet, and a central angle of 59°26'47"; thence run Northwesterly along the arc of said curve, 54.99 feet; thence N 29°41'56" W, 197.54 feet to a point of curvature of a curve concave Easterly having a radius of 35.00 feet, and a central angle of 89°42'46"; thence run Northerly along the arc of said curve, 54.80 feet; thence N 60°00'50" E, 221.46 feet to a point of curvature of a curve concave Southerly having a radius of 25.00 feet, and a central angle of 39°35'35"; thence run Easterly along the arc of said curve, 17.28 feet; thence S 80°23'35" E, 57.44 feet; thence N 09°36'25" E, 60.12 feet; thence N 31°01'11" E, 77.42 feet, thence N 55°55'17" E, 133.12 feet; thence N 80°09'48" E, 73 36 feet; thence S 81°24'09" E, 131.25 feet; thence S 64°27'38" E, 62.78 feet; thence S 52°26'34" E, 129.61 feet; thence S 41°23'44" E, 42.59 feet; thence S 30°54'13" E, 131.24 feet; thence S 59°05'47" W, 100.00 feet, thence N 30°54'13" W, 134.45 feet; thence N 52°26'34" W, 143 67 feet; thence N 81°24'09" W, 137.79 feet; thence S 55°55'17" W, 124.44 feet; thence S 10°37'19" W, 131.92 feet; thence S 18°55'14" E, 141.06 feet; thence S 44°11'35" E, 169.32 feet; thence S 34°28'59" E, 127.01 feet, thence S 00°09'32" W, 44.80 feet; thence S 13°26'48" E, 78.89 feet; thence S 16°37'58" W, 61.20 feet, thence S 62°58'06" W, 116.81 feet; thence S 67°54'44" W, 125 34 feet; thence S 64°10'08" W, 150.04 feet; thence S 38°03'28" W, 140.34 feet; thence S 00°38'18" W, 125.95 feet; thence S 47°03'11" E, 132.04 feet; thence S 82°55'33" E, 142 76 feet; thence N 74°04'17" E, 138.05 feet; thence S 15°55'43" E, 48.50 feet; thence S 74°04'17" W, 147.92 feet; thence N 82°55'33" W, 138.11 feet; thence S 75°53'18" W, 70.55 feet; thence N 47°03'11" W, 173 64 feet; thence N 00°38'18" E, 196.21 feet; thence N 38°03'28" E, 191.69 feet to the Point of Beginning, containing 7 805 Acres, more or less.

*PREPARED BY:*
JOHNSTON'S SURVEYING INC
900 Shady Lane, Kissimmee, Florida 34744-8695
(407) 847-2179 • Fax (407) 847-8140

### GENERAL NOTES

1) The bearings are based on S00°00'19"W being the West line of the Southwest ¼ of Section 34, Township 24 South, Range 27 East, Orange County, Florida.
2) Unless a comparison is made, measured bearings and distances are identical with leasehold values.
3) All dimensions are in fee and decimals thereof.
4) An abstract of title was not furnished to the surveyor.
5) No title opinion is expressed or implied.
6) The boundary survey was provided by Reedy Creek Energy Services, Surveying and Mapping Dept., dated 09/11/2006.
7) The floor plans were prepared from drawings supplied by EDI Architecture, dated 09/29/2006.
8) Various agreements have been granted and retained in Article 4 of the Declaration of Condominium. The developer has reserved the right to grant other easements over the Condominium property from time to time.
9) See Article 1 of the Declaration of Condominium for the definition of "Unit", "Commercial Unit", "Common Element", "Limited Common Element" and other items.
10) Other easements over and benefiting the Condominium Property have been granted and retained in that certain Master Declaration of Covenants, Conditions and Restrictions recorded in Official Records Book 9077, Pages 4175 of the Public Records of Orange County, Florida.
11) Where the upper, lower or perimeter boundary of any Unit is not otherwise specified within this Exhibit "A", such boundary shall be:
    1. Upper and Lower Boundaries. The upper and lower boundaries of the Unit shall be the following boundaries extended to an intersection with the perimeter boundaries.
        A. Upper Boundaries: The interior unfinished surface of the ceiling of the Unit.
        B. Lower Boundaries: The horizontal plane through the finished undecorated surface of the floor of the Unit.
    2. Perimeter Boundaries. The perimeter boundaries of the Unit shall be the vertical planes along and coincident with the interior unfinished surfaces of the perimeter walls of the closed figure.

    Not included in the description of the Units are as follows: balconies, terraces, exterior stairwells, elevators and utility rooms.
12) Unless otherwise designated within this Exhibit "A", any portion of the Condominium Property not included within a Unit is a Common Element.
13) Unless otherwise designated within this Exhibit "A", all porches, balconies and terraces appurtenant to a Unit are Limited Common Elements of that Unit.
14) DVD reserves all rights pursuant to section 721.07(5)(r), Florida Statutes, (2006) to vary the phasing plan as to phase boundaries, plot plans and floor plans, unit types, unit sizes and unit type mixes, numbers of units and recreational areas and facilities with respect to each subsequent phase.
15) The description of the boundaries of the overall site plan as set forth herein is for the purpose of describing the property which may ultimately be declared as part of the Condominium in phases, however, DVD reserves all rights to declare all or any portion or portions of the property to be a part of the condominium and to declare additional property no described herein to be a part of the condominium, whether or not such additional property is contiguous to the property described herein.
16) Owners have non-exclusive ingress and egress access and parking pursuant to those certain Non-Exclusive Access Easement Agreements as recorded in Official Records Book 9077 Page 4234 and Oficial Records Book 9077, Page 4243 Public Records of Orange County, Florida.

NOTE:
Exhibit "A" To Declaration of Condominium of The Disney's Animal Kingdom Villas, A Leasehold Condominium, recorded in Official Records Book 9077, Pages 4252 4361 of the Public Records of Orange County, Florida.

Disney VACATION CLUB
© DISNEY

SHEET 1 OF 6



DISNEY'S ANIMAL KINGDOM VILLAS
A LEASEHOLD CONDOMINIUM
EXHIBIT "A"

SECTIONS 34, TOWNSHIP 24 SOUTH, RANGE 27 EAST,
ORANGE COUNTY, FLORIDA.
OVERALL SITE PLAN
FIFTH FLOOR LEVEL



DISNEY'S ANIMAL KINGDOM VILLAS
A LEASEHOLD CONDOMINIUM
EXHIBIT "A"

SECTIONS 34, TOWNSHIP 24 SOUTH, RANGE 27 EAST,
ORANGE COUNTY, FLORIDA.
OVERALL SITE PLAN
SIXTH FLOOR LEVEL

VICINITY MAP

CONDOMINIUM EXHIBIT

SHEET 3 OF 6







CONDOMINIUM EXHIBIT
BOOK ___ PAGE ___

DISNEY'S ANIMAL KINGDOM VILLAS
A LEASEHOLD CONDOMINIUM
EXHIBIT "A" – PHASE 41A
UNIT 41A FLOOR PLAN

GRAPHIC SCALE IN
FEET AND THE INCH
SCALE 1" = 6'

Unit 41A shall include that part of a building containing
the Unit that lies within the boundaries of the Unit,
which boundaries are as follows:

1. Upper and Lower Boundaries. The upper and lower boundaries
of the Unit shall be the following boundaries extended to
an intersection with the perimeter boundaries.

A. Upper Boundaries: The interior unfinished surface of
the Fifth Floor ceiling of the building.

B. Lower Boundaries: The interior unfinished surface
of the 5th floor slab of the building.

2. Perimeter Boundaries. The perimeter boundaries of the
Unit shall be the vertical planes along and coincident
with the unfinished interior surfaces of perimeter walls.

Not included in the description of Units are as follows:
balconies, terraces, interior stairwells, elevators and utility
rooms.

NOTE: SIZE AND SHAPE OF TERRACES AND BALCONIES MAY VARY.
LCE = LIMITED COMMON ELEMENT
CE = COMMON ELEMENT

PERIMETER BOUNDARY
BALCONY
LCE
BEDROOM
BATH

PERIMETER BOUNDARY
BATH
BATH
BEDROOM
BEDROOM
BALCONY
LCE

UNIT 41A

TYPICAL SIDE ELEVATION
WITH APPROXIMATE INTERIOR DIMENSIONS

SHEET 6 OF 6

BC-PH15-PP

# ARTICLES OF INCORPORATION
## OF DISNEY'S ANIMAL KINGDOM VILLAS CONDOMINIUM ASSOCIATION, INC.

*FILED*
*2006 NOV 8  PM 12: 04*

All terms used in these Articles of Incorporation of DISNEY'S ANIMAL KINGDOM VILLAS CONDOMINIUM ASSOCIATION, INC. (the **"Articles"**) shall have the same meaning as the identical terms used in the Declaration of Condominium of DISNEY'S ANIMAL KINGDOM VILLAS, a leasehold condominium (the **"Declaration"**), unless the context otherwise requires.

## ARTICLE I - Name

The name of the corporation shall be DISNEY'S ANIMAL KINGDOM VILLAS CONDOMINIUM ASSOCIATION, INC. (the **"Association"**).

In the event that the Property Management Agreement between the Association and Disney Vacation Club Management Corp., a Florida corporation (**"DVCMC"**), terminates for any reason, the name of the Association shall, at the option of Disney Vacation Development, Inc. (**"DVD"**) or DVCMC and without any action to be taken by the board of directors of the Association (the **"Board"**) or the Association, simultaneously and automatically be changed to SAVANNAH CONDOMINIUM ASSOCIATION, INC. In the event that the name "SAVANNAH CONDOMINIUM ASSOCIATION, INC." is unavailable for use by the Association, the Board shall be empowered to select an alternative name for the Association; provided, however that prior to the use of any name to identify the Association, such name shall be submitted to WALT DISNEY WORLD HOSPITALITY & RECREATION CORPORATION, a Florida corporation (**"WDWHRC"**), for its consent. WDWHRC may consent or withhold its consent to the use of such name in its sole, absolute and unfettered discretion and, if given, the consent shall be set forth in writing.

In the event that the name of the Association is changed because of the termination of the Property Management Agreement, the Board and any and all Owners shall be prohibited from using the name "Disney" (or any other form thereof) in any manner whatsoever and shall immediately be required to:

a. Remove all signs containing the name "Disney" from the Condominium Property and from any offsite location to the extent the sign refers to the Condominium or to the Condominium Property; and

b. Destroy all stationery, descriptive literature or printed or written matter bearing the name "Disney" other than books and records of the Association; and

c. Cease and desist from using the name "Disney" (or any other form thereof) orally or in writing in referring to the Association or the Condominium; and

d. Take immediate action to effect changes to the names of the Association and the documents of the Condominium reflecting the name "Disney" to eliminate the use of such names in any manner whatsoever; and

e. Remove any architectural or landscaping features from the Condominium Property which contain the "Disney" name or any "Disney" caricature, fanciful character, logo or other trademarked symbol registered by any of The Walt Disney Companies. In this regard, the Association shall be responsible for repairing or replacing the structure or landscaping from which any such symbol has been removed so as to ensure that the structural integrity of such structure or landscaping is not jeopardized and that the appearance of the structure or landscaping remains consistent with the surrounding area.

©Disney
Revised: 11/28/2006

## ARTICLE II - Purposes

1. The purpose for which the Association is organized is to manage, operate and maintain a condominium, to be known as DISNEY'S ANIMAL KINGDOM VILLAS, A LEASEHOLD CONDOMINIUM (the **"Condominium"**), in accordance with the Declaration, the Master Declaration and the Ground Lease.

2. The Association shall have no capital stock and shall make no distribution of income or profit to its members, directors or officers.

## ARTICLE III - Powers

1. The Association shall have all of the common law and statutory powers of a not-for-profit corporation which are not in conflict with the terms of these Articles, together with such specific powers as are contained in the Bylaws or the Declaration.

2. The Association shall have all of the powers reasonably necessary to implement the purpose of the Association including, without limitation, the following:

a. To adopt a budget and make and collect assessments against Owners to defray the costs of the Condominium.

b. To use the proceeds of assessments in the exercise of its powers and duties.

c. To maintain, manage, repair, replace and operate the Condominium Property.

d. To reconstruct improvements after casualty and construct further improvements to the Condominium Property.

e. To promulgate and amend the Condominium Rules and Regulations respecting the use of Condominium Property.

f. To enforce by legal means the provisions of the various Condominium Documents, these Articles, the Bylaws of the Association (the **"Bylaws"**) and the Condominium Rules and Regulations.

g. To contract for the management of the Condominium and to delegate to such contractor all powers and duties of the Association except as are specifically required by the various Condominium Documents to have approval of the Board or the Owners. Notwithstanding any provisions contained in these Articles to the contrary, it is the intent of these Articles that the Board shall not have the power to independently terminate the Property Management Agreement except as set forth in the Property Management Agreement. The Property Management Agreement may only be terminated in accordance with it own terms or by the vote of the Owners in accordance with Florida law.

h. To maintain, manage, repair, replace and operate the property of the single condominium resulting from a merger of this Condominium with another independent and separate condominium pursuant to the merger provisions of the Declaration.

i. To operate and manage or assign the operation or management of any reservation system created for the Condominium. Notwithstanding any provisions contained in these Articles to the contrary, it is the intent of these Articles that the Board shall not have the power to independently terminate the Membership Agreement or the DVC Resort Agreement except as set forth in the Membership Agreement or the DVC Resort Agreement, respectively.

Revised: 11/28/2006

2

j.   To acquire title to and hold, convey or mortgage non-Condominium Property and Condominium Property in accordance with the Declaration.

3.   All funds and the titles to all property acquired by the Association and the proceeds thereof shall be held only for the benefit of the Owners in accordance with the provisions of the Condominium Documents.

4.   The powers of the Association shall be subject to and shall be exercised in accordance with the provisions of the Declaration, the Master Declaration and the Ground Lease.

### ARTICLE IV - Owners

The qualifications of Owners, the manner of their admission to the Association, and voting by Owners shall be as follows:

1.   All Owners of Units shall be members of this Association, and no other persons or entities shall be entitled to membership. Each Unit shall be entitled to one (1) vote at Association meetings, except for Commercial Units, which shall not be entitled to any vote. The vote of the Owner of a Unit shall be cast by its Voting Representative. Voting Representatives for Units owned by more than one person or by a corporation or other entity shall be cast by the Voting Representative named in a Voting Certificate signed or accepted by all of the Owners of that Unit and filed with the secretary of the Association.

2.   Changes in membership in the Association shall be established by the recording in the Public Records of Orange County, Florida, of a deed or other instrument establishing a change of record title to a Unit in the Condominium. The Association shall recognize a change in membership upon delivery to the Association of a copy of such recorded instrument. The new Owner designated by such instrument shall thereby become a member of the Association. The membership of the prior Owner shall be thereby terminated.

3.   The share of Owners in the funds and assets of the Association cannot be assigned, hypothecated or transferred in any manner except as an appurtenance to their Unit.

### ARTICLE V - Directors

1.   The affairs of the Association will be managed by a board of directors of not less than three (3) nor more than seven (7) directors as shall be determined by the Bylaws, and in the absence of such determination the board of directors shall consist of three (3) directors.

2.   Directors of the Association shall be appointed or elected at the annual Owners' meeting in the manner determined by the Bylaws.

### ARTICLE VI - Officers

The affairs of the Association shall be administered by a president, a vice president, a secretary, a treasurer, and as many assistant vice presidents, assistant secretaries and assistant treasurers as the Board shall from time to time determine. Such officers shall be elected by the Board at its first meeting following the annual Owners' meeting. Officers shall serve without compensation at the pleasure of the Board. The same person may hold two offices, the duties of which are not incompatible; provided, however, that the offices of president and vice president shall not be held by the same person, nor shall the offices of president and secretary or assistant secretary or treasurer or assistant treasurer be held by the same person.

Revised: 11/28/ 2006

3

## ARTICLE VII - Indemnification

Every director and every officer of the Association shall be indemnified by the Association against all expenses and liabilities, including, without limitation, attorneys' and other professionals' fees, reasonably incurred by or imposed upon such officer or director in connection with any proceeding to which he or she may be a party, or in which such officer or director may become involved by reason of his or her being or having been a director or officer at the time such expenses are incurred, except in such cases wherein the director or officer is adjudged guilty of willful misfeasance or malfeasance in the performance of his or her duties; provided that in the event of a settlement, the indemnification herein shall apply only when the Board has approved such settlement and reimbursement as being in the best interests of the Association. The foregoing indemnification shall be in addition to and not exclusive of all other rights to which such director or officer may be entitled.

## ARTICLE VIII - Bylaws

The Bylaws shall be adopted by the Board and may be altered, amended or rescinded as provided in the Bylaws.

## ARTICLE IX - Amendments

Amendments to these Articles of Incorporation shall be proposed and adopted in the following manner:

1. Notice of the subject matter of a proposed amendment shall be included in the notice of any meeting at which a proposed amendment is considered.

2. Until the first election of a majority of Directors by Owners other than DVD, proposal of an amendment and approval thereof shall require the affirmative action of three-fourths (3/4) of the entire membership of the Board, and no meeting of the Owners or any approval thereof is required.

3. After the first election of a majority of directors by Owners other than DVD, a resolution approving a proposed amendment may be proposed by either the Board or by the Owners, and after being proposed and approved by one of such bodies, requires the approval of the other body. Except as otherwise provided herein, such approvals must be by not less than three-fourths (3/4) of the entire membership of the Board and by not less than a three-fourths (3/4) vote of the voting interests of the Association at a duly called meeting of the Association.

4. Once adopted, an amendment shall be effective when filed with the Secretary of State of the State of Florida and recorded in the Public Records of Orange County.

5. Notwithstanding the foregoing, these Articles may be amended by DVD as may be required by any governmental entity; as may be necessary to conform these Articles to any governmental statutes; as may be in the best interests of the Association; or as DVD may deem appropriate to carry out the purposes of the Condominium, Vacation Ownership Plan or Multisite Timeshare Plan.

## ARTICLE X - Term

The term of the Association shall be the life of the Condominium. The Association shall be terminated by the termination of the Condominium in accordance with the Declaration.

## ARTICLE XI - Special Meetings

Special Owners' meetings shall be held whenever called by the president or vice president or by a majority of the Board and must be called by such officers upon receipt of a written request from fifty percent (50%) of the Owners, unless otherwise provided by law.

## ARTICLE XII - Incorporator

The name and address of the incorporator of the corporation is as follows: John M. McGowan, 1375 Buena Vista Drive, 4th Floor North, Lake Buena Vista, Florida 32830-1000.

## ARTICLE XIII - Registered Agent

The Association hereby appoints Jeffrey H. Smith, as its Registered Agent to accept service of process within this state, with the Registered Office located at 1375 Buena Vista Drive, 4th Floor North, Lake Buena Vista, Florida 32830-1000.

## ARTICLE XIV - Principal Office

The mailing address of the principal office of the Association is 200 Celebration Place, Celebration, Florida 34747.

IN WITNESS WHEREOF the incorporator has affixed his signature this 2 ]th day of November, 2006.

John M. McGowan

## REGISTERED AGENT CERTIFICATE

Pursuant to the Florida Not-For-Profit Corporation Act, the following is submitted, in compliance with said statute:

That DISNEY'S ANIMAL KINGDOM VILLAS CONDOMINIUM ASSOCIATION, INC., with its registered office as indicated in the Articles of Incorporation, has named Jeffrey H. Smith, located at said registered office, as its registered agent to accept service of process and perform such other duties as are required in the State of Florida.

### ACKNOWLEDGMENT:

Having been named to accept service of process and serve as registered agent for the above-stated Corporation at the place designated in this Certificate, the undersigned hereby accepts to act in this capacity, and agrees to comply with the provision of said statute relative to keeping open said office, and further states that he is familiar with Section 617.0501, Florida Statutes.

Dated: November 30, 2006

Jeffrey H. Smith

06 DEC -8 PM 12: 04
SECRETARY OF STATE
TALLAHASSEE, FLORIDA
FILED

Revised: 11/28/06

6

# BYLAWS
## OF
## DISNEY'S ANIMAL KINGDOM VILLAS CONDOMINIUM ASSOCIATION, INC.,
a corporation not-for-profit under the laws of the State of Florida

The terms used in these Bylaws of Disney's Animal Kingdom Villas Condominium Association, Inc. (the **"Bylaws"**) shall have the same meaning as the identical terms used in the Declaration of Condominium of Disney's Animal Kingdom Villas, a leasehold condominium (the **"Declaration"**), unless the context otherwise requires. Regarding the interpretation of these Bylaws, in the event of a conflict between Chapter 718, Florida Statutes, and Chapter 721, Florida Statutes, or any rules promulgated under either, Chapter 721 shall control.

## I. IDENTITY

These are the Bylaws of DISNEY'S ANIMAL KINGDOM VILLAS CONDOMINIUM ASSOCIATION, INC., a corporation not-for-profit under the laws of the State of Florida (the **"Association"**), and under the Articles of Incorporation (the **"Articles"**) which were filed in the office of the Secretary of State of the State of Florida. The Association has been organized for the purpose of administering a leasehold condominium upon certain lands in Orange County, Florida known as Disney's Animal Kingdom Villas, a leasehold condominium (the **"Condominium"**), in accordance with the Declaration, the Master Declaration and the Ground Lease.

1.      The office of the Association shall be at 200 Celebration Place, Celebration, Florida 34747, or at such other place as may be designated by the board of directors of the Association (the **"Board"**) from time to time.

2.      The fiscal year of the Association shall be the calendar year.

3.      The seal of the Association shall bear the name of the Association, the word "Florida," the words "Corporation Not-for-Profit," and the year of incorporation.

## II. OWNERS' MEETINGS

1.      The annual Owners' meeting shall be held at such time, place and date as may be designated by the Board, for the purpose of electing directors and of transacting any other business authorized to be transacted by the Owners. At the election of the Board, such annual Owners' meeting may be held jointly with the annual Owners' meetings of other condominium associations that are members of the Disney Vacation Club.

2.      As set forth in Article XI of the Articles, special Owners' meetings shall be held whenever called by the president or vice president of the Association, or by a majority of the Board, and must be called by such officers upon receipt of a written request from fifty percent (50%) of the voting interests, except as provided for in Article III below. Unless otherwise set forth in the notice of special meeting, as provided for above, all special meetings shall be held in Orange County, Florida.

3.      Notice of all Owners' meetings stating the time, place and agenda for which the meeting is called shall be given by the president or secretary of the Association, unless waived in writing. Such notice shall be sent in writing to each Owner at the Owner's address or e-mail address as it appears on the books of the Association and shall be sent by mail, facsimile (upon confirmation of receipt) or e-mail to each Owner not less than fourteen (14) days nor more than sixty (60) days prior to the date of the meeting. Any notice by e-mail shall only be valid if the Owner has first consented electronically to the use of e-mail for notice purposes demonstrating that the purchaser has the ability to access the notice by e-mail. Any consent to receive notice by e-mail is effective until revoked by the Owner. An affidavit executed by the secretary attesting to the mailing or the post office certificate of mailing shall be retained in the records of the Association as proof of such mailing. In addition, a notice of the meeting shall be posted at a conspicuous place on the Condominium Property, which location shall be duly adopted by rule by the Board upon notice to the Owners, at least fourteen (14) days prior to said meeting. In lieu of any physical posting of notice, the

Board may adopt a procedure for conspicuously posting and repeatedly broadcasting the notice and agenda on a closed-circuit television system serving the Association at least four (4) times every broadcast hour each day notice is required.  Owners may waive notice of specific meetings and may take action by written agreement without meetings, and any Owner's attendance at a meeting shall constitute a waiver of the notice of that meeting. Mortgagees shall, upon prior written request, be entitled to receive notice of all Owners' meetings. Failure to provide such notice shall not invalidate any action taken at an otherwise properly noticed meeting.  Where assessments against Owners are to be considered for any reason at an Owners' meeting, the notice shall contain a statement that assessments will be considered and shall specify the nature of any such assessment.

4.      The presence in person or by proxy of Voting Representatives representing a majority of the total voting interests eligible to vote shall constitute a quorum, and decisions shall be made by the vote of a majority of the voting interests at a meeting at which a quorum is present.

5.      Each Unit shall be entitled to one (1) vote at Association meetings, except for Commercial Units, which shall not be entitled to any vote. The vote of the Owner of a Unit shall be cast by its Voting Representative. Voting Representatives for Units owned by more than one person or by a corporation or other entity shall be cast by the Voting Representative named in a Voting Certificate signed or accepted by all of the Owners of that Unit and filed with the secretary of the Association. The Voting Certificate shall provide that all notices or other information required to be delivered to Owners by the Association shall be delivered by the Association to the Voting Representative; provided, however, that the Voting Certificate shall require the Voting Representative to provide the Owners of a Unit with all notices required by Florida law. Each Voting Certificate shall be valid until revoked by a subsequent Voting Certificate. In the event that a Voting Certificate is not on file with respect to a Unit that is owned by more than one Owner, the vote of such Owners shall not be considered in determining the requirements for a quorum nor for any other purposes. By execution of a deed for purchase of an Ownership Interest in a Unit in the Condominium, Cotenants of a Unit shall evidence their joinder in the Master Cotenancy Agreement recorded in the Public Records of Orange County, which Agreement shall be recognized by the Association as the Voting Certificate for that Unit, and nothing herein shall affect the terms and conditions of the Voting Certificate established in the Master Cotenancy Agreement for each Unit.

6.      Votes may be cast in person or by proxy. Any proxy given shall be effective only for the specific meeting for which originally given and any lawfully adjourned meetings thereof and must be filed with the secretary at or before the appointed time of the meeting. Each proxy shall specifically set forth the name of the person voting by proxy, the name of the person authorized to vote the proxy, and the date the proxy was given. Each proxy shall contain the date, time and place of the meeting for which the proxy is given. In addition, limited proxies shall set forth those items which the holder of the proxy may vote and the manner in which the vote is to be cast. In no event shall any proxy be valid for a period of longer than ninety (90) days after the date of the first meeting, and any adjournments thereof, for which the proxy was given. Every proxy shall be revocable at any time at the pleasure of the Owner executing it. If a proxy expressly provides, any proxy holder may appoint, in writing, a substitute to act in the Owner's place. If such provision is not made, substitution is not authorized.  Proxies or written consents on votes may be received by e-mail and utilized for votes of the Association; provided, however, that the e-mail signature is authorized through use of a password, cryptology software or other reasonable means and proof of such authentication is made available to the Board.

7.      Approval or disapproval of an Owner upon any matter, whether or not the subject of an Association meeting, shall be by the same person, corporation or other entity who would cast the vote of such Owner if in an Association meeting.

8.      If any meeting of Owners cannot be organized because a quorum has not attended, the Owners who are present, either in person or by proxy, may adjourn the meeting from time to time until a quorum is present.

9.      The presiding officer of all Owners' meetings shall be the president of the Association. In the absence of the president, the vice-president of the Association shall preside.

10.     The order of business at annual Owners' meetings and, as far as practicable at all other Owners' meetings, shall be:

| | |
|---|---|
| A. Call to order. | F. Report of committees. |
| B. Calling of the roll and certifying of proxies. | G. Election of directors. |
| C. Proof of notice of meeting or waiver of notice. | H. Unfinished business. |
| D. Reading and disposal of any unapproved minutes. | I. New business. |
| E. Report of officers. | J. Adjournment. |

Notwithstanding the foregoing, if any item listed above is not relevant to a particular meeting, as determined by the Board in it's sole, absolute and unfettered discretion, such item shall not be required to be addressed at that particular meeting.

11.     For so long as Disney Vacation Development, Inc., a Florida corporation (**"DVD"**), holds Units or Ownership Interests in Units for sale in the ordinary course of business, none of the following actions may be taken without the prior approval in writing by DVD:

A.  Assessment of DVD as the Owner of Units or Ownership Interests in Units for capital improvements.
B.  Any action by the Association that would be detrimental to the sale of Units or Ownership Interests in Units by DVD.

### III. DIRECTORS

1.      The affairs of the Association shall be managed by a board of directors who shall be members of the Association, excepting that the first Board and their successors appointed by the remaining directors (in the event of vacancies occurring before the first election of a majority of directors by Owners) need not be members and excepting that any directors appointed or elected by DVD as developer or as Voting Representative need not be members. The initial Board shall consist of three (3) directors, and thereafter the membership of the Board shall consist of not less than three (3) nor more than seven (7) directors. The Board may from time to time increase or decrease the number of persons to serve on the  Board; provided, however, that the Board shall always consist of an odd number of directors. Where Ownership Interests are owned by corporations, the officers, directors, employees or other appointed representatives of said corporations shall be eligible to serve on the Board on behalf of the corporation.

2.      Election of directors shall be conducted in the following manner:

A.      Members of the Board shall be elected by a plurality of the votes cast at an annual Owners' meeting. There shall be no cumulative voting. The Board may appoint a search committee for the purpose of locating and encouraging qualified persons to become candidates.

B.      Vacancies in the Board may be filled by the remaining directors subject to the provisions of Paragraph 2(C) of this Article. A director appointed to fill a vacancy in office shall serve the remainder of the term of the office which the departing director held.

C.      The initial directors shall be appointed by DVD and shall serve until the first election of directors, and any vacancies in office occurring before the first election shall be filled by the remaining directors. In the event there are no remaining directors, any such vacancies shall be filled by DVD. Unless applicable law is subsequently amended to permit a longer period of control of the Board by DVD (in which case such applicable law shall govern at the option of DVD), the Owners of Ownership Interests in Units other than DVD will be entitled to elect members of the Board as follows:

(1)    At such time as fifteen percent (15%) or more of the Ownership Interests in all Units that will be operated ultimately by the Association are owned by Owners other than DVD, the Owners of Ownership Interests other than DVD shall be entitled to elect not less than one-third (1/3) of the members of the Board.

(2)    Owners of Ownership Interests other than DVD shall be entitled to elect not less than a majority of the members of the Board three (3) years after fifty percent (50%) of the Ownership Interests in all Units that will be operated ultimately by the Association have been conveyed to purchasers, or three (3) months after ninety percent (90%) of the Ownership Interests in all Units that will be operated ultimately by the Association have been conveyed to purchasers, or when some of the Ownership Interests in the Units have been sold and none of the others are being offered for sale by DVD in the ordinary course of business, or seven years after the recordation of the Declaration creating the initial phase or phases of the Condominium, whichever shall first occur.

(3)    DVD shall be entitled to elect not less than one (1) member of the Board as long as DVD holds for sale in the ordinary course of business at least:  (i) five percent (5%) of the Ownership Interests in all Units that will be operated ultimately by the Association, if such number of Units is less than 500; and (ii) two percent (2%) of the Ownership Interests in all Units that will be operated ultimately by the Association, if such number of Units is greater than 500.

(4)    As to the election of directors pursuant to Subparagraphs (1), (2) and (3) above, within seventy-five (75) days after Owners other than DVD are entitled to elect a member or members of the Board, the Association shall call and give not less than sixty (60) days nor more than ninety (90) days notice of a meeting of the Owners for this purpose.

(5)    Nothing in this subparagraph shall be construed so as to preclude DVD from relinquishing control of the Board at any time DVD may so elect.

3.    At the first election at which all of the members of the Board are elected by Owners other than DVD, the majority of those directors receiving the most votes shall serve for a two (2) year term and the remaining directors shall serve for a one (1) year term. Thereafter, each director's service shall extend for a two (2) year period and thereafter until a successor is duly elected and qualified or until the director is removed in the manner elsewhere provided. Prior to the first election at which all of the members of the Board are elected by Owners other than DVD, the term of office of each director elected by the Owners shall extend until the next annual Owners' meeting and thereafter until a successor is duly elected or qualified or until the director is removed in the manner elsewhere provided.

4.    The organizational meeting of a newly elected Board shall be held within ten (10) days of their election at such place and time as shall be fixed by the directors at the meeting at which they were elected, and no further notice of the organizational meeting shall be necessary providing a quorum shall be present.

5.    Regular meetings of the Board may be held at such time and place as shall be determined from time to time by a majority of the directors. Notice of regular meetings shall be given to each director, personally by fax upon confirmation of receipt, or by mail or e-mail at least three (3) days prior to the date set forth for such meeting unless such notice is waived. Notice of all meetings of the Board shall be posted in a conspicuous place on the Condominium Property for the benefit of Owners at least forty-eight (48) hours in advance of such meeting, except in an emergency. In lieu of any physical posting of notice, the Board may adopt a procedure for conspicuously posting and repeatedly broadcasting the notice and agenda on a closed-circuit television system serving the Association at least four (4) times every broadcast hour each day notice is required.  Any item not included on the notice may be taken up on an emergency basis by at least a majority plus one (1) of the members of the Board. Such emergency action shall be noticed and ratified at the next regular meeting of the Board. Upon notice to the Owners, the Board shall, by duly adopted rule, designate a specific location on the Condominium Property upon which all notices of Board meetings shall be posted. All meetings of the Board shall be open to all Owners. All Owners shall have the right to speak at

©Disney
J:\DATA\Compliance\DVC RESORTS\ANIMAL KINGDOM VILLAS\Organizational Documents\Bylaws\Bylaws 12 11 2006.DOC
Rev.: 1/10/2007                                                                Page 4 of 10

meetings of the Board with reference to designated agenda items; however, the Board may adopt reasonable rules governing the frequency, duration, and manner of Owner statements.

6.     Special meetings of the Board may be called by the chairperson of the Board or the president of the Association and must be called by the secretary of the Association at the written request of one-third (1/3) of the votes of the Board. Not less than three (3) days notice of the meeting shall be given personally, by fax upon confirmation of receipt, by mail facsimile (upon confirmation of receipt) or e-mail, which notice shall set forth the time, place and purpose of the meeting.

7.     Any director may waive notice of a meeting before or after the meeting, and such waiver shall be deemed equivalent to the giving of notice. Any director's attendance at a meeting shall constitute a waiver of the notice of that meeting.

8.     A quorum at Board meetings shall consist of the directors entitled to cast a majority of the votes of the entire Board. The acts of the Board, approved by a majority of votes present at a meeting at which a quorum is present, shall constitute the acts of the Board, except as specifically otherwise provided in the Declaration. If at any meeting of the Board there is less than a quorum present, the majority of those present may adjourn the meeting from time to time until a quorum is present. Once a quorum is present, the meeting may resume and any business which might have been transacted at the meeting as originally called may be transacted without further notice.

9.     The presiding officer of Board meetings shall be the president of the Association. In the absence of the president, the members of the Board who are present shall elect a chairperson to preside.

10.     Directors' fees, if any, shall be determined by the Owners, and no director shall receive a fee prior to the election of a majority of the members of the Board by Owners other than DVD.

11.     Owner directors may be removed from the Board pursuant to Section 718.112(2)(j), Florida Statutes.

12.     Anything to the contrary contained herein notwithstanding, any director appointed by DVD may be removed by DVD at any time. Upon such removal, DVD shall immediately appoint a replacement director and notify the remaining directors, if any, of such removal and appointment.

## IV. POWERS AND DUTIES OF THE BOARD OF DIRECTORS

All of the powers and duties of the Association shall be exercised by the Board, including, but not limited to, those existing under common law, statutes and the Condominium Documents. Such powers and duties of the Board shall be exercised in accordance with the provisions of the Declaration governing the use of the Condominium Property, and shall include the following:

1.     To adopt a budget and to make and collect assessments against Owners to defray the costs of operating the Condominium.

2.     To use the proceeds of assessments in the exercise of its powers and duties.

3.     To maintain, manage, repair, replace and operate the Condominium Property, including, but not limited to, obtaining and maintaining adequate insurance to protect the Association and the Condominium Property.

4.     To reconstruct improvements after casualty and to construct further improvements to the Condominium Property.

5.     To make and amend rules and regulations respecting the use of the Condominium Property.

6.     To enforce by legal means the provisions of the Condominium Documents.

7.      To contract for management of the Condominium and to delegate to such contractor all powers and duties of the Association except such as are specifically required by the Condominium Documents to have approval of the Board or Owners. Notwithstanding any provisions contained in these Bylaws to the contrary, it is the intent of these Bylaws that the Board shall not have the power to independently terminate the Property Management Agreement except as set forth in the Property Management Agreement. The Property Management Agreement may only be terminated in accordance with it own terms or by the vote of the Owners in accordance with Florida law.

8.      To pay taxes and assessments which are liens against any part of the Condominium, and to assess the same against the Owner subject to such liens.

9.      To pay the cost of all power, water, sewer and other utility services rendered to the Condominium and not billed directly to an Owner.

10.     To employ personnel for reasonable compensation to perform the services required for proper administration of the purposes of the Association, including, but not limited to, accountants and attorneys.

11.     To bond any or all employees, officers and directors of the Association, for which the Association shall bear the costs.

12.     To maintain, manage, repair, replace and operate the property of the single condominium resulting from a merger of this Condominium with another independent and separate condominium pursuant to the merger provisions of the Declaration.

13.     To maintain all books and records concerning the Condominium and the Vacation Ownership Plan including, but not limited to, the maintenance of a complete list of the names, addresses and e-mail addresses of all Owners, a copy of which shall be provided to the Division of Florida Land Sales, Condominiums and Mobile Homes upon request.

14.     To operate and administer or assign the operation and administration of any reservation system created for the Condominium, and to amend or revise the reservation system as is necessary from time to time. Notwithstanding any provisions contained in these Bylaws to the contrary, it is the intent of these Bylaws that the Board shall not have the power to independently terminate the Membership Agreement or DVC Resort Agreement except as set forth in the Membership Agreement or the DVC Resort Agreement, respectively.

15.     To lease non-Condominium Property for the Association as lessee, and Condominium Property, including, but not limited to, Association Property and Common Elements, for the Association as lessor, in accordance with the Declaration.

16.     To convey a portion of the Common Elements to a condemning authority for the purpose of providing utility easements, right-of-way expansions or other public purposes, whether negotiated or as a result of eminent domain proceedings.

## V. OFFICERS

1.      The executive officers of the Association shall be a president, a vice president, a secretary, and a treasurer, all of whom may be directors of the Association and who shall be elected annually by the Board at any meeting. Any person may hold two or more offices except that the president shall not also be the vice president, secretary or treasurer, or assistant secretary or assistant treasurer. The Board shall from time to time elect such other officers and designate their powers and duties as the Board determines necessary to manage the affairs of the Association.

2.      The president shall be the chief executive officer of the Association. The president shall have all of the powers and duties which are usually vested in the office of president including, but not limited to, the power of

appointing committees from among the Owners from time to time, as the president may in the president's discretion determine appropriate, to assist in the conduct of the affairs of the Association.

3.      The vice president shall, in the absence or disability of the president, exercise the powers and duties of the president. The vice president shall also generally assist the president and exercise such other powers and perform such other duties as shall be prescribed by the Board.

4.      The secretary shall keep the minutes of the proceedings of the Board and the Owners in a book available for inspection at any reasonable time by the directors or Owners, or their authorized representatives. The Association shall retain these minutes for a period of not less than seven (7) years. The secretary shall attend to the giving and serving of all notices required by law. The secretary shall have custody of the seal of the Association and affix the same to instruments requiring a seal when duly signed.

5.      The treasurer shall have custody of all property of the Association including, but not limited to, financial records, funds, securities and evidences of indebtedness. The treasurer shall keep the financial records of the Association and shall keep the assessment rolls, the accounts of the Owners, and the books of the Association in accordance with good accounting practices. The treasurer shall perform all other duties incident to the office of treasurer of an Association and as may be required by the directors or the president of the Association.

6.      The compensation of all employees of the Association shall be fixed by the Board. This provision shall not preclude the Board from employing a director or an officer as an employee of the Association nor from contracting with a director for the management of the Condominium.

## VI. FISCAL MANAGEMENT

The provisions for fiscal management of the Association set forth in the Declaration and the Articles shall be supplemented by the following:

1.      Assessments.

        A.      The Board shall fix and determine from time to time the sum or sums necessary and adequate for the Common Expenses of the Condominium. Common Expenses shall include the expenses for the operation, maintenance, repair or replacement of the Common Elements and the Limited Common Elements, costs of carrying out the powers and duties of the Association, all insurance premiums and expenses relating thereto, including, but not limited to, fire insurance and extended coverage, and any other expenses designated as Common Expenses from time to time by the Board, or under the provisions of the Declaration. The Board is specifically empowered, on behalf of the Association, to make and collect assessments and to lease, maintain, repair and replace the Common Elements and Limited Common Elements of the Condominium. The Board shall have the power, on behalf of the Association, to lease Common Elements of the Condominium in accordance with the provisions of the Declaration. Funds for the payment of Common Expenses shall be assessed against the Owners in the proportions of percentages of sharing Common Expenses, as provided in the Declaration. Assessments for Units shall be due on the fifteenth day of January each year and shall be considered delinquent if payment has not been received before the fourteenth day of February each year, unless otherwise ordered by the Board. Special assessments, should such be required by the Board, shall be levied in the same manner as provided for regular assessments, and shall be payable in the manner determined by the Board. If an Owner shall be in default in the payment of any assessment or taxes due on the Owner's interest, the Association shall have all collection rights available to it under Chapters 718 and 721, Florida Statutes. If any unpaid share of Common Expenses or assessments is extinguished by foreclosure of a superior lien or by a deed in lieu of foreclosure thereof, the unpaid share of Common Expenses or assessments shall be Common Expenses collectible from all the Owners.

        B.      The assessment roll shall be maintained in a set of accounting books in which there shall be an account for each Unit. Such an account shall designate the name and address of the Owners or Owner, the dates and

amounts in which the assessments come due, the amounts paid upon the account and the balance due upon assessments. Assessments shall be made against Owners in an amount not less than required to provide funds in advance for payment of all of the anticipated current operating expenses and for all of the unpaid operating expenses previously incurred. In the absence of a determination by the Board as to the frequency of assessments, assessments shall be due and payable annually. The personal liability of an Owner for assessments shall survive the termination of such Owner's membership in the Association.

C.    Any Owner shall have the right to require a certificate from the Association showing the amount of unpaid assessments against such Owner with respect to the Owner's Unit. The holder of a mortgage or other lien shall have the same right as to any Unit upon which the lien is against. Any person who relies upon such certificate shall be protected thereby.

D.    Notice of any meeting at which assessments against Owners are to be considered, whether a meeting of the Board or of the Owners, shall specifically contain a statement that assessments will be considered and the nature of such assessments.

2.    Budget.

A.    The Board shall adopt an operating budget and a capital reserves budget for each calendar year which shall contain estimates of the cost of performing the functions of the Association and estimates of the revenue received by the Association. The proposed annual operating budget of Common Expenses shall be detailed and shall show the amounts budgeted, by accounts and expense classifications. The capital reserves budget shall include reserve accounts for capital expenditures and deferred maintenance. These accounts shall include roof replacement, building painting and pavement resurfacing. The amount to be reserved shall be computed by means of a formula which is based upon estimated remaining useful life, taking into account deferred maintenance, and estimated replacement cost of each reserve item. These reserve accounts may be waived, or less adequate reserves established, by a majority vote of the voting interests, voting in person or by proxy, at a duly called meeting of the Association. The budget shall include proposed assessments against each Owner, together with an annual total of assessments, and the following items, if applicable:

| | | | |
|---|---|---|---|
| (a) | Administration of the Association. | (i) | Operating Capital. |
| (b) | Management fees. | (j) | Reserves. |
| (c) | Maintenance. | (k) | Fees payable to any governmental entities, if applicable. |
| (d) | Rent for recreational and other commonly used facilities. | (l) | The costs and expenses of the Club, including, but not limited to, the DVC Reservation Component, that are attributed to the Condominium. |
| (e) | Taxes upon Association Property. | | |
| (f) | Taxes upon leased areas. | | |
| (g) | Insurance. | | |
| (h) | Security provisions. | (m) | Other expenses. |

B.    Copies of the proposed budget and proposed assessments shall be transmitted to each Owner at least fourteen (14) days prior to the meeting at which the budget is to be considered, together with a notice of the meeting which shall state the time and place of the meeting. The meeting shall be open to all Owners. If the budget is subsequently amended before the assessments are made, a copy of the amended budget or a description of any changes in the adopted budget and a disclosure regarding the Owner's rights to receive a copy of the adopted budget shall be furnished to each Owner.  If an adopted budget requires assessment against the Owners in any fiscal or calendar year in excess of one hundred and fifteen percent (115%) of the assessments for the preceding year, the Board, upon written application to it of ten percent (10%) of the voting interests of the Association, shall call a special meeting of the Owners within thirty (30) days, giving not less than ten (10) days written notice to each Owner. At the special meeting, Owners shall consider and enact a budget. The adoption of the budget at such a special meeting shall require a vote of a majority of all voting interests. The Board may propose a budget which exceeds one hundred

and fifteen percent (115%) of the assessments for the preceding year to the Owners at a meeting of the Owners or in writing, and if the budget or proposed budget is approved at the meeting or by a majority of all voting interests in writing, the budget shall be adopted. In determining whether assessments exceed one hundred and fifteen percent (115%) of similar assessments in prior years, any authorized provisions for reasonable reserves for repair or replacement of the Condominium Property, expenses by the Association which are not anticipated to be incurred on a regular or annual basis, or assessments for capital improvements to the Condominium Property, shall be excluded from the computation. However, as long as DVD is in control of the Board, the Board shall not impose an assessment for any year greater than one hundred and fifteen percent (115%) of the prior fiscal or calendar year's assessment without approval of a majority of all voting interests of the Association.

3.      The depository of the Association shall be such bank or other institution as permitted by applicable Florida law, as shall be designated from time to time by the Board and from which the monies in such accounts shall be withdrawn only by checks signed by such persons as are authorized by the Board.

4.      The board of directors shall arrange for an annual independent audit of all the books and financial records of the association by a certified public accountant in accordance with generally accepted auditing standards as defined by the rules of the Board of Accountancy of the Department of Business and Professional Regulation. A copy of the audit shall be filed with the division and forwarded to the officers of the Association in accordance with Florida law.

5.      The Board shall obtain fidelity bonding of all officers and directors who control or disburse funds of the Association, as defined in Chapter 718, Florida Statutes. The amount of such bonds shall be determined in accordance with Chapter 718, Florida Statutes. The premiums on such bonds shall be paid by the Association as a Common Expense.

## VII. PARLIAMENTARY RULES

Robert's Rules of Order (latest edition) shall govern the conduct of the Association proceedings when not in conflict with the Condominium Documents or with the statutes of the State of Florida.

## VIII. AMENDMENTS

Amendments to these Bylaws shall be proposed and adopted in the following manner:

1.      Notice of the subject matter of a proposed amendment shall be included in the notice of any meeting at which a proposed amendment is considered.

2.      Until the first election of a majority of directors by Owners other than DVD, proposal of an amendment to these Bylaws and approval thereof shall require the affirmative action of two-thirds (2/3) of the entire membership of the Board, and no meeting of the Owners nor any approval thereof is required.

3.      After the first election of a majority of directors by Owners other than DVD, an amendment may be proposed by either the Board or by the membership of the Association, and after being proposed and approved by one of such bodies, it must be approved by the other. Except as otherwise provided herein, a resolution adopting a proposed amendment must receive approval of not less than two-thirds (2/3) of the votes of the entire membership of the Board and not less than a majority vote of the voting interests of the Association at a duly called meeting of the Association. Directors and Owners not present at the meeting considering the amendment may express their approval in writing within ten (10) days after such meeting.

4.      These Bylaws shall be amended by DVD, if necessary, to make the same consistent with the provisions of the Declaration, the Master Declaration and the Ground Lease, to conform these Bylaws to meet the requirements of any governmental entity or statute, as may be in the best interests of the Association, and as it may deem appropriate, in its sole, absolute and unfettered discretion, to carry out the purposes of the project and to expand or enhance the Vacation Ownership Plan or the Disney Vacation Club.

5.    An amendment when adopted or made shall become effective only after being recorded in the Public Records of Orange County, Florida. No Bylaw shall be revised or amended by reference to its title or number only. Proposals to amend existing Bylaws shall contain the full text of the Bylaws to be amended; new words shall be inserted in the text double underlined, and words to be deleted shall be lined through. However, if the proposed change is so extensive that this procedure would hinder rather than assist the understanding of the proposed amendment, it is not necessary to use double underlining and lining as indicators of words added or deleted, but, instead, a notation must be inserted immediately preceding the proposed amendment in substantially the following language "Substantial rewording of Bylaw. See Bylaw . . . for present text." Nonmaterial errors or omissions in the Bylaw amendment process shall not invalidate an otherwise properly promulgated amendment.

## IX. SEVERABILITY AND CONFORMITY TO STATE LAW

These Bylaws are to be governed by and construed according to the laws of the State of Florida. If it should appear that any of the provisions hereof are in conflict with the Declaration, the Master Declaration, the Ground Lease or any rule of law or statutory provision of the State of Florida, as of the date of the recording of the Declaration, then such provisions of these Bylaws shall be deemed inoperative and null and void insofar as they may be in conflict therewith, and shall be deemed modified to conform to the Declaration, the Master Declaration, the Ground Lease or such rule of law.

## X. MANDATORY NON-BINDING ARBITRATION

Internal disputes arising from the operation of the Condominium among DVD, the Association, the Owners, their respective agents and assigns, or any or all of them, must be submitted first for resolution through non-binding arbitration pursuant to Florida law.

**Exhibit "D"**

<u>PERCENTAGE INTEREST IN COMMON ELEMENTS</u>

Each residential Unit within the Condominium shall have an undivided percentage interest in the Common Elements and Common Surplus and a share of the Common Expenses of the Condominium on an equal fractional basis. This fractional interest is based on the total number of Units and Commercial Units declared as part of the Condominium at any given time. The percentage interest in the Common Elements and Common Surplus and share of the Common Expenses of a given residential Unit declared into the Condominium from time to time shall always equal the total square footage of that residential Unit divided by the total square footage of all Units declared into the Condominium; however, each Commercial Unit declared into the Condominium from time to time will have a percentage interest of .00000001% (does this change?) in the Common Elements and Common Surplus and share of the Common Expenses. As additional phases are added to the Condominium, the respective percentage interests in the Common Elements and Common Surplus and share of the Common Expenses of the Units already declared into the Condominium will be decreased accordingly.

To determine the exact percentage interest of a given Unit declared into the Condominium at any given time, the following mathematical formula applies: $I=(B/T)*[1.0-(C*.00000001)]$.(is this still correct?)

1.  "I" represents the interest to be determined of a particular Unit.

2.  "B" represents the square footage of the particular Unit.

3.  "T" represents the total square footage of all of the Units declared as part of the Condominium.

4.  "C" represents the number of Commercial Units declared as part of the Condominium.

; 7/24/06

## CONDOMINIUM RULES AND REGULATIONS OF
## DISNEY'S ANIMAL KINGDOM VILLAS, A LEASEHOLD CONDOMINIUM

Each Owner at Disney's Animal Kingdom Villas, a leasehold condominium, shall be governed by and shall comply with the terms of the Condominium Documents and these Condominium Rules and Regulations adopted pursuant to the Condominium Documents. All terms used in these Condominium Rules and Regulations shall have the same meaning as the identical terms used in the Declaration of Condominium for Disney's Animal Kingdom Villas, a leasehold condominium. Failure of an Owner to comply with the provisions of the Condominium Documents and these Condominium Rules and Regulations shall entitle the Association or other Owners to pursue any and all legal and equitable remedies for the enforcement of such provisions, including, without limitation, an action for damages, an action for injunctive relief or an action for declaratory judgment.

1.    Personal Use. Each of the Vacation Homes shall be occupied only as vacation accommodations. Use of the accommodations, commonly used facilities, and recreational facilities of the Condominium is limited solely to the personal use of the Owners or Cotenants, their lessees, guests, exchangers and invitees and for recreational uses by corporations and other entities owning Ownership Interests in a Unit. No Owner may occupy a Unit or Vacation Home or use any recreational facilities or Common Elements at any time other than during the time that a Vacation Home is properly reserved in accordance with the Condominium Documents. Use of Vacation Homes, recreational facilities and Common Elements, other than Commercial Units and Commercial Unit LCEs, for commercial purposes or any purposes other than the personal use described herein is expressly prohibited. "Commercial purpose" shall include a pattern of rental activity by a Cotenant that the board of directors of the Association (the "**Board**"), in its reasonable discretion, could conclude constitutes a commercial enterprise or practice. From time to time, to the extent that the Board determines that use is occurring that is for a commercial purpose, the Board may in its sole and absolute discretion, adopt policies to provide what constitutes a commercial enterprise, practice or purpose.  No Vacation Home in any Unit may be divided or subdivided into a smaller Vacation Home without prior written approval of DVD. No Ownership Interest may be added to a vacation ownership plan, multisite timeshare plan, vacation club or exchange program except as provided in the Declaration of Condominium without written approval of DVD.

It is expressly contemplated that Commercial Units, Commercial Unit LCEs, portions of the adjacent Master Declaration Property, and nearby properties owned by the TWDC Companies may be operated as commercial spaces containing stores, restaurants, entertainment areas and other public establishments which may have nighttime hours of operation and which may result in noise or light levels in excess of levels typically occurring in areas consisting solely of residential accommodations, including, without limitation, fireworks and concerts.  Nothing contained within these Condominium Rules and Regulations shall be deemed to prohibit such commercial activity.

2.    Common Elements and Limited Common Elements. The Common Elements and Limited Common Elements shall be used only for the purposes for which they are intended as set forth in the Declaration.

3.    Nuisances. No nuisance shall be allowed upon the Condominium Property nor within a Unit or a Vacation Home, nor any use or practice that is the source of annoyance to Owners or which interferes with the peaceful possession and proper use of the property by the Owners. All parts of the Condominium shall be kept in a clean and sanitary condition, and no rubbish, refuse or garbage shall be allowed to accumulate or any fire hazard allowed to exist. No Owner shall permit any use of a Unit or a Vacation Home or make any use of the Common Elements that will increase the cost of insurance upon the Condominium Property beyond the cost generally charged for intended use.

As more specifically provided in the Master Declaration, WDWHRC has reserved unto itself easement rights over, under and across all the Master Declaration Property for the purpose of constructing, maintaining and supporting a monorail, boat launch, and/or a street or other right-of-way servicing properties owned by WDWHRC or the TWDC Companies as part of the larger Walt Disney World transportation system.  DVD, WDWHRC, and the TWDC Companies do not contemplate that any monorail constructed pursuant to such easement rights will

©Disney
Revised: 9 15 2006

1

stop within or otherwise service the Condominium Property. In the event these easement rights are exercised, it may result in noise or light levels in excess of that typically occurring in areas consisting solely of residential accommodations and may result in an obstruction of views.

     4.    <u>Lawful Use</u>. No immoral, improper, offensive or unlawful use shall be made of the Condominium Property, a Unit or a Vacation Home, and all valid laws, zoning ordinances and regulations of all governmental bodies having jurisdiction shall be observed. The responsibility of meeting the requirements of governmental bodies for maintenance, modification or repair of the Condominium Property, a Unit or a Vacation Home shall be the same as the responsibility for the maintenance and repair of the property concerned.

     5.    <u>Leasing of Vacation Homes</u>. All of the terms and provisions of the Condominium Documents and these Condominium Rules and Regulations pertaining to use and occupancy shall be applicable and enforceable against any person occupying a Vacation Home as a tenant to the same extent as against an Owner. Any lease or rental agreement, whether oral or written and whether specifically expressed in such agreement or not, shall be deemed to contain a covenant upon the part of each such tenant designating the Association as the Owner's agent for the purpose of and with the authority to terminate any such lease or rental agreement in the event of violations by the tenant of the terms and provisions of the Condominium Documents or Condominium Rules and Regulations. All leasing or rental agreements relating to the use, occupancy and possession of any Vacation Home must be in writing and must set forth an acknowledgment and consent on the part of the lessee-sublessee-tenant to use, occupy and possess such Vacation Home in conformance and compliance with the provisions of the Condominium Documents and these Condominium Rules and Regulations. In the event an Owner fails to secure a written leasing or rental agreement, the Association reserves the right to request the lessee-sublessee-tenant to execute an acknowledgment to use and occupy the rented or leased Vacation Home in conformance and compliance with the Condominium Documents and these Condominium Rules and Regulations.

     6.    <u>Signs</u>. No "For Sale" or "For Rent" signs or other displays or advertising shall be maintained on any part of the Common Elements, Limited Common Elements, Units or Vacation Homes, except that the right is specifically reserved in DVD, to place and maintain "For Sale" and "For Rent" signs for so long as it may have Units or Ownership Interests to sell or lease in this Condominium or any other DVC Resort, and except as permitted by the Board from time to time.

     7.    <u>Prohibited Vehicles</u>. No trucks, motorcycles, trailers or commercial vehicles (excluding those vehicles owned by DVD or the Management Company) shall be parked in any parking space, except such temporary parking spaces provided for the purpose as may be necessary to effectuate deliveries to the Condominium, the Association or the Owners. Bicycles and motorcycles shall not be stored on the Condominium Property, except in such areas designated for this purpose or except as permitted by the Board.

     8.    <u>No Pets</u>. All pets are prohibited. No pets of any type are allowed on Condominium Property. The provisions of this paragraph shall not apply to service animals, as defined by the Americans With Disabilities Act.

     9.    <u>Exterior Appearance</u>. No Owner shall decorate or alter any part of a Unit or a Vacation Home so as to affect the appearance of a Unit or a Vacation Home from the exterior. Such decoration or alteration shall include painting or illumination of the exterior of a Unit or a Vacation Home, display of plants or other objects upon balconies or railings or exterior window sills or ledges, reflective film or other window treatments, draperies, window shades, screen doors and lights. The Association shall have the sole discretion, which may be based on aesthetic principles only, to determine compliance with this provision.

     10.    <u>Antennas</u>. No antennas or satellite transmission receivers of any type designed to serve a Unit or a Vacation Home shall be allowed on the Common Elements or Limited Common Elements, except as provided by the Association to serve as a master antenna for the benefit and use of the Condominium. Notwithstanding such restriction, the Owners of Commercial Units may place such antennas or satellite transmission receivers upon Commercial Units or Commercial Unit LCEs. No electrical or other equipment may be operated on the

Condominium Property which interferes with television signal reception, except for permitted equipment on the Commercial Units or Commercial Unit LCEs.

11.    Decor of Vacation Homes. No Owner shall alter the furnishings, appliances, personal property or decor of any Unit or Vacation Home without the prior written consent of the Board. The Association shall determine the interior color scheme, decor and furnishings of each Unit and Vacation Home as well as the proper time for redecorating and renovating the Unit or Vacation Home and its contents.

12.    Noise. Should noise transmission within the Condominium create a disturbance or a nuisance, the responsibility is with the Owner to abate the noise transmission and not with the Association. In order to insure the comfort of all Owners and authorized users, radio, stereo and television sets, and any and all other such audio equipment generating noise should be turned down to a minimum volume so as not to disturb other persons between the hours of 11:00 p.m. and 8:00 a.m. All other unnecessary noises between these hours should be avoided. Nothing contained within this paragraph shall be deemed to prohibit commercial activity occurring within any Commercial Unit or on any Commercial Unit LCE.

13.    Obstructions. Sidewalks, entrances, driveways, passages, patios, courts, vestibules, stairways, corridors, halls and/or all other areas intended for common use must be kept open and shall not be obstructed in any manner. Rugs or mats, except those either permitted or placed by the Association, must not be placed outside of doors or in corridors. No sign, notice or advertisement shall be inscribed or exposed on or at any window of a Unit or any part of the Condominium Property, except such as shall have been approved in writing by the Board or as is permitted to DVD pursuant to these Condominium Rules and Regulations or the Condominium Documents; nor shall anything be projected out of any window in the Condominium Property without similar approval. All personal property of Owners shall be stored within the Vacation Home.

14.    Children. Children are to play only in areas either designated or clearly intended for play, and they are not to play in public halls, on stairways, or other common areas which would cause an obstruction. Reasonable supervision by parents or guardians must be exercised at all times when children are playing on the Condominium Property.

15.    Balconies. Plants, pots, receptacles and other movable objects must not be kept, placed or maintained on ledges or balconies, except as permitted by the Board. No objects shall be hung from balconies or window sills. No cloth, clothing, rugs or mops shall be hung up or shaken from windows, doors or balconies. No cooking shall be permitted on any balcony of a Unit. Owners shall not allow anything to be thrown or to fall from windows, doors, balconies or the interior of the building from hall doors.

16.    Hallways. Bicycles, garbage cans, laundry, dry cleaning, supplies or other articles shall not be placed in the halls or on staircase landings. No Owner shall allow doors to the corridor to remain open for any purpose other than for immediate ingress and egress.

17.    Entry for Emergencies. In case of emergency originating in or threatening any Unit or Vacation Home, regardless of whether or not the Owner is present at the time of such emergency, the Board, the Management Company or any other person authorized by them, shall have the right to enter such Unit or Vacation Home for the purpose of remedying or abating the cause of such emergency, and such right of entry shall be immediate. To facilitate entry into Units and Vacation Homes in the event of any such emergency, the Association or its designee shall be allowed to retain a key for each Unit and each Vacation Home.

18.    Plumbing. Plumbing shall not be used for any other purpose than those for which it was constructed, and no sweepings, rubbish, rags or other foreign substances shall be deposited into the plumbing.

19.    Roof. Owners are not permitted on the roof of any building within the Condominium Property for any purpose without the express written approval of the Board or Management Company.

Rev. 9 15 2006

3

20.    <u>Solicitation</u>. There shall be no solicitation by any person anywhere on the Condominium Property for any cause, charity or purpose whatsoever, unless specifically authorized in writing by the Board or the Management Company, except for solicitation by DVD in marketing Ownership Interests or related products.

21.    <u>Parking</u>. No vehicle belonging to any Owner or to a member of the family of an Owner or guest, tenant or employee of an Owner shall be parked in any unauthorized area or in such manner as to impede or prevent access to another Owner's or authorized user's parking space or any fire lanes. The Association or Management Company has the right to limit the number of vehicles permitted to be parked on the Condominium Property in connection with occupancy of a Unit. No repair of vehicles shall be made within the Condominium Property. No Owner shall store or leave boats, trailers, mobile homes, recreational vehicles and the like on the Condominium Property, except in areas, if any, designated for same; provided, however, that boats, trailers, mobile homes, recreational vehicles and the like may be parked on the Condominium Property if the vehicle is less than the width of the interior of the lines of one (1) individual parking space and does not exceed twenty-four (24) feet in length. If the vehicle is wider than the width of the interior lines of one (1) individual parking space or if the vehicle exceeds twenty-four (24) feet in length, then such vehicle may not be parked on the Condominium Property without the prior permission of the Association or Management Company. No trucks or buses may be parked anywhere on Condominium Property, except for those of DVD or the Management Company, if any. Parking spaces are not assigned as appurtenances to particular Units or Vacation Homes. As such, each space may be used by any Owner, family member, lessee or guest. Owners may not park vehicles in spaces designated for handicapped persons, unless they fall within this category of individuals, and the Association or Management Company shall have the right to notify local authorities of any such violations. All vehicles shall be parked within the painted lines of one individual parking space and in no event shall a vehicle exceed, in width, the interior of the painted lines of one individual space. The Owners, their employees, servants, agents, visitors, licensees and the Owner's family will obey all posted parking regulations. Vehicles parked in any unauthorized area or impeding or preventing access to another Owner's or authorized user's parking space or any fire lanes are subject to being towed away at the Owner's or authorized user's sole expense.

22.    <u>Use of Swimming Pools, Whirlpools, and/or Other Facilities</u>. Owners and authorized users of the swimming pools, whirlpools and/or other facilities do so at their own risk. All users are requested to obey the posted rules. Children under ten (10) years of age using any swimming pools, whirlpools, and/or other available facilities must be accompanied and supervised by a responsible adult.

Swimming in the pools and/or whirlpools and use of other facilities is permitted only during the posted hours of operation. Since the facilities are not guarded, <u>persons using the facilities do so at their own risk</u>. Persons using all facilities must be appropriately attired.

The following are the basic rules for persons using the swimming pools and/or whirlpools:

a.    Shower thoroughly each and every time before entering.

b.    Pneumatic floats or other items of similar nature, except for Board-approved floatation devices, are not permitted in the pools or whirlpools.

c.    Running and/or ball playing or throwing objects is not permitted in the general pool area except in designated areas and in connection with various activities as permitted by the Board from time to time.

d.    Beverages may be consumed within the pool areas, but absolutely no glass, glass bottles or other glass containers shall be allowed within the pool area. Anyone who hosts or participates in serving or consuming beverages will be held strictly responsible for cleaning up after such refreshments have been consumed and will further be held strictly liable for any injury resulting from broken glass.

e.    If suntan oils, creams or lotions are used, a towel or other form of protection must be placed on pool furniture to protect the attire of others who use the furniture.

Rev. 9 15 2006

4

        f.     No children in diapers will be allowed in the pools and/or whirlpools.

        g.     Pool towels are provided at the pool for your convenience.    No person or party may leave personal items, including towels to reserve pool chairs.

        h.     There will be no swimming or fishing allowed in any lakes, retention ponds and/or lagoons.

23.    Storage of Dangerous Items. No inflammable, combustible, or explosive fluid, chemical or substance, shall be kept in any Unit or Vacation Home, Common Element or Limited Common Element except as are required for normal household use. This provision shall not apply to the storage of such materials in Commercial Units or Commercial LCEs where such storage is for commercial purposes.

24.    Employees/Agents Control and Entry of Units for Maintenance. Employees and/or agents of the Association or Management Company, and employees and/or agents of DVD's on-going sales program, shall not be sent off the Condominium Property by any Owner or authorized user at any time for any purpose. No Owner or authorized user shall direct, supervise or in any manner attempt to assert any control over the employees of the Management Company or the Association. Violations of these Condominium Rules and Regulations, or other matters of concern, should be brought to the attention of the Management Company for proper resolution. Employees or agents of the Management Company shall be permitted to enter Units or Vacation Homes for maintenance and repairs during reasonable hours.

25.    Complaints. Complaints regarding the operation of the Condominium shall be made in writing first to the Management Company, as long as the Property Management Agreement remains in effect, and thereafter, to the Board.

26.    Payment of Maintenance Fees, Special Charges and Fines. Payment of maintenance fees, special charges, and fines shall be made at the office of the Management Company or at such other location as designated by the Management Company from time to time. Payments made in the form of checks shall be made to the order of such party as the Management Company shall designate.

27.    Weapons. No explosives, firearms, or weapons of any kind shall be permitted in any Unit or Vacation Home or anywhere on the Condominium Property without the approval of the Board.

28.    Non-Payment of Assessment. Any Owners who are delinquent in payment of their assessments may be denied the right to make reservations, access, check-in and occupancy of a Vacation Home in accordance with Section 721.13(6), Florida Statutes, until all delinquent assessments are paid in full. In addition, the Board or the Management Company may rent the delinquent Owner's Vacation Home in accordance with Section 721.13(6), Florida Statutes. Assessments and installments on such assessments paid on or before fifteen (15) days after the date when due shall not bear interest, but all sums not paid on or before fifteen (15) days after the date when due shall bear interest at the highest rate permitted by law from the date when due until paid. In addition to such interest, the Association may charge an administrative late fee on delinquent accounts in an amount not to exceed the amount permitted under Florida law.  In addition, the Association may authorize the Management Company to charge a non-sufficient funds fee on all returned checks or dishonored electronic debits in an amount not to exceed the amount permitted under Florida law.

29.    Right of Occupancy - Holdover Owners. In the event Owners, their lessees, guests, exchangers or invitees fail to vacate a Vacation Home upon the expiration of any reserved use period each year, as may be required by the rules and regulations governing occupancy of the Vacation Home, such persons shall be deemed a "holdover owner."  It shall be the responsibility of the Association to take such steps as may be necessary to remove such holdover owner from the Vacation Home, and to assist the holder of any subsequent reservation who may be affected by the holdover owner's failure to vacate to find alternate accommodations during such holdover period.

Rev. 9 15 2006

a.      In addition to such other remedies as may be available to it, the Association shall have the right to secure, at its expense, alternate accommodations for any holder of a subsequent reservation who may not occupy the Vacation Home due to the failure to vacate of any holdover owner. Such accommodations shall be as similar to the reserved Vacation Home as possible. The holdover owner shall be charged for the cost of such alternate accommodations, any other costs incurred due to the holdover owner's failure to vacate, and an administrative fee of Fifty Dollars ($50.00) per day, during this period of holding over. In the event it is necessary that the Association contract for a period greater than the actual period of holding over, in order to secure alternate accommodations as set forth above, the entire period shall be the responsibility of the holdover owner, although the Fifty Dollars ($50.00) per day administrative fee shall cease upon actual vacating by the holdover owner.

b.      The Association shall submit a bill to the holdover owner in accordance with this rule. Before the Association may levy a fine against a party for violation of any of the provisions of the Condominium Documents, the Association must afford the party reasonable notice of the levy and a right to a hearing as required under Florida law.

c.      The foregoing provisions shall not abridge the Association's right to take such other action as is provided by law including, without limitation, eviction proceedings. Further, the foregoing provisions shall not limit the Association's right to take any action permitted by Florida law against trespassers who are not Owners.

30.     No Private Watercraft. No boats, jet-skis, waverunners or watercraft of any kind shall be used, stored or brought onto the Condominium Property by any Owner, lessee, guest, exchanger or invitee except in such areas and under such conditions as may be determined by the Board from time to time.

31.     Security. Owners shall at all times lock and secure their unattended motor vehicles parked or located upon the Condominium Property, and they shall not leave any valuables in plain sight within or upon such vehicles. During their occupancy, Owners shall at all times lock and secure all doors, windows, balconies or other points of possible entry with respect to their accommodations (except when any such point of entry is in use by Owners or their lessees, guests, exchangers or invitees). Neither the Management Company nor the Association shall be responsible for the safekeeping or protection of personal property brought onto the Condominium Property.

32.     Check-In, Check-Out Times. Check-in time for all Disney Vacation Club Resorts is 4:00 p.m. Check-out time for all Disney Vacation Club Resorts is 11:00 a.m. The front desk must approve any exceptions to these times.

33.     Repairs and Replacements. Each Owner shall bear in their entirety any expenses for repairs or replacements to the Condominium Property occasioned by the specific use or abuse of such Owner or any lessee, guest, exchanger, tenant, or invitee of said Owner.

34.     Timeshare Plans, Fractional Plans and Clubs. Except as provided in the Declaration, no timeshare plans, fractional plans, exchange programs or clubs, or travel or vacation clubs comprised of a trust, corporation, cooperative, limited liability company, partnership, equity plan, non-equity plan, membership program, or any such other similar programs, structures, schemes, devices or plans of any kind (a) shall be created, established, operated or maintained with respect to the Condominium Property or the Ownership Interests; (b) shall acquire or accommodate Condominium Property or Ownership Interests; and (c) shall be permitted to incorporate an Ownership Interest into such entity, program, structure, scheme, device or plan, except by the Developer or except with the prior written authorization from the Developer, which authorization may be given or withheld in the Developer's sole and absolute discretion, and which authorization shall be evidenced by a written instrument executed by the Developer, recorded in the Public Records, and containing a reference to the Declaration.

Rev. 9 15 2006

6

35.    No Feeding the Animals or Dropping Items Into the Habitat. The Master Property is designed to encourage observation of Africa's amazing wildlife from either the comfort of your Vacation Home, Common Elements or Shared Areas (as defined in the Master Declaration) throughout the Master Property. No person or party may feed the animals or drop items into the habitats. Failure to abide by this rule shall be cause for removal from the Master Property. No person or party may attempt to cross the barriers designed for guest and animal safety. Any person or party that attempts to harm the animals or their habitats will be immediately asked to leave the resort.

36.    No Straws, Lids or Balloons. No person or party may have straws, lids or balloons on the Master Property. These Items can be a potential health risk to our animals if they are ingested.

Rev. 9 15 2006

7

## PROPERTY MANAGEMENT AGREEMENT

### FOR

### DISNEY'S ANIMAL KINGDOM VILLAS

THIS PROPERTY MANAGEMENT AGREEMENT (the **"Agreement"**) is made and entered into as of the 18th day of January, 2007, by and between Disney's Animal Kingdom Villas Condominium Association, Inc., a Florida not-for-profit corporation, whose address is 200 Celebration Place, Celebration, Florida 34747 (the "**Association**"), and Disney Vacation Club Management Corp., a Florida corporation, whose address is 200 Celebration Place, Celebration, Florida 34747 ("**DVCMC**").

### W I T N E S S E T H :

WHEREAS, the Association is the entity responsible for the management and operation of Disney's Animal Kingdom Villas, a leasehold condominium (the "**Condominium**"); and

WHEREAS, the Association is desirous of entering into this Agreement for the purpose of assigning its responsibilities and obligations for the management and the operation of the Condominium to DVCMC, as set forth in this Agreement; and

WHEREAS, DVCMC is desirous of accepting such delegation and furnishing the necessary management and operational services to the Condominium for the Association.

NOW, THEREFORE, for and in consideration of the mutual promises contained herein and Ten and No/100 dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed by and between the parties as follows:

1.    Recitals and Terms. The above recitals are true and correct and incorporated herein by this reference. The terms used in this Agreement shall be defined in accordance with the Declaration of Condominium for Disney's Animal Kingdom Villas, a leasehold condominium, unless the context otherwise requires.

2.    Employment. The Association, on its own behalf and on behalf of all of the Owners, hereby enters into and agrees to be bound by the terms and conditions of this Agreement and delegates to DVCMC, to the exclusion of all persons and entities, all the powers and duties of the Association (except those that cannot be delegated as a matter of law) relating to the management and operation of the Condominium. This delegation in no way relieves the Association of any fiduciary obligations owed by it to the Owners under Florida law. DVCMC hereby accepts such delegation and further agrees to manage and operate the Condominium in accordance with the provisions of the Condominium Documents.

3.    Term. The term of this Agreement shall commence as of the date hereof and have effect for a period of three (3) years from the date of execution hereof (hereinafter referred to as the "**Initial Term**"). Notwithstanding any provisions contained in this Agreement to the contrary, it is the intent of this Agreement that the board of directors of the Association (the "**Board**") shall not have the power to independently terminate this Agreement. This Agreement may only be terminated by the Association through the vote of the Owners in accordance with Florida law, by DVCMC in accordance with the provisions of this Agreement, or upon termination of the Condominium as provided for in Paragraph 31. DVCMC shall have the unequivocal right, at any time either during the Initial Term or thereafter, to cancel this Agreement upon sixty (60) days' written notice to the Association. Provided, however, if the Owners cancel any portion of this Agreement or if a court declares any portion hereof invalid or unenforceable, which in the sole, absolute and unfettered discretion of DVCMC makes the performance of the balance this Agreement impractical, DVCMC may cancel the Agreement upon fifteen (15) days notice to the Association and it shall be understood that, for the purposes of this Agreement, cancellation was made by the Owners.

4.    Renewal. This Agreement shall automatically renew itself for successive periods of three (3) years each, unless either party hereto shall give the other written notice of a non-renewal pursuant to Paragraph 3 above three (3) months prior to the date of renewal or unless sooner terminated in accordance with its terms.

5.    DVCMC's Responsibilities. DVCMC shall be responsible for the efficient and satisfactory management, operation and maintenance of the Condominium, Condominium Property and Association Property. The Association hereby acknowledges and agrees that pursuant to the terms of this Agreement and in consideration of the Management Fee, as defined in Paragraph 14 below, DVCMC, in its sole, absolute and unfettered discretion, shall perform itself, hire personnel to perform or procure providers to perform all services necessary for the operation and the maintenance of the Condominium in a reasonable and professional manner, and shall supervise the performance of all services provided to, or on behalf of, the Association pursuant to this Agreement. Notwithstanding any provision in this Agreement to the contrary, the Association agrees to pay to DVCMC as part of its Management Fee any and all costs incurred by DVCMC in connection with the performance of its duties hereunder including the salaries, benefits, fees, taxes and other

©Disney

costs incurred in connection with all persons employed at the Condominium, whether employees of DVCMC or the Association, and of all other providers of services or, alternatively, to reimburse DVCMC directly for any such costs.

      a.    <u>Employees</u>. DVCMC shall hire, pay and supervise the necessary employees to properly, adequately, safely and economically perform the duties and responsibilities of DVCMC set forth herein; and DVCMC shall hire, pay and supervise employees to provide for services not obtained by a separate provider pursuant to Paragraph 5.b. below. Any persons actually hired by DVCMC shall be the employees of DVCMC rather than of the Association, unless DVCMC specifically hires the employees to be employees of the Association. DVCMC, in its absolute discretion, may determine to discharge and cause to be discharged any employee or subcontractor so hired. Pursuant to Section 718.3025(1)(d) <u>Florida Statutes</u>, DVCMC shall employ a minimum of one (1) person to perform its duties pursuant to this Agreement, and shall hire and supervise such additional employees as may be required from time to time in its sole, absolute and unfettered discretion. All matters pertaining to the employment, interviewing and screening process, supervision, compensation, promotion and discharge of employees of DVCMC and the Association are the responsibility of DVCMC.

      b.    <u>Procurement of Separate Providers of Services</u>. The parties expressly agree that DVCMC shall be responsible for providing all services for the Association and, in connection therewith shall have the right to procure necessary services for the Condominium from third parties, from Disney Vacation Development, Inc., (**"DVD"**), from any of the other TWDC Companies or may provide such services itself. All services procured by DVCMC, regardless of source, shall be charged to the Association either directly or as part of DVCMC's Management Fee on a flat fee per service basis; provided, however, those services which cannot practicably be charged on a flat fee per service basis, as determined by DVCMC in its sole, absolute and unfettered discretion, will be charged on a cost basis.

      In procuring providers of specific services from any source pursuant to its authority hereunder, DVCMC shall enter into service agreements on behalf of the Association based upon the following factors:

      (1)    the quality of work obtainable for the desired level of service, and

      (2)    a reasonable practicable price for the service obtainable in the local market.

      DVCMC shall use its best judgment in evaluating these factors with respect to each proposed service; provided, however, nothing contained herein shall require DVCMC to obtain the lowest price available as to any service, material or purchase, or in instances where bids are obtained, to accept the lowest bid.

      DVCMC shall have the authority to enter into (and cancel) any service agreements contemplated pursuant to this Subparagraph, in either the Association's or DVCMC's name, as determined by DVCMC in its sole, absolute and unfettered discretion. Furthermore, the Association hereby agrees to execute on its own behalf such service agreements as are deemed necessary by DVCMC from time to time to effectuate the obligations set forth in this Agreement. The fees or costs arising out of any agreements entered into by DVCMC pursuant to this Subparagraph shall be charged to the Association either directly or as part of DVCMC's Management Fee and shall be a Common Expense of the Association.

      6.    <u>Power and Duties</u>. By way of illustration and not of limitation, DVCMC's powers and duties hereunder shall include the following:

      a.    <u>Condominium Management and Operations</u>. DVCMC shall be responsible for:  (i) the general operation of the physical properties that constitute the Condominium Property and the Association Property, including buildings and improvements; (ii) security; (iii) front desk check-in and check-out services; (iv) cleaning and linen services for each Unit, as necessary; and (v) any other Condominium operational matters. DVCMC shall ensure that Condominium management and operational services are performed as required.

      b.    <u>Maintenance and Repair</u>. DVCMC shall be responsible for the maintenance and repair of the Condominium Property and the Association Property, including the Common Elements and Limited Common Elements of the Condominium to the extent that the Association is required to maintain and repair same, as provided in the Condominium Documents. Maintenance and repair services shall be performed as required.

      c.    <u>Accounting and Financial Reporting</u>. DVCMC shall have the following powers and shall be responsible for the following duties concerning accounting and financial reporting services for the Condominium:

      (1)    <u>Establishment and Administration of Association Bank Accounts</u>. DVCMC shall ensure that all funds collected from the assessment of Owners or funds otherwise accruing to the Association are deposited in accounts with a bank or other institution as permitted by applicable Florida law. Such accounts shall be held in the name of the Association with suitable designations indicating the source of the funds. In the alternative, DVCMC is authorized to invest collected funds on behalf of the Association in accordance with Chapter 721; provided, however, that such investments are styled so as to indicate the custodial nature thereof. DVCMC shall ensure that all funds collected are

maintained separately, and not commingled with similar funds collected on behalf of other condominium or owners' associations, or other clients. DVCMC shall not commingle the reserve and operating funds of the Association, except to the extent permitted under Chapter 721. DVCMC shall not be liable for any loss resulting from the insolvency of any depository or the loss from any investment.

DVCMC is authorized to draw on the Association accounts for any payments to be made by DVCMC to discharge any liabilities or obligations incurred pursuant to this Agreement, for the payment of the management fee (as set forth in Paragraph 14) or any other disbursements properly incurred on the Association's behalf. Services to be performed pursuant to this Subparagraph shall be performed as required.

(2)    Maintenance of Books and Records. DVCMC shall be responsible for maintaining the Association's financial records, books, accounts and other official records as provided by Chapter 718, Chapter 721 and the Condominium Documents. DVCMC shall ensure that certificates of account are issued to members, their mortgagees and lienors upon request without liability for errors unless made as a result of gross negligence. Such records shall be kept at the principal offices of DVCMC and shall be available for inspection by Association members or their authorized representatives at reasonable times. Upon reasonable notice, DVCMC shall produce copies of any such records at the Association's expense for members of the Board. All books and financial records of the Association shall be made available by DVCMC to the Division of Florida Land Sales, Condominiums and Mobile Homes (the "**Division**") for inspection upon request and at the Association's expense. Services to be performed pursuant to this Subparagraph shall be performed quarterly, or more often if necessary, with the exception of the issuance of certificates of account which shall be performed as required.

(3)    Annual Financial Report and Audit. DVCMC shall ensure that a financial report is rendered to the Association for each calendar year no later than May 31st of the following year (or such later date as permitted by Florida law). DVCMC shall also ensure that an annual independent audit of all books and financial records of the Vacation Ownership Plan is conducted for each calendar year by a certified public accountant in accordance with the standards of the Accounting Standards Board of the American Institute of Certified Public Accountants and the rules of the Board of Accountancy of the Department of Business and Professional Regulation and completed no later than June 1st of the following year (or such later date as permitted by Florida law). A copy of the audit shall be filed with the Division as required under Florida law and forwarded to the Board and officers of the Association. Services to be performed pursuant to this Subparagraph shall be performed annually.

(4)    Preparation of Annual Tax Returns. DVCMC shall ensure that competent, professional assistance is engaged, as necessary, for the preparation of any tax returns or forms or other filings required by any local, state or federal agency, and DVCMC will provide any assistance necessary in the compilation of financial data from the books and records of the Association required for the completion of these filings and returns. Services to be performed pursuant to this Subparagraph shall be performed annually.

(5)    Maintenance of Owners' List. DVCMC shall maintain among its records a complete list of the names and addresses of all purchasers and Owners in the Vacation Ownership Plan pursuant to Chapter 721 and shall allow the Division to inspect the list upon request.

(6)    Preparation of Ad Valorem Tax Escrow Statement. DVCMC shall ensure that the statement of receipts and disbursements regarding the ad valorem tax escrow account is submitted to the Division as required by Section 192.037(6), Florida Statutes. Services to be performed pursuant to this Subparagraph shall be performed as required by Florida law.

d.    Annual Budget. Annual budget services shall include the preparation of a recommended annual operating budget and annual capital reserves budget for review by the Board, which shall in turn either adopt a final annual operating budget and annual capital reserves budget or refer such adoption to a meeting of the Association in compliance with Chapter 718, Chapter 721 and the Condominium Documents. Should a special assessment be required during the year, it shall be recommended and presented to the Board or the Association for adoption in compliance with Chapter 718 and Chapter 721 and the Condominium Documents, and the members of the Association shall be advised thereof and the share thereof shall be payable by each of the members pursuant to the Condominium Documents. DVCMC shall use its best efforts to ensure that annual and special assessments are collected from the members for each Unit and Ownership Interest based upon the foregoing. Services to be performed pursuant to this Subparagraph shall be performed annually or as needed.

e.    Replacement of Personal Property. DVCMC shall have sole authority and responsibility to ensure that the personal property within Units committed to the Vacation Ownership Plan are maintained and replaced as required, and in such capacity:

Revised  9 15 2006

3

(1)   DVCMC shall have sole, absolute and unfettered discretion while this Agreement remains in effect for making determinations as to replacements of personal property located within such Units, decor and all other judgments relating to Units committed to the Vacation Ownership Plan.

(2)   It is understood by both parties that the capital reserves assessment will be set aside as reserves for replacement and repair as required by Chapter 718, Chapter 721 and the Condominium Documents.

f.   <u>Compliance with Laws</u>. DVCMC is authorized to and shall be responsible for taking such action as may be necessary to comply with all laws, statutes, ordinances, and rules of all appropriate governmental authorities and with the rules and regulations of the National Board of Fire Underwriters (or in the event it shall terminate its present functions, those of any other body exercising similar functions). Services to be performed pursuant to this Subparagraph shall be performed as required.

g.   <u>Coordination of Annual and Special Meetings of Owners</u>.

(1)   DVCMC shall ensure that a representative of DVCMC attends all meetings of the Owners and that notices of all such meetings are delivered in accordance with the Condominium Documents to all Owners.

(2)   DVCMC shall be responsible for providing assistance to the Board in preparing an agenda for all such meetings and in preparing any reports, charts or other material for presentation at such meetings that are requested by the Board. DVCMC shall also be responsible for preparing a draft of the minutes of all such meetings for review and approval by the Association's secretary.

(3)   Services to be performed pursuant to this Subparagraph g. shall be performed as required.

h.   <u>Coordination of All Board Meetings</u>.

(1)   DVCMC shall ensure that a representative of DVCMC attends all meetings of the Board and that notices of all such meetings are delivered in accordance with the Condominium Documents to all members of the Board.

(2)   DVCMC shall be responsible for providing assistance to the Board in preparing an agenda for all such meetings and any reports, charts or other material for presentation at such meetings that are requested by the Board. DVCMC shall also be responsible for preparing a draft of the minutes of all such meetings for review and approval by the Association's secretary.

(3)   Services to be performed pursuant to this Subparagraph h. shall be performed as required.

i.   <u>Rules and Regulations</u>. DVCMC shall be responsible for the promulgation, adoption and amendment of all rules and regulations as it deems advisable for the use and occupancy of the Condominium Property and Association Property, and shall be responsible for enforcing same, all subject to the approval of the Board. DVCMC shall be responsible for determining, in its sole, absolute and unfettered discretion, all activities and programs to be carried on as to same and shall employ the personnel or contract for the service required therefor as it determines in its sole, absolute and unfettered discretion. Services to be performed pursuant to this Subparagraph shall be performed as required.

j.   <u>Alterations and Additions</u>. DVCMC shall be responsible for ensuring that alterations or additions to the Common Elements, Limited Common Elements or Association Properties are made as authorized, pursuant to and in accordance with the Condominium Documents. Services to be performed pursuant to this Subparagraph shall be performed as required.

k.   <u>Employment of Professionals</u>. DVCMC shall retain and employ such professionals and such other experts whose services may be reasonably required to allow DVCMC to effectively perform its duties and exercise its powers hereunder and as it deems most beneficial. Services to be performed pursuant to this Subparagraph shall be performed as required.

l.   <u>Damage to Property</u>. If repair or restoration of the Condominium Property or any portion thereof, including any Unit, Units or the Common Elements or Limited Common Elements, is required due to loss by act of God, or by other cause, which is other than normal wear and tear, then in such event DVCMC shall be authorized and empowered to determine, assess, charge and levy costs of repairing and restoring such loss among the Owners. Such costs shall be assessed, charged and levied among the Owners in the proportions required by the Condominium Documents, notwithstanding the fact that said loss or damage was, or was not, covered by insurance, and said total

assessment shall be equal to the cost of said repair which shall include the costs of DVCMC's personnel and overhead, materials and equipment, and any and all other contractors, subcontractors or materialmen as are required. Should the loss be covered by insurance, the proceeds thereof shall be applied as a credit against the total costs of said repair and restoration in such proportions as hereinbefore set forth in this Subparagraph. It shall be presumed that the first monies disbursed in payment of costs of repair and restoration shall be from insurance proceeds, where such are received, and then from assessments collected and, should there be a surplus of such funds, the said surplus shall be distributed to or on behalf of the beneficial owners, as provided in the Condominium Documents. Services to be performed pursuant to this Subparagraph shall be performed as required.

m.    Maintenance of Relationship with Exchange Company. DVCMC may be requested to act on behalf of the Association regarding any exchange company or companies associated with the Condominium. If so requested, DVCMC shall use its best efforts to ensure that relationships with such exchange company or companies are maintained in such a manner as to maximize the benefits available to Owners in its sole, absolute and unfettered discretion. In addition, if so requested, DVCMC will also be responsible for working with such exchange company or companies to stay abreast of relevant exchange procedures and for informing the Association, the Board and Owners of any significant changes in these procedures. Services to be performed pursuant to this Subparagraph shall be performed as required.

n.    Insurance. DVCMC shall be responsible for obtaining and maintaining all insurance policies required to be obtained and maintained by the Association pursuant to Chapter 718, Chapter 721 and the Condominium Documents. DVCMC is hereby authorized to act as agent for the Association, each Owner, and for each owner of any other insured interest and, further, to adjust all claims arising under the insurance policies subject to the provisions of the Condominium Documents. DVCMC is also authorized to file lawsuits and deliver releases upon payments of claims; to otherwise exercise all of the rights, powers and privileges of the insured parties, and to receive on behalf of the insured parties, all insurance proceeds, subject to the provisions of the Condominium Documents. The cost of all insurance obtained hereunder shall be a Common Expense of the Association. Services to be performed pursuant to this Subparagraph shall be performed as required.

o.    Condominium Lockout and Liens. DVCMC shall be responsible for the collection, on behalf of the Association, of all assessments for Common Expenses, charges or other payments from Owners including the annual maintenance fee and all other monies and debts which may become due to the Association. Should an Owner fail to pay an assessment as provided in the Condominium Documents, DVCMC is authorized to deny to the Owner or the authorized user, the use and enjoyment of the Vacation Homes and facilities of the Vacation Ownership Plan in accordance with the provisions of Chapter 721 and the Master Cotenancy Agreement entered into by DVCMC, the Cotenants in each Unit and the Association. In addition, DVCMC is authorized, in accordance with Section 721.13(6)(f), Florida Statutes, to rent out the Ownership Interests of delinquent Owners and apply the proceeds of such rental, less any rental commissions, cleaning charges, travel agent commissions, or any other commercially reasonable charges reasonably and usually incurred by the managing entity in securing rentals, to the delinquent Owner's account.

Further, DVCMC is authorized to file liens on behalf of the Association against the Units or Ownership Interests of Owners who fail to pay their assessments as required by and provided for in the Condominium Documents. DVCMC shall have the right to enforce any lien for unpaid assessments and all other sums due from an Owner to the same extent as the Association has this right by virtue of the Condominium Documents. The Association also authorizes DVCMC to assign any such liens to a third party as its deems advisable in the Association's best interest. DVCMC may compromise liens for interest, late charges, or any fines imposed in such amounts as it deems advisable, in its sole, absolute and unfettered discretion, and may satisfy liens of record and render statements as to the current status of an Owner's assessments. DVCMC is further authorized to utilize the services of a collection agency for collection of delinquent accounts and to charge the delinquent Owner for such costs in accordance with Chapter 721. Services to be performed pursuant to this Subparagraph shall be performed as required.

p.    Call Aggregator. DVCMC shall have any and all of the Association's rights, duties, obligations and benefits related to the performance of a call aggregator as that term is defined under applicable law.

q.    Concessions. DVCMC shall have the right, but not the obligation, to contract with third parties, DVD or any of the other TWDC Companies to provide concessions (including, without limitation, hair wrapping services, "penny press" machines, ATM machines, vending machines or operations, or newspaper machines) or other ventures profitable to DVD or the TWDC Companies, throughout the Condominium Property (collectively, the "**Concessions**").

7.    Fiduciary Duty. DVCMC shall act in a fiduciary capacity with respect to the proper protection of and the accounting for the Association's assets. In this capacity, DVCMC shall deal at arm's length with all third parties and shall serve the Association's interests at all times. This Agreement shall not be construed as prohibiting DVCMC, or any firm or corporation or any related person or entity controlled by DVCMC, from conducting or possessing an interest in any

other business or activity, including the ownership, financing, leasing, operation, development, management or brokerage of real property.

8.    <u>Authority to Purchase Materials and Supplies</u>. DVCMC shall have the authority to purchase equipment, tools, vehicles, appliances, goods, supplies and materials as shall be reasonably necessary to perform its duties and responsibilities pursuant to this Agreement. Purchases shall be in the name of the Association and shall be a Common Expense. All purchases made pursuant to this Paragraph shall be made on an as required basis. Notwithstanding anything contained herein to the contrary, all personal property of DVCMC, including property acquired by DVCMC with its own funds, during the term of this Agreement, shall remain the property of DVCMC regardless of the use of such property in carrying out DVCMC's duties and obligations under this Agreement.

9.    <u>Independent Contractor</u>. The parties hereby agree and acknowledge that DVCMC is an independent contractor of the Association. The Association hereby releases any right of control over the method, manner or means by which DVCMC performs its duties and responsibilities under this Agreement.

10.    <u>Common Expenses</u>. All expenses incurred by DVCMC on behalf of the Association pursuant to this Agreement, including DVCMC's Management Fee, overhead and expenses, shall be Common Expenses of the Condominium.

11.    <u>Application of Assessments</u>. DVCMC shall, in its sole, absolute and unfettered discretion, apply assessments collected in such a manner as to properly discharge its obligations under this Agreement.

12.    <u>Aid and Assistance</u>. The Association shall aid and assist DVCMC, in any reasonable manner requested by DVCMC, in collecting assessments and effectuating the purposes of this Agreement.

13.    <u>Deficits</u>. It is specifically understood that DVCMC shall not be required to undertake to pay any costs or expenses for the benefit of the Association or its members from its own funds, and shall only be required to perform its services and make disbursements to the extent that, and as long as, the payments of assessments or other revenue, if any, received from the Association or its members are sufficient to pay, in full, the costs and expenses of such services and the amounts of such disbursements. DVCMC's duties and responsibilities hereunder and the performance thereof, shall be subject to and limited by the availability of funds for the payment of the expenses associated therewith and the payment of the other amounts required herein. In that regard, DVCMC does not represent, guarantee or promise any specific standard of services and performance of such obligations and duties hereunder, but agrees only to use its best efforts, with available funds. If it shall appear to DVCMC that said assessments are insufficient to pay the same, and to adequately provide full reserves, DVCMC shall promptly determine the amount of additional assessments required and advise the Board accordingly.

14.    <u>Management Fee</u>. DVCMC shall provide the services required of it hereunder, for which services the Association shall pay to DVCMC an annual management fee (the "**Management Fee**") in an amount equal to the sum of: (a) twelve percent (12%) of the total annual operating and capital reserves budgets which twelve percent (12%) shall be deemed to include certain home office expenses which may be incurred by DVCMC in performing the services required of it pursuant to this Agreement; (b) the costs, expenses and fees charged to the Association pursuant to the terms of this Agreement, including expenses charged pursuant to Paragraph 5 of this Agreement; and (c) all fees, profits, revenue and/or monies generated from the concessions as described in Subparagraph 6.q above. The twelve percent (12%) portion of the Management Fee shall be calculated on all line items of the annual operating and capital reserve budgets except ad valorem taxes, transportation fees and the resulting twelve percent (12%) amount itself.

Notwithstanding the provisions of the foregoing, the parties understand and agree that the provisions of this Paragraph which, subject to its terms, fix the fees hereunder for a specified time, are made in recognition of the fact that all of the active functions of the Association have been delegated to DVCMC hereunder. However, if the Association undertakes any action or incurs any expense in addition to those actions or expenses incurred by DVCMC, or as set forth in the budget prepared by DVCMC, the same shall be paid by the Association.

15.    <u>Special Services</u>. DVCMC is authorized to assess a special assessment against an Owner to recover the cost of providing special services on behalf of and at the request of the Owner in a reasonable amount determined by DVCMC.

16.    <u>Non-Interference</u>. For so long as this Agreement remains in effect and is not properly terminated by the Owners as herein provided, the Association shall not unlawfully interfere nor permit, allow or cause any of its officers, directors or members to unlawfully interfere with DVCMC in the performance of its duties or the exercise of any of its powers hereunder.

17.    <u>Indemnification of DVCMC by Association</u>. DVCMC shall not be liable to the Association or Owners for any loss or damage not caused by the gross negligence or willful misconduct of DVCMC, its employees, officers,

directors or agents. The Association, its members and employees will, and do hereby indemnify and save harmless DVCMC from and against any such liability for damages, costs and expenses, including attorneys' and other professionals' fees, for the administration of its duties hereunder or from injury to any person or property in and about, or in connection with the Condominium from any cause whatsoever, unless such loss or injury shall be solely caused by the gross negligence or willful misconduct of DVCMC, its employees, officers, directors or agents. DVCMC shall be designated as an additional insured in the comprehensive public liability policy obtained by or for the benefit of the Association, and any additional premium therefor shall be the responsibility of the Association.

The Association's indemnity obligations under this Article arising prior to the termination or assignment of this Agreement shall survive termination or assignment.

18.    Assignment. DVCMC may assign this Agreement to an affiliate or other company under common management or control with DVCMC without the consent of the Association. Upon such assignment and assumption DVCMC shall be released from any and all obligations hereunder. Thirty (30) days advance written notice of the assignment shall be delivered to the Association.

19.    Amendments of Documents. The Board shall not propose that any amendments be made to the Condominium Documents which impair or prejudice the rights of DVCMC without the prior written consent of DVCMC.

20.    Ownership of DVCMC. DVCMC is an affiliate of The Walt Disney Company, a Delaware corporation (**"TWDC"**). The developer of the Condominium, DVD, is also an affiliate of TWDC. DVD and DVCMC are separate and distinct entities from TWDC. Neither TWDC nor any other subsidiary or affiliate of TWDC has agreed or will agree to assume, guarantee or otherwise be responsible for any of the obligations, acts or omissions of DVD or DVCMC in connection with this Agreement.

21.    Vehicular Parking and Storage. DVCMC shall have the power to regulate all vehicular parking. DVCMC shall regulate the use of the storage areas on the Condominium Property, if any.

22.    Governing Law; Waiver of Jury Trial; Venue of Actions. This Agreement shall be governed by, and shall be construed in accordance with, the laws of the State of Florida. The parties hereby waive any right they may have under any applicable law to a trial by jury with respect to any suit or legal action which may be commenced by or against the other concerning the interpretation, construction, validity, enforcement or performance of this Agreement or any other agreement or instrument executed in connection with this Agreement. In the event any such suit or legal action is commenced by either party, the other party hereby agrees, consents and submits to the personal jurisdiction of the Circuit Court of the Ninth Judicial Circuit of Florida in and for Orange County, Florida, with respect to such suit or legal action, and each party also hereby consents and submits to and agrees that venue in any such suit or legal action is proper in said court and county, and each party hereby waives any and all personal rights under applicable law or in equity to object to the jurisdiction and venue in said court and county. Such jurisdiction and venue shall be exclusive of any other jurisdiction and venue.

23.    Waiver. No waiver of a breach of any of the covenants contained in this Agreement shall be construed to be a waiver of any succeeding breach of the same or any other covenant.

24.    Time of the Essence. Except as otherwise specifically set forth herein, time is of the essence for all terms of this Agreement.

25.    Modification. No modification, release, discharge or waiver of any provision hereof shall be of any force, effect or value unless in writing and signed by the parties to this Agreement.

26.    Entire Agreement. This Agreement constitutes the entire agreement between the parties hereto, and neither has been induced by the other by representations, promises or understandings not expressed herein. There are no collateral agreements, stipulations, promises or understandings whatsoever, in any way touching the subject matter of this instrument, or the instruments referred to herein that are not expressly contained herein or in the Condominium Documents.

27.    Partial Invalidation. The invalidity in whole or in part of any covenant, promise or undertaking, or any paragraph, subparagraph, sentence, clause, phrase or words, or of any provision of this Agreement shall not affect the validity of the remaining portions hereof.

28.    Notices. Except as may be otherwise provided herein, any notice, demand, request, consent, approval or communication under this Agreement shall be in writing and shall be deemed duly given or made:  (i) three (3) days after being deposited, postage prepaid, in the U.S. mail, certified or registered mail with a return receipt requested, addressed to the party at the address shown above; (ii) when delivered personally to the party at the address specified above; (iii) when delivered by a reliable overnight courier service, fee prepaid, with receipt of confirmation requested,

Book9077/Page4328        CFN#20070050562                    Page 77 of 110

addressed to the party as specified above; or (iv) when delivered by facsimile transmission with confirmed receipt of transmission. A party may designate a different address for receiving notices hereunder by notice to the other parties.

29.    <u>Default by Association</u>. If the Association or its members interfere with DVCMC in the performance of its duties or exercise of its powers hereunder, or if the Association fails to promptly do any of the things required of it hereunder, then DVCMC may, fifteen (15) days after having given written notice to any officer or director of the Association, declare this Agreement in default if such default remains then uncured or incapable of being cured. Upon default, DVCMC may, in addition to any other remedy given it by agreement or in law or equity:  (i) terminate this Agreement; or (ii) bring an action against the Association for damages or injunctive relief. The Association shall be liable for DVCMC's reasonable attorneys' and other professionals' fees and costs incurred thereby. All rights of DVCMC, upon default, shall be cumulative and the exercise of one or more remedies shall not be deemed to exclude or constitute a waiver of any other additional remedy.

30.    <u>Default by DVCMC</u>. Failure of DVCMC to substantially perform its duties and obligations under this Agreement shall be grounds for the Owners to cancel this Agreement as the Association's sole remedy, provided said termination is accomplished by a vote of the Owners pursuant to Chapter 718 or Chapter 721. In no event shall DVCMC be liable to the Association or Owners for damages.

31.    <u>Termination of Condominium</u>. If the Condominium is terminated as set forth in the Condominium Documents, then this Agreement shall automatically terminate.

32.    <u>DVCMC Materials</u>. The parties acknowledge that all of DVCMC's personal and intellectual property related to its operation of the Condominium, including DVCMC's trade name and the trade names of DVCMC's affiliates or subsidiaries and any and all personal property relating to the operation of any reservation program by DVCMC (the **"Materials"**), is and always shall be the personal property of DVCMC. The parties expressly agree that upon termination of this Agreement, for any reason, the Association and all Owners shall abstain from using the Materials and shall return any Materials in its possession to DVCMC within fifteen (15) days after termination of this Agreement, subject to any transition periods required under Chapter 721, <u>Florida Statutes</u>.

33.    <u>Excusable Delays</u>. In the event that DVCMC shall be delayed, hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, act of God, or any other reason beyond DVCMC's control, then performance of such act shall be excused for the period of the delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.

34.    <u>Standards of Operation</u>. For so long as this Agreement remains in effect, the parties agree that the Condominium shall be maintained in accordance with the standards and restrictions set forth in the Master Declaration and the **"Standards of Operation,"** as that term is defined in the Ground Lease for Disney's Animal Kingdom Villas. Any failure of the Association to maintain the Condominium in accordance with said standards, which failure is not caused by the acts or omissions of DVCMC, shall constitute a default by the Association under this Agreement as contemplated by Paragraph 30 above.

35.    <u>Chapter 721 Controls Over Chapter 718</u>. Regarding the interpretation of this Agreement, in the event of a conflict between Chapter 718, and Chapter 721 or any rules promulgated under either, Chapter 721 shall control.

36.    <u>Reasonableness Standard for Consents</u>. Under any circumstance in which this Agreement requires one party to consent to the actions of the other party, the party whose consent is required shall not withhold such consent unreasonably.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and date first above written.

WITNESSES:

Print Name: _Jeaynette Greene_

Print Name: _CL NIELSEN_

Print Name: _Jeannette Greene_

Print Name: _CL NIELSEN_

Revised 9 15 2006

DISNEY VACATION CLUB MANAGEMENT CORP.,
a Florida corporation

By: _____
Name: Leigh Anne Nieman
As its: Assistant Secretary

DISNEY'S ANIMAL KINGDOM VILLAS CONDOMINIUM ASSOCIATION, INC., a Florida non-for-profit corporation

By: _____
Name: Lawrence Smith
As its:  Treasurer

8

## DISNEY VACATION CLUB MEMBERSHIP AGREEMENT

**THIS DISNEY VACATION CLUB MEMBERSHIP AGREEMENT** for DISNEY'S ANIMAL KINGDOM VILLAS is entered into effective this 18ᵗʰ day of January , 200 7 (the "**Effective Date**") by and among **DISNEY VACATION DEVELOPMENT, INC.**, a Florida corporation ("**DVD**"), whose address is 200 Celebration Place, Celebration, Florida 34747; **DISNEY VACATION CLUB MANAGEMENT CORP.**, a Florida corporation ("**DVCMC**"), whose address is 200 Celebration Place, Celebration, Florida 34747; and **DISNEY'S ANIMAL KINGDOM VILLAS CONDOMINIUM ASSOCIATION, INC.**, a Florida not-for-profit corporation (the "**Association**"), whose address is 200 Celebration Place, Celebration, Florida 34747 .

## W I T N E S S E T H :

WHEREAS, DVD has established a vacation ownership plan pursuant to Chapter 721, Florida Statutes (the "**Vacation Ownership Plan**") for Disney's Animal Kingdom Villas, a leasehold condominium (the "**Condominium**"); and

WHEREAS, pursuant to the Declaration of Condominium for the Condominium (the "**Declaration**"), the Association has the responsibility, obligation and authority to operate the Vacation Ownership Plan for the Condominium; and

WHEREAS, DVD has provided for a "central reservation system" and related services (the "**Club**") which includes the operation of a reservation system for the Condominium (the "**Home Resort Reservation Component**") through which Owners in the Condominium reserve the use of the accommodations of the Condominium pursuant to the priorities, restrictions and limitations of the Vacation Ownership Plan established by DVCMC from time to time; and

WHEREAS, the Association is desirous of entering into this Agreement for the purpose of assigning its responsibilities and obligations for operating the Vacation Ownership Plan to DVCMC as described herein and for the purpose of assuring that the quality of the operation of the Vacation Ownership Plan is maintained as described herein; and

WHEREAS, DVCMC is desirous of accepting such assignment and furnishing the necessary services for the Association; and

WHEREAS, the parties desire to enter into this Agreement for the purpose of defining and implementing the operation of the Vacation Ownership Plan and the Home Resort Reservation Component.

NOW, THEREFORE, in consideration of the covenants, conditions and obligations contained herein and other good and valuable consideration received by the parties, it is agreed by and among the parties as follows:

### I. DEFINITIONS

The terms used in this Agreement shall be defined in accordance with the Declaration unless otherwise defined herein or the context otherwise requires. In addition, the following definitions of terms used in this Agreement shall also apply:

1.1  Agreement shall mean this Disney Vacation Club Membership Agreement.

1.2  Annual Dues means that portion of the Condominium Estimated Budgets that has been assessed against an individual Owner's Ownership Interest together with the Owner's proportionate share of the ad valorem taxes for the Ownership Interest.

1.3  Banking shall mean the act of a Club Member in deferring the use of all or a portion of the Club Member's Home Resort Vacation Points from the current Use Year into the next succeeding Use Year.

1.4  Borrowing shall mean the act of a Club Member in using all or a portion of the Club Member's Home Resort Vacation Points from the next succeeding Use Year for the purpose of making a reservation in the immediately preceding Use Year.

1.5  Breakage shall mean those Use Days which have not been reserved by Club Members prior to the commencement of the Breakage Period, the use of which may only be reserved by Club Members pursuant to the priorities set forth in Paragraph 4.3 below.

1.6  Breakage Period shall mean the period, as set forth in the Home Resort Rules and Regulations from time to time, preceding a given Use Day.

©Disney

1.7  Club Member shall mean the owner of record of an Ownership Interest.

1.8  Condominium Estimated Budgets shall mean the operating and capital reserves budgets that establish the estimated annual common expenses and reserves of the Condominium.

1.9  External Exchange Company shall mean any company that owns, operates or owns and operates an External Exchange Program.

1.10  External Exchange Documents shall mean all information provided to Club Members, from time to time, regarding the operation of any External Exchange Program, including the disclosures required by Section 721.18, Florida Statutes.

1.11  External Exchange Program shall mean the contractual arrangement between DVCMC, the Association, or individual Club Members or an External Exchange Company or Companies under which Club Members may request and reserve, under certain conditions, the use of accommodations in resorts other than the Condominium or other DVC Resorts.

1.12  Full Kitchen shall mean a kitchen that includes, at a minimum, a dishwasher, range, sink, oven and refrigerator.

1.13  Home Resort Rules and Regulations shall mean the rules and regulations which DVCMC, in its sole, absolute and unfettered discretion, determines are necessary or desirable from time to time in order to enforce the provisions of this Agreement.

1.14  Multiple Club Member shall mean a Club Member consisting of a business entity or two (2) or more natural persons owning a single Ownership Interest.

1.15  One-Bedroom Vacation Home shall mean a Vacation Home containing one (1) bedroom, one (1) bathroom and a Full Kitchen.

1.16  Studio Vacation Home shall mean a Vacation Home containing one (1) bedroom, one (1) bathroom and equipped with a microwave, under counter refrigerator, and sink.

1.17  Transfer shall mean the assignment by one Club Member of the use of his or her Home Resort Vacation Points to another Club Member during a given Use Year.

1.18  Two-Bedroom Vacation Home shall mean a Vacation Home containing two (2) bedrooms, two (2) bathrooms and a Full Kitchen. Certain of the Two-Bedroom Vacation Homes may be locked-off into One-Bedroom and Studio Vacation Homes as a use convenience only.

1.19  Use Day shall mean a twenty-four (24) hour period (or such lesser period as may be designated by DVCMC from time to time) in a Vacation Home subject to reservation and use by Club Members.

1.20  Use Year shall mean, for each Unit, the twelve (12) month period beginning on the first day of the month designated by DVD in each purchase agreement selling an Ownership Interest to a Club Member in that Unit and in each deed conveying an Ownership Interest to a Club Member in that Unit. All Ownership Interests in a given Unit may have the same Use Year. The Use Year shall continue for successive twelve (12) month periods for so long as the Vacation Ownership Plan continues. Any Ownership Interest purchased to supplement a Club Member's existing Ownership Interest may have the same Use Year as the Ownership Interest it supplements.

1.21  Vacation Home shall mean and refer to those portions of a Unit designed and intended for separate use and occupancy.

## II. ASSIGNMENT

The Association, on its own behalf and on behalf of all of the Owners, hereby enters into and agrees to be bound by the terms and conditions of this Agreement and assigns to DVCMC, to the exclusion of all persons, all the powers and duties of the Association (except those that cannot be assigned as a matter of law) relating to the operation of the Vacation Ownership Plan for the Condominium. DVCMC hereby accepts such assignment and further agrees to operate the Vacation Ownership Plan and the Home Resort Reservation Component in accordance with the provisions of the Condominium Documents. Each Owner shall expressly evidence acceptance of the terms and conditions of this Agreement and the Home Resort Rules and Regulations by acceptance of a deed conveying an Ownership Interest in a Unit. DVD enters into this Agreement for the purpose of expressing its consent to and acceptance of the terms and conditions of this Agreement.

## III. OPERATION OF THE VACATION OWNERSHIP PLAN

3.1 <u>Operation of the Home Resort Reservation Component</u>. The purpose of this Agreement is to define the operation of the Vacation Ownership Plan for the Condominium by DVCMC. Club Members at the Condominium accessing Vacation Homes in accordance with the Vacation Ownership Plan and through the Home Resort Reservation Component must do so pursuant to the terms and conditions of this Agreement and the Home Resort Rules and Regulations.

3.2 <u>Vacation Points</u>. For administrative convenience in the operation of the Club and in the determination of the respective rights of Club Members to enjoy the services and benefits associated with membership in the Club, the Ownership Interest of each Club Member will be symbolized by a number of Home Resort Vacation Points rather than by the specific percentage of the Club Member's Ownership Interest in a Unit. Club Members will be permitted to use their Home Resort Vacation Points each Use Year to make a reservation in the Condominium.

3.3 <u>Home Resort Vacation Point Reservation Values</u>. A certain number of Home Resort Vacation Points have been or will be established by DVCMC in its sole, absolute and unfettered discretion for the use of each Vacation Home in the Condominium during each Use Day, with variations that will take into account, among other factors, anticipated seasonal and geographical demand factors and the related actual use demand of Club Members experienced in the operation of the Club. The number of Home Resort Vacation Points that a Club Member has with respect to an Ownership Interest will remain fixed and will always be symbolic of the Club Member's Ownership Interest. The Home Resort Vacation Point values established by DVCMC that are symbolic of all Ownership Interests will be based upon a 365 Use Day calendar year containing a minimum number of Fridays and Saturdays distributed through high demand periods (the "**Base Year**"). During the Base Year the total number of Home Resort Vacation Points required to reserve all Vacation Homes during all Use Days in the Condominium must always equal, and be symbolic of, the total number of Ownership Interests owned by Club Members in the Condominium. Any excess availability that may exist from time to time shall be subject to the Breakage Period priorities set forth in the Home Resort Rules and Regulations.

In order to meet the Club Members' needs and expectations as evidenced by fluctuations in Use Day demand at the Condominium experienced by DVCMC during a given calendar year, DVCMC may, in its sole, absolute and unfettered discretion, increase or decrease the Home Resort Vacation Point requirements for reservation of a given Use Day within a given Vacation Home during the given calendar year by any amount not to exceed twenty percent (20%) of the Home Resort Vacation Points required to reserve that Use Day during the previous calendar year; provided, however, that the total number of Home Resort Vacation Points existing within a given Unit at any time may not be increased or decreased because of any such reallocation. The twenty percent (20%) reallocation limitation shall not apply to increases or decreases in Home Resort Vacation Point reservation requirements relating to special periods of high demand based upon Club Member use patterns and changes in Club Member use demand (including, without limitation, use demand during special or holiday seasons), as determined by DVCMC in its sole, absolute and unfettered discretion.

Any increase or decrease in the Home Resort Vacation Point reservation requirement for a given Use Day pursuant to DVCMC's right to make this Home Resort Vacation Point adjustment must be offset by a corresponding decrease or increase for another Use Day or Days. Except as otherwise provided above, adjustments in excess of twenty percent (20%) in any calendar year will require approval of not less than sixty percent (60%) of all then-existing Club Members at the Condominium. The right to reallocate Home Resort Vacation Points is reserved by DVCMC solely for adjusting the Home Resort Reservation Component to accommodate Club Member demand. However, with respect to the Condominium, each Club Member will always be eligible to reserve at the Condominium, subject to availability:  at least one (1) Use Day in a Studio Vacation Home for every 14 Home Resort Vacation Points; at least one (1) Use Day in a One-Bedroom Vacation Home for every 34 Home Resort Vacation Points; at least one (1) Use Day in a Two-Bedroom Vacation Home for every  45 Home Resort Vacation Points; or at least one (1) Use Day in a Grand Villa Vacation Home for every 88 Home Resort Vacation Points. A maximum reallocation of Vacation Point reservation requirements could result in a "leveling" of all seasons, such that Home Resort Vacation Point reservation requirements would have no variation based upon seasonality or different times of the year. Similarly, a maximum reallocation of Home Resort Vacation Point reservation requirements could result in a "leveling" of differences in Vacation Point reservation requirements based upon particular Use Days in the week.

Participation in certain External Exchange Programs may be based on a week for week exchange, and require the reservation and deposit of a seven (7) consecutive Use Day period in a One-Bedroom or Two-Bedroom Vacation Home. Therefore, in the event of maximum reallocation as described in the preceding paragraph, a Club Member would be required (absent Banking and Borrowing) to have annual Home Resort Vacation Points of at least 238 Home Resort Vacation Points (7

Rev. 12 04 2006

3

Use Days X 34 Home Resort Vacation Points per Use Day) to reserve and deposit a One-Bedroom Vacation Home for exchange through the External Exchange Program, and at least 315 Home Resort Vacation Points (7 Use Days X 45 Home Resort Vacation Points per Use Day) to reserve and deposit a Two-Bedroom Vacation Home for exchange through the External Exchange Program. Club Members should refer to the External Exchange Documents for details concerning the requirements for making an exchange through a particular External Exchange Program.

3.4    Home Resort Rules and Regulations. The Home Resort Rules and Regulations promulgated by DVCMC from time to time shall contain detailed information regarding the operation of the Vacation Ownership Plan and the Home Resort Reservation Component, including the following:

  a.   The procedures by which a reservation must be made and confirmed;

  b.   The procedures for Banking and Borrowing;

  c.   The Home Resort Vacation Point Charts listing the values for each Vacation Home for each Use Day in the Condominium;

  d.   The procedures for and limitations upon canceling confirmed reservations;

  e.   The procedures for and limitations upon any wait list;

  f.   The procedures for and limitations upon Transfers; and

  g.   Any other rules and regulations which DVCMC in its sole, absolute and unfettered discretion determines are necessary or desirable from time to time in order to enforce the provisions of this Agreement in a manner that, in DVCMC's reasonable business judgment, will be for the principal purpose of improving upon the quality and operation of the Vacation Ownership Plan and furthering the collective enjoyment of the use of the Vacation Homes by Club Members taken as a whole. Such rules and regulations may include the implementation of *Special Season* Preference Lists, or other use demand management vehicles. In the event DVCMC implements a *Special Season* Preference List, persons eligible to appear on this List will have a special reservation priority that will supersede the usual first come, first served reservation procedure and Home Resort Priority Period to varying extents.

3.5    DVCMC. The Vacation Ownership Plan and the Home Resort Reservation Component shall be operated by DVCMC pursuant to the terms of this Agreement and pursuant to the Home Resort Rules and Regulations. DVCMC is expressly authorized to take such actions as it deems are necessary and appropriate for the operation of the Vacation Ownership Plan, including the implementation of all Home Resort Reservation Component duties as outlined in Paragraph 4.2 below.

DVCMC shall also be responsible for all management, maintenance and operation of the Vacation Homes and facilities of the Condominium pursuant to the terms and conditions set forth in the Property Management Agreement. DVCMC further reserves the right to provide site management services for one or more other DVC Resorts. DVCMC shall initially be compensated for services performed under the Property Management Agreement and this Agreement by receiving (an annual fee equal to) twelve percent (12%) of the total operating and capital reserves budgets for each year of the Property Management Agreement, exclusive of ad valorem taxes, the management fee and transportation fees.

As additional consideration, the Association hereby assigns to DVCMC any and all rights of the Association to rent unreserved Vacation Homes (in accordance with the reservation priorities of the Breakage Period) and to receive the proceeds therefrom in excess of the following:  (i) the rental proceeds equaling an amount up to two and one-half percent (2 1/2%) of the Condominium Estimated Budgets shall be remitted by DVCMC to the Association; and (ii) a portion of the rental proceeds, if any, in an amount equal to Buena Vista Trading Company's ("**BVTC's**") costs for providing those services as set forth in the DVC Resort Agreement for the Condominium plus five percent (5%) of such costs. The portion of rental proceeds, if any, set forth in (ii) of the preceding sentence shall be remitted by DVCMC to BVTC in consideration for BVTC's performance of such services under the DVC Resort Agreement for the Condominium. In performing its obligations for the Association and BVTC pursuant to (i) and (ii) above, DVCMC shall segregate such funds owed to the Association and BVTC and hold them, respectively, on behalf of the Association and BVTC and not for its own account. Such funds shall be deemed to be the property, respectively, of the Association and BVTC and not of DVCMC upon receipt of such funds by DVCMC.

3.6    DVD Home Resort Vacation Points. DVD shall not sell Ownership Interests that equal more than ninety-eight percent (98%) of the total amount of undivided percentage interests existing at the time within a Unit (although DVD reserves the

right to convey its Ownership Interests to a successor developer). All Home Resort Vacation Points assigned to DVD in connection with these Ownership Interests will be governed by the same rules and regulations pertaining to all Club Members.

3.7   Reciprocal Use by DVD and Club Members. At any given time, DVD may own completed Vacation Homes which have not yet been committed to the Vacation Ownership Plan for various reasons. In order to provide Club Members with the greatest possible flexibility in making reservation requests, Club Members may be assigned to occupy both Vacation Homes which are associated with the Vacation Ownership Plan and completed accommodations which have not yet been committed to the Vacation Ownership Plan; however, the total number of accommodations available for Club Member reservation for any given Use Day will never exceed the total number of Vacation Homes existing within the Vacation Ownership Plan on that Use Day. Conversely, DVD may assign its renters or other users of the completed accommodations which have not yet been committed to the Vacation Ownership Plan to occupy both those Vacation Homes which are committed to the Vacation Ownership Plan and those accommodations which are not; however, the number of total Vacation Homes available for DVD renter/user reservation for any given Use Day will never exceed the total number of completed accommodations which have not yet been committed to the Vacation Ownership Plan on that Use Day.

## IV. USE OF HOME RESORT VACATION POINTS

4.1   Options in Use of Home Resort Vacation Points. Home Resort Vacation Points may be used by Club Members in any of the following ways during the Use Year:  (i) Home Resort Vacation Points may be used to reserve Vacation Home use rights in accordance with the reservation rules set forth in Paragraph 4.2 below and in the Home Resort Rules and Regulations; (ii) Home Resort Vacation Points may be Banked as set forth in Paragraph 4.4 below and in the Home Resort Rules and Regulations; (iii) Home Resort Vacation Points may be Borrowed as set forth in Paragraph 4.5 below and in the Home Resort Rules and Regulations; (iv) Home Resort Vacation Points may be used to reserve accommodations for exchange through an External Exchange Program as set forth in Paragraph 4.7 below and in the Home Resort Rules and Regulations; (v) Home Resort Vacation Points may be Transferred as set forth in Paragraph 4.8 below and in the Home Resort Rules and Regulations; or (vi) a Club Member may voluntarily participate in the DVC Reservation Component by converting all or a portion of a Club Member's Home Resort Vacation Points into DVC Vacation Points (as described in the Disclosure Document) to make a reservation for available accommodations in other DVC Resorts in accordance with the DVC Resort Agreement.

4.2   Reservations. Club Members shall reserve Vacation Homes pursuant to the following guidelines:

a.   The Use Year. If all of a Club Member's Home Resort Vacation Points for a given Use Year are not used in some manner set forth in Paragraph 4.1 above during that Use Year, any unused balance at the end of the Use Year will automatically expire as set forth in Paragraph 4.9 below. On the first day of each new Use Year, the Club Member will again have a full complement of Home Resort Vacation Points for use during that Use Year, unless the Home Resort Vacation Points were borrowed in the previous Use Year.

b.   Reservation Requests. Reservation requests for Vacation Homes by Club Members at the Condominium will be taken on a first come, first served basis. Home Resort Vacation Points available for use in a given Use Year (taking into account Banking and Borrowing activity) may only be used to reserve an available Vacation Home for use within that Use Year. To reserve a given Use Day on a space-available basis, a Club Member must follow the reservation procedures set forth in the Home Resort Rules and Regulations. Club Members are encouraged to submit requests as far in advance as possible to obtain the best choice of Vacation Homes. DVCMC's ability to confirm a reservation request is dependent upon the availability of the requested Vacation Home; therefore, DVCMC cannot guarantee that a particular reservation request can be fulfilled.

In addition to Club Members at the Condominium, Club Members from other DVC Resorts will also have the opportunity to make reservations for a Vacation Home on a first come, first served basis through the DVC Reservation Component upon the expiration of any applicable Home Resort Priority Period. In the case of the Condominium, the Home Resort Priority Period is currently four (4) months. This Home Resort Priority Period will be subject to any preference list rights set forth in the Home Resort Rules and Regulations. A Club Member from this Condominium seeking a reservation at another DVC Resort through voluntary participation in the DVC Reservation Component will be subject to the Home Resort Priority Period established for that other DVC Resort.

DVCMC reserves the right in its sole, absolute and unfettered discretion to extend or decrease the Home Resort Priority Period; provided, however, in no event shall the Home Resort Priority Period be for a period of less than one (1) month prior to the period during which the other Club Members have the right to reserve that Vacation Home during that Use

Day. In addition, DVCMC reserves the right to establish a continental or other preference periods in the event resorts located outside of the jurisdictional limits of the United States are associated as DVC Resorts.

c. <u>Confirmations and Cancellations</u>. Reservations shall be confirmed and cancellations shall be processed as set forth in the Home Resort Rules and Regulations. Cancellations and reservation changes may be subject to restrictions or charges as set forth in the Home Resort Rules and Regulations.

d. <u>Annual Dues</u>. Failure to pay all Annual Dues (with respect to all Ownership Interests owned by a Club Member) in full when due may result in the initiation of lock-out procedures by DVCMC pursuant to applicable law, resulting (where permitted) in a denial of the right of delinquent Club Members to reserve, check in or use the Vacation Homes and facilities of the Condominium through the Home Resort Reservation Component or to voluntarily participate in the DVC Reservation Component by requesting a reservation for accommodations at other DVC Resorts until such time as the delinquency is paid in full. Unsatisfied delinquencies are also subject to procedures under applicable law to foreclose a lien against a Club Member's Ownership Interest.

e. <u>Minimum Stay</u>. DVCMC may require from time to time that a minimum number of consecutive Use Days for a particular season or special season be reserved as set forth in the Home Resort Rules and Regulations. The number of consecutive Use Days required to be reserved shall in no event exceed five (5) Use Days.

4.3 <u>Breakage</u>. If a reservation request for any Vacation Home is not received by the first day of the Breakage Period with respect to a given Use Day, the right to reserve that Vacation Home for that Use Day will thereafter be subject to the priorities set forth in the Home Resort Rules and Regulations. In any event, DVCMC shall always have first priority to reserve the use of any available Use Day within the Breakage Period for purposes of Unit and Vacation Home maintenance. DVCMC, in its sole, absolute and unfettered discretion, may lengthen or shorten the Breakage Period for all Use Days from time to time if DVCMC, in its reasonable business judgment, determines that such an adjustment will be for the principal purpose of improving upon the quality and operation of the Vacation Ownership Plan and furthering the collective enjoyment of the use of the Vacation Homes by Club Members taken as a whole. In no event will DVCMC establish a Breakage Period greater than ninety (90) days or less than thirty (30) days.

4.4 <u>Banking Home Resort Vacation Points</u>. Banking of Home Resort Vacation Points involves the decision by a Club Member during the current Use Year to save all or a portion of the Club Member's Home Resort Vacation Points for use in the next succeeding Use Year.

Banked Home Resort Vacation Points can only be used in the next succeeding Use Year, and once deposited, the Club Member cannot retrieve the Banked Home Resort Vacation Points during the Use Year of deposit. Failure of Club Members to use their Banked Home Resort Vacation Points in the next succeeding Use Year will result in the expiration of those Home Resort Vacation Points as set forth in Paragraph 4.9 below. Banked Home Resort Vacation Points may be used by Club Members for reservations at the Condominium, or other DVC Resorts (as DVC Vacation Points) or for use of the External Exchange Program.

4.5 <u>Borrowing Home Resort Vacation Points</u>. Borrowing of Home Resort Vacation Points involves the decision by a Club Member during the current Use Year to use all or a portion of the Club Member's Home Resort Vacation Points from the next succeeding Use Year to secure a reservation in the current Use Year.

Borrowed Home Resort Vacation Points can only be used in the Use Year into which they have been Borrowed, and failure of a Club Member to use any Borrowed Home Resort Vacation Points in the current Use Year will result in the expiration of those Home Resort Vacation Points as set forth in Paragraph 4.9 below. Borrowed Home Resort Vacation Points may not be returned to the original Use Year once they have been Borrowed. Borrowed Home Resort Vacation Points may be used by the Club Member for reservations at the Condominium or other DVC Resorts (as DVC Vacation Points) or for use of the External Exchange Program.

4.6 <u>Limitation on Banking and Borrowing</u>. A Club Member's ability to either Bank or Borrow at any given time is limited by the level of general Banking and Borrowing that exists at that particular time and by the projected amount of Use Days available for reservation at the Condominium. DVCMC reserves the right, in its sole, absolute and unfettered discretion, to suspend, in whole or in part, or increase or decrease the amount of Banking and/or Borrowing activity at any time or from time to time if DVCMC, in its reasonable business judgment, determines that such suspension will be for the principal purpose of improving upon the quality and operation of the Vacation Ownership Plan and furthering the collective enjoyment of the use of

the Vacation Homes by Club Members taken as a whole. A Club Member will also not be permitted to Bank or Borrow Home Resort Points in a given Use Year if the Club Member is delinquent in the payment of Annual Dues with respect to any Ownership Interests owned by the Club Member. Additional restrictions on Banking and Borrowing are set forth in the Home Resort Rules and Regulations.

4.7    External Exchange Programs. In order to increase the range of vacation options available to Club Members, DVCMC may arrange for Club Members to access External Exchange Programs from time to time. These Programs may include exchange agreements between DVCMC (as a corporate participant or member) and External Exchange Companies for the purpose of affording Club Members with the opportunity to avail themselves of alternative vacation opportunities through the duration of the Vacation Ownership Plan. There can be no assurance, however, that DVCMC will be successful in arranging for ongoing access to any External Exchange Program. Under such circumstances, Club Members may contact a provider of exchange services directly to establish individual exchange privileges. There can be no assurance, however, that an individual Club Member will be able to satisfy the terms and conditions then required by such provider to participate individually in that provider's exchange program. If neither DVCMC nor the individual Club Member is successful in establishing an agreement with a provider of exchange services, the ability of an individual Club Member to request future external exchanges other than to a DVC Resort will cease. Club Members should refer to the Home Resort Rules and Regulations and External Exchange Documents for procedures and restrictions involved in requesting an exchange into any currently existing External Exchange Program.

4.8    Transfers. Transfers may be made by Club Members from time to time as set forth in the Home Resort Rules and Regulations.

4.9    Expiration of Vacation Points. Failure of Club Members to use their Vacation Points in any given Use Year, however such Vacation Points are obtained, shall result in automatic expiration of all unused Vacation Points without compensation to the Club Members.

## V. RENTALS

5.1    Club Member Rentals. A Club Member may make a reservation to use the Vacation Homes for the Club Member's own use, make their use available to family or friends or guests, or rent them solely through the Club Member's own efforts. DVD's approval of a rental by a Club Member is not required after a reservation has been made in the renter's own name, and Club Members are permitted to rent their occupancy rights on terms and conditions that they may establish. No rental assistance is being offered by The TWDC Companies. All renters must comply with the rules and regulations affecting occupancy, and the renting Club Member will be responsible for the acts or omissions of the renters or any other person or persons permitted by the Club Member to use the Vacation Home. The TWDC Companies do not in any way represent or promote that a particular Vacation Home can be rented, or if it is rented, that any particular rental rate can be obtained for such rental.    Use of Vacation Homes and recreational facilities for commercial purposes or any purposes other than the personal use described in the Declaration is expressly prohibited. "Commercial purpose" includes a pattern of rental activity or other occupancy by an Owner that the Board, in its reasonable discretion, could conclude constitutes a commercial enterprise or practice. No Vacation Home may be divided or subdivided into a smaller Vacation Home.

5.2    Area Resort Hotels. Club Members should be aware that several resort hotels may be in operation within and around the Condominium, including hotels owned and/or operated by The TWDC Companies, and that DVD will also rent its Ownership Interests to the general public. Accordingly, any Club Members who attempt to rent reserved Vacation Homes for their own account must compete with these resort hotels and DVD for renters without any assistance from The TWDC Companies, and would be at a substantial competitive disadvantage. Club Members should not purchase an Ownership Interest based upon any expectation of deriving any rental or other revenue or profit therefrom.

## VI. ANNUAL DUES

6.1    Condominium Estimated Budgets. The Association will promulgate an operating budget and a capital reserves budget each calendar year in the manner required by applicable law. The operating budget shall include the Condominium's share of the operating expenses of the Club attributed to it.

6.2    Assessment and Collection of Annual Dues. DVCMC will assess each Club Member's share of the Condominium Estimated Budgets to each Club Member each year in the ratio that the number of Home Resort Vacation Points assigned to that Club Member's Ownership Interest bears to the total number of Home Resort Vacation Points in the Condominium at that time.

Annual Dues will be billed and will be past due as set forth in the Condominium Documents. Each Club Member who has not paid his or her Annual Dues in full by the past due date will be subject to late charges and interest as set forth in the Declaration.

6.3 Club Member Default. In the event a Club Member has not paid his or her Annual Dues after the past due date described in Paragraph 6.2 above, a lien may be placed against the Club Member's Ownership Interest and foreclosed pursuant to applicable law, resulting in the loss of the Club Member's Ownership Interest and the termination of his or her membership in the Club as set forth in the Declaration.

## VII. MISCELLANEOUS PROVISIONS

7.1 Compliance; Personal Use; Commercial Purposes. Failure of a Club Member to comply with the terms and conditions of this Agreement, the Home Resort Rules and Regulations or the Condominium Documents may result in the denial of the right of the non-complying Club Member to reserve, check in or use the Vacation Homes and facilities of the Condominium or to voluntarily participate in the DVC Reservation Component by requesting a reservation for accommodations at other DVC Resorts until such time as the Club Member is in compliance. Except for Ownership Interests owned by DVD, rentals of Vacation Homes to the general public by DVD or DVCMC, use of Vacation Points in connection with external exchange programs, and the rights of third parties under the Master Declaration, use of Vacation Homes and facilities of the Condominium is limited solely to the personal use of Club Members, their guests, invitees, exchangers and lessees and for recreational use by corporations or other similar business entities owning Ownership Interests while staying as a registered guest at the Condominium. Purchase of an Ownership Interest or use of Vacation Homes and facilities of the Condominium for commercial purposes or for any purpose other than the personal use described above is expressly prohibited.

7.2 Amendment of this Agreement. DVCMC, in its sole, absolute and unfettered discretion, may change the terms and conditions of this Agreement and the Home Resort Rules and Regulations. These changes may affect an Owner's right to use, exchange and rent the Owner's Ownership Interest and impose obligations upon the use and enjoyment of the Ownership Interest and the appurtenant Club membership. Such changes may be made by DVCMC without the consent of any Club Member and may adversely affect a Club Member's rights and benefits and increase or decrease the Club Member's costs of ownership. Further, although DVCMC generally is required to make such changes in a manner which, in its reasonable business judgment, improves upon the quality and operation of the Vacation Ownership Plan and furthers the collective enjoyment of its benefits by the Club Members taken as a whole, such changes under some circumstances may not be to the advantage of some Club Members and could adversely affect their ability to secure reservations when and where they want them. Notice of any amendment shall be: (i) either mailed, faxed, e-mailed or sent by other electronic or wireless means, as the case may be, by DVCMC to each Club Member or to the designated representative of each Multiple Club Member at the Club Member's or designated representative's last known mailing address prior to its effective date; or (ii) included as a part of a newsletter or other periodic report sent by the Association or DVCMC as the Management Company.

7.3 Governing Law; Waiver of Jury Trial; Venue. This Agreement shall be governed by, and shall be construed in accordance with, the laws of the State of Florida. Each party hereby waives any right they may have under any applicable law to a trial by jury with respect to any suit or legal action which may be commenced by or against any other party concerning the interpretation, construction, validity, enforcement or performance of this Agreement or any other agreement or instrument executed in connection with this Agreement. In the event any such suit or legal action is commenced by any party, the other parties hereby agree, consent and submit to the personal jurisdiction of the Circuit Court of the Ninth Judicial Circuit of Florida in and for Orange County, Florida, with respect to such suit or legal action, and each party also hereby consents and submits to and agrees that venue in any such suit or legal action is proper in said court and county, and each party hereby waives any and all personal rights under applicable law or in equity to object to the jurisdiction and venue in said court and county. Such jurisdiction and venue shall be exclusive of any other jurisdiction and venue.

7.4 Notices. Except as may be otherwise provided herein, any notice, demand, request, consent, approval or communication under this Agreement shall be in writing and shall be deemed duly given or made: (i) when deposited, postage prepaid, in the United States mail, addressed to the party at the address shown above (or, in the case of a Club Member or designated representative of a Multiple Club Member, at the address shown on the books and records of DVCMC); (ii) when delivered personally to the party at the address specified above; or (iii) when deposited with a reliable overnight courier service, fee prepaid, with receipt of confirmation requested, addressed to the party as specified above. A party may designate a different address for receiving notices hereunder by notice to the other parties.

7.5 Termination. This Agreement shall automatically expire on January 31, 2057, or upon the earlier expiration of the Vacation Ownership Plan for the Condominium as set forth in the Declaration. In the event the Vacation Ownership Plan for

Condominium is extended beyond January 31, 2057, pursuant to the terms of the Declaration and at the election of the parties, the term of this Agreement shall automatically be extended for the additional term unless sooner terminated as provided in this Agreement.

In the event that the Property Management Agreement is terminated or it expires in accordance with its own terms, this Agreement will terminate, and DVCMC will no longer provide for the operation of the Vacation Ownership Plan. DVCMC also reserves the right to terminate this Agreement in the event that the DVC Resort Agreement for the Condominium is terminated.

In the event that this Agreement terminates, the Association shall have the authority to establish reservation procedures, which may or may not be identical to the reservation procedures set forth in this Agreement, by which use of the Units and Vacation Homes among all of the Club Members at the Condominium shall be determined. In addition, the parties expressly agree that in the event that this Agreement terminates, irrespective of whether the termination is voluntary or involuntary and irrespective of the cause of such termination, the Association and all Club Members shall cease using and thereafter abstain from using any and all personal property belonging to DVCMC, including any and all personal property relating to the operation of the Home Resort Reservation Component, and shall return same to DVCMC within fifteen (15) days from the date of termination.

7.6  Suspension. Notwithstanding any provisions contained in this Agreement to the contrary, DVCMC reserves the right to elect to suspend the operation of the Home Resort Reservation Component at the Condominium rather than electing to terminate this Agreement. The terms and conditions governing such suspension shall be determined by DVCMC in its sole, absolute and unfettered discretion. Upon the termination of such suspension period, the Condominium shall be entitled to resume participation as contemplated under this Agreement subject to any terms and conditions established by DVCMC in its sole, absolute and unfettered discretion.

7.7  Recitals. The recitals set forth at the beginning of this Agreement are true and correct and are incorporated herein by this reference.

7.8  Assignment. DVCMC may assign this Agreement to a wholly owned subsidiary of DVCMC, the parent corporation of DVCMC, or a corporation under common ownership and control with BVTC without the consent of the Association. Upon such assignment and assumption DVCMC shall be released from any and all obligations hereunder. Thirty (30) days advance notice of the assignment shall be delivered to the Association.

7.9  Entire Agreement. This Agreement constitutes the entire agreement among the parties hereto, and none of the parties have been induced by any other party by representations, promises or understandings not expressed herein, and there are no collateral agreements, stipulations, promises or understandings whatsoever, in any way touching the subject matter of this instrument, or the instruments referred to herein that are not expressly contained herein or in the Condominium Documents.

7.10  Partial Invalidation. The invalidity in whole or in part of any covenant, promise or undertaking, or any paragraph, subparagraph, sentence, clause, phrase or words, or of any provision of this Agreement shall not affect the validity of the remaining portions hereof.

7.11  Excusable Delays. In the event that DVCMC shall be delayed, hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, act of God, or any other reason beyond DVCMC's control, then performance of such act shall be excused for the period of the delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.

7.12  Remedies; Costs and Fees. DVCMC shall be entitled to pursue any and all legal and equitable remedies for the enforcement of the terms and conditions of this Agreement, including an action for damages, an action for injunctive relief, and an action for declaratory judgment. In any proceeding arising because of an alleged failure to comply with the terms of this Agreement, the prevailing party shall be entitled to recover the costs of the proceeding, and recover such reasonable attorneys', legal assistant or other professionals' fees as may be awarded by the court, including all appeals and all proceedings in bankruptcy.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

WITNESSES:

Print Name: Katherine DellaCasa

Print Name: Jeannette Greene

**DISNEY VACATION DEVELOPMENT, INC.,**
a Florida corporation

By: _____

Name: John McGowan

As its:  Secretary


Print Name: Jeannette Greene

Print Name: CL NIELSEN

**DISNEY VACATION CLUB MANAGEMENT CORP.,**
a Florida corporation

By: _____

Name: Leigh Anne Nieman

As its:  Assistant Secretary


Print Name: Jeannette Greene

Print Name: CL NIELSEN

**DISNEY'S ANIMAL KINGDOM VILLAS CONDOMINIUM
ASSOCIATION, INC.,** a Florida not-for-profit corporation

By: _____

Name: Lawrence Smith

As its:  Treasurer


J:\DATA\Compliance\DVC RESORTS\QUASAR\POS Docs\Membership Agmt\Quasar Membership Agr Rev. 09 15 2006.doc

## DVC RESORT AGREEMENT

THIS DVC RESORT AGREEMENT (**"Agreement"**) is made and entered into effective the $\underline{18^{th}}$ day of $\underline{January}$ , 200 $\underline{7}$ (the **"Effective Date"**) by and among BUENA VISTA TRADING COMPANY, a Florida corporation, having offices and its principal place of business at 1375 Buena Vista Drive, 4th Floor North, Lake Buena Vista, Florida, 32830 (**"BVTC"**); DISNEY VACATION CLUB MANAGEMENT CORP., a Florida corporation, having offices and its principal place of business at 200 Celebration Place, Celebration, Florida 34747 (**"DVCMC"**); DISNEY VACATION DEVELOPMENT, INC., a Florida corporation having offices and its principal place of business at 200 Celebration Place, Celebration, Florida 34747 (**"DVD"**); and DISNEY'S ANIMAL KINGDOM VILLAS CONDOMINIUM ASSOCIATION, INC., a Florida not-for-profit corporation, having offices at 200 Celebration Place, Celebration, Florida 34747 (the **"Association"**).

### RECITALS

WHEREAS, DVD has developed a resort project known as Disney's Animal Kingdom Villas, a leasehold condominium, located in Orange County, Florida (the **"Animal Kingdom Resort"**) subject to a vacation ownership plan pursuant to Chapter 721, <u>Florida</u> <u>Statutes</u> (the **"Vacation Ownership Plan"**); and

WHEREAS, DVD has provided for a central reservation system and related services (the **"Club"**) which includes the operation of an exchange system (the **"DVC Reservation Component"**) through which the owners of ownership interests in the Animal Kingdom Resort (**"Owners"**) and in any other vacation resorts that are entitled to access and use the DVC Reservation Component (**"DVC Resorts"**) have the ability to voluntarily reserve the use of available accommodations and related facilities of any DVC Resort in accordance with and as restricted by rules and regulations established by BVTC from time to time; and

WHEREAS, the Association is the owners' association for the Animal Kingdom Resort pursuant to Chapter 718, <u>Florida</u> <u>Statutes</u>; and

WHEREAS, DVCMC and the Association have entered into that certain property management agreement and that certain membership agreement for the purpose of the Association assigning to DVCMC all of the Association's management and assessment collection duties, obligations and responsibilities (except those which cannot be delegated as a matter of law), including the Association's responsibility for managing the use of the accommodations and related facilities of the Animal Kingdom Resort in accordance with and as restricted by the Vacation Ownership Plan; and

WHEREAS, DVD, the Association, DVCMC and BVTC desire to enter into this Agreement for the purpose of enabling the Animal Kingdom Resort to become a DVC Resort and for BVTC to coordinate activities and perform services associated therewith in accordance with the provisions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained herein, the parties hereby agree as follows:

### AGREEMENT

### I. Definitions

The following definitions of terms used in this Agreement shall prevail unless the context requires a different meaning:

1.1 <u>Agreement</u> shall mean this DVC Resort Agreement for the Animal Kingdom Resort.

1.2 <u>Animal Kingdom Resort Documents</u> shall mean all of the documents, by whatever names denominated, and any amendments thereto, which create and govern the rights and relationships of the Club Members in the Animal Kingdom Resort as required or allowed by Applicable Law.

1.3 <u>Animal Kingdom Resort Estimated Budgets</u> shall mean the operating and capital reserves budgets that establish the estimated annual common expenses and reserves of the Animal Kingdom Resort.

1.4 <u>Annual Dues</u> means that portion of the Animal Kingdom Resort Estimated Budgets that has been assessed against an individual Owner's Ownership Interest together with the Owner's proportionate share of the ad valorem taxes for the Ownership Interest.

1.5 <u>Applicable Law</u> shall mean the law of the jurisdiction where the DVC Resort referred to is located, as of the date of this Agreement unless BVTC determines otherwise.

1.6 <u>Association</u> shall mean Disney's Animal Kingdom Resort Condominium Association, Inc., a not-for-profit Florida corporation, and its successors and assigns, which is responsible for the operation and management of the Animal Kingdom Resort under Applicable Law.

©Disney

1.7  BVTC shall mean Buena Vista Trading Company, a Florida corporation, its successors and assigns. BVTC is an exchange company registered under Chapter 721.

1.8  Chapter 721 shall mean Chapter 721, Florida Statutes, as it is constituted on the date of this Agreement.

1.9  Club shall mean the Disney Vacation Club. The Club is not a legal entity or association of any kind, but rather is a service name for the services and benefits appurtenant to and the restrictions imposed upon the use and enjoyment of Ownership Interests. These services presently include, among other things, the operation of a central reservation system consisting of the reservation component for the Vacation Ownership Plan and the DVC Reservation Component.

1.10  Club Member shall mean the owner of record of an Ownership Interest.

1.11  Disclosure Document shall mean the disclosure statement promulgated or amended by BVTC in accordance with Section 721.18, Florida Statutes, and containing the rules and regulations that BVTC in its sole, absolute and unfettered discretion determines are necessary or desirable from time to time in order to enforce the provisions of this Agreement. The terms and conditions of the Disclosure Document are incorporated herein by this reference.

1.12  DVCMC shall mean Disney Vacation Club Management Corp., a Florida corporation, its successors and assigns.

1.13  DVC Reservation Component shall mean the exchange component of the Club central reservation system through which Vacation Homes in any DVC Resort may be reserved using DVC Vacation Points pursuant to priorities, restrictions and limitations established by BVTC from time to time and as set forth in the Disclosure Document.

1.14  DVC Resort shall mean each resort, including the Animal Kingdom Resort, which is entitled to access and use the DVC Reservation Component and other applicable Club services and benefits provided by BVTC by virtue of and pursuant to the terms and conditions of a DVC Resort Agreement.

1.15  DVC Resort Agreement shall mean the agreement pursuant to which a resort becomes and remains a DVC Resort in accordance with the terms and conditions of such agreement.

1.16  DVC Vacation Points shall mean Vacation Points utilized by a Club Member to make a reservation through the DVC Reservation Component at a DVC Resort.

1.17  DVD shall mean Disney Vacation Development, Inc., a Florida corporation, its successors and assigns, and the developer of the Animal Kingdom Resort.

1.18  Home Resort shall mean any DVC Resort in which a Club Member owns an Ownership Interest which is symbolized by Home Resort Vacation Points.

1.19  Home Resort Priority Period shall mean the period of time at each DVC Resort during which only Club Members having an Ownership Interest at that DVC Resort are entitled to request a reservation for the Vacation Homes at that DVC Resort through the vacation ownership plan at that DVC Resort.

1.20  Home Resort Vacation Points shall mean Vacation Points symbolizing an Ownership Interest at a Home Resort which Vacation Points may be used to reserve Vacation Homes at that Home Resort where that Ownership Interest is held.

1.21  Ownership Interest shall mean a property interest in a Unit in a DVC Resort.

1.22  The TWDC Companies shall mean TWDC and all subsidiaries and affiliates of TWDC, including DVD, DVCMC and BVTC.

1.23  TWDC shall mean The Walt Disney Company, a Delaware corporation, its successors and assigns.

1.24  Unit shall mean that portion of a DVC Resort, which is subject to exclusive ownership by one or more persons pursuant to Applicable Law.

1.25  Vacation Home shall mean those portions of a Unit designed and intended for separate use and occupancy.

1.26  Vacation Ownership Plan is the arrangement pursuant to Applicable Law and the documents establishing the DVC Resort under Applicable Law whereby a Club Member receives an Ownership Interest in a Unit in a DVC Resort under which the exclusive right of use, possession or occupancy of all Units in the DVC Resort circulates among the various Club Members at that DVC Resort on a recurring basis during the term of the plan.

1.27  Vacation Point shall mean the symbolic unit of measuring the respective rights of a Club Member to enjoy the benefits of the Club Member's Ownership Interest within the Club.

Rev: 9 15 06

## II. Assignment

2.1  The Association, on its own behalf and on behalf of all of the Club Members at the Animal Kingdom Resort, hereby enters into and agrees to be bound by the terms and conditions of this Agreement with the purpose of engaging BVTC to arrange for the assignment of the possession and use of the Animal Kingdom Resort Vacation Homes by Club Members from other DVC Resorts and the possession and use of Vacation Homes at other DVC Resorts by Club Members from the Animal Kingdom Resort through the DVC Reservation Component. In this regard, the Association shall be deemed to be the "corporate member" entitled to act on behalf of the Club Members with respect to all provisions of this Agreement. Each Club Member at the Animal Kingdom Resort shall expressly evidence acceptance of the terms and conditions of this Agreement and the Disclosure Document by acceptance of a deed conveying an Ownership Interest in a Unit.

2.2  DVD hereby enters into this Agreement for the purpose of expressing its consent to and acceptance of the terms and conditions of this Agreement.

2.3  DVCMC, as the management company for the Animal Kingdom Resort, hereby enters into this Agreement for the purpose of expressing its consent to and acceptance of the terms and conditions of this Agreement. Whatever obligations are imposed upon the Association by this Agreement, the reference to the Association shall include DVCMC as the management company authorized to act on behalf of the Association to the extent contemplated under the Animal Kingdom Resort Documents.

2.4  BVTC for itself and its successors and assigns hereby agrees to assume all of the responsibilities and duties set forth above, and to faithfully discharge all of its obligations as assigned hereunder.

2.5  The parties agree that the rights assigned to BVTC pursuant to this Agreement are exclusive to BVTC.

## III. Acknowledgments

3.1  DVCMC, DVD, BVTC and the Association hereby acknowledge the following:

a.  That the DVC Reservation Component shall be operated by BVTC pursuant to the terms of this Agreement and the Disclosure Document, as the same may be amended from time to time.

b.  That membership in the Club is an appurtenance to each Ownership Interest at the Animal Kingdom Resort in accordance with the terms of the Animal Kingdom Resort Documents and this Agreement and may not be partitioned from such Ownership Interest.

c.  That the Club does not own any property or assets, and that Club Members will acquire no legal or beneficial interest in any of The TWDC Companies or their assets, including the Club, and no right or interest in the property, contract rights or business of The TWDC Companies. Furthermore, Club Members will not be entitled to any share of income, gain or distribution by or of The TWDC Companies and will not acquire any voting rights in respect of The TWDC Companies.

d.  That DVD is only obligated to develop and construct the phases of the Animal Kingdom Resort initially declared as part of the Animal Kingdom Resort and described in the Animal Kingdom Resort Documents. DVD has the right, in its sole discretion, to add other land, units and facilities, whether or not developed by The TWDC Companies, as part of the Animal Kingdom Resort.

e.  That BVTC has the right to delete a DVC Resort, including the Animal Kingdom Resort, in accordance with Section 6.3 below, in which case the Club Members at the remaining DVC Resorts will not be able to reserve the use of accommodations at the deleted resort through the DVC Reservation Component and owners at the deleted resort will not be able to reserve the use of Vacation Homes through the DVC Reservation Component.

f.  That the discretion to associate other resorts as DVC Resorts and the terms and conditions of such association and the right to delete existing DVC Resorts belongs solely to BVTC and neither the Association, DVCMC nor the individual Club Members will be entitled to participate in BVTC's decision in this regard.

g.  That the relationship between DVCMC, the Association and BVTC, together with the handling of all of the services and benefits provided by BVTC for the Club Members at the Animal Kingdom Resort, constitutes legitimate business of the Association.

## IV. Covenants of DVD, DVCMC and the Association

4.1  DVD agrees to notify BVTC of DVD's execution and delivery of deeds to each Club Member at the Animal Kingdom Resort indicating that DVD has transferred an Ownership Interest in the Animal Kingdom Resort to the Club Member.

4.2   The Association agrees that at the time that DVD transfers its control of the Animal Kingdom Resort to the Association as set forth in the Animal Kingdom Resort Documents, the Animal Kingdom Resort shall continue to be a DVC Resort pursuant to the provisions of and in accordance with the terms and conditions of this Agreement.

4.3   DVD, DVCMC and the Association represent and warrant to BVTC that:  (a) DVD owns or leases, or shall own or lease prior to marketing or commencement of sales, the real estate and improvements constituting the Animal Kingdom Resort; and (b) each Club Member owning an Ownership Interest in the Animal Kingdom Resort shall acquire, possess and enjoy the right to use his or her Ownership Interest in accordance with information contained in the deed submitted for each Club Member and in accordance with the Animal Kingdom Resort Documents. DVD, DVCMC and the Association shall immediately notify BVTC of any change or any other fact or circumstance affecting BVTC's delivery of services and benefits to Club Members at the Animal Kingdom Resort, including the termination of any existing management company for the Animal Kingdom Resort.

## V. Operation and Management of Reservation Rights.

5.1   All reservations made by Club Members among the DVC Resorts using the DVC Reservation Component shall be made in accordance with the Disclosure Document as promulgated and/or amended from time to time by BVTC. BVTC reserves the right to amend the Disclosure Document in its sole, absolute and unfettered discretion and as it determines is necessary or desirable in order to operate and manage the services and benefits made available through BVTC; provided, however, that the Disclosure Document will only be amended as permitted under Applicable Law.

5.2   DVD, DVCMC and the Association acknowledge and understand that the operation and management of the DVC Reservation Component is based upon a Vacation Point structure. Under this structure, each Ownership Interest is symbolized by a number of Home Resort Vacation Points under the Vacation Ownership Plan for the DVC Resort representing the reservation power of that Ownership Interest in that DVC Resort's Vacation Ownership Plan. These Home Resort Vacation Points may be converted into DVC Vacation Points (as described in the Disclosure Document) if the Club Member voluntarily participates in the DVC Reservation Component by making a reservation at other DVC Resorts. Home Resort Vacation Points may not be converted into DVC Vacation Points except in connection with making a reservation through the DVC Reservation Component. The number of DVC Vacation Points required to reserve Vacation Homes at a DVC Resort will be determined annually by BVTC in its sole, absolute and unfettered discretion; however, in no event will BVTC reallocate DVC Vacation Points by more than 20% for any use day from year to year except for special periods of high demand and based upon Club Member use patterns and changes in Club Member use demand (including, without limitation, use demand during special or holiday seasons), as determined by BVTC in its sole, absolute and unfettered discretion.

5.3   DVD, DVCMC and the Association acknowledge and understand that different Home Resort Priority Periods may exist at each DVC Resort; provided, however, that in no event shall BVTC associate a resort as a DVC Resort if such resort has a Home Resort Priority Period of less than one (1) month.

5.4   DVD, DVCMC and the Association acknowledge and agree that all personal property related to BVTC's operation of the DVC Reservation Component, including all computer hardware and software and intellectual property, is and always shall be the personal property of BVTC; provided, however, that in the event that this Agreement is terminated or suspended, the rights of the parties to use the DVC Reservation Component for the Club will be governed by the provisions of Article VIII. below.

## VI. Other DVC Resorts

6.1   In the event BVTC associates one or more additional resorts as DVC Resorts, the DVC Resort Agreement executed to effect such association shall be substantially similar to this Agreement in all material respects under the circumstances pertaining to each such additional DVC Resort.

6.2   The parties agree that BVTC shall have the following rights with respect to the addition of resorts as DVC Resorts:

a.   BVTC may elect to associate other resort properties as DVC Resorts from time to time. These other DVC Resorts, if any, may be located within or outside the United States of America. Furthermore, it is contemplated that all resorts that may be associated as DVC Resorts from time to time will be developed by DVD or another affiliate or subsidiary of The TWDC Companies and managed by DVCMC; however, BVTC in its sole discretion reserves the right to enter into a DVC Resort Agreement with other resorts that have not been developed by DVD or any of The TWDC Companies and that may or may not be managed by DVCMC.

b.   The association of additional DVC Resorts is not subject to the approval of DVCMC, the Association or any Club Member, and any decision to associate DVC Resorts, including the terms and conditions under which the DVC Resort is associated, will be made by BVTC subject to the express written approval of DVD. In making a decision to associate additional DVC Resorts, BVTC shall use its best efforts, in good faith and based upon all available evidence under the circumstances, to further the best interests of the Club Members taken as a whole with respect to the Club Members' opportunity to use and enjoy all of the Vacation

Rev: 9 15 06

4

Homes and related facilities made available through the DVC Reservation Component. In this regard, BVTC will consider such factors as size, capacity, furnishings, maintenance impact, location (including geographic, topographic and scenic considerations), recreational capabilities, and demand and availability for Club Member use and enjoyment.

c. In the event other resorts are associated as DVC Resorts, the addition of the DVC Resort will result in the addition of new Club Members who will have the opportunity to make reservations for the use of Vacation Homes and related facilities through the DVC Reservation Component under the same terms and conditions as existing Club Members, including the Club Members at the Animal Kingdom Resort, and may also result in an increase in the Annual Dues assessed against each Ownership Interest. If other DVC Resorts are associated, demand for use may vary among the various DVC Resorts and the level of Club Member demand for the use of a particular DVC Resort may increase over the level of use demand that existed at the time of purchase by a particular Club Member such that the ability of a Club Member to reserve use at a high demand DVC Resort at a particular time may be impacted. However, new Club Members' reservation requests will also be subject to the Home Resort Priority Period for each DVC Resort, and in no event shall the addition of a DVC Resort result in a greater than "one-to-one purchaser to accommodation ratio," as that term is defined in Section 721.05(23), Florida Statutes. In addition, the inclusion of new resorts as DVC Resorts will afford existing Club Members with more DVC Resort Vacation Homes and location reservation opportunities and options.

d. BVTC does not anticipate that the rules and regulations governing reservations among the DVC Resorts will be affected by adding additional resorts as DVC Resorts. However, BVTC has reserved the right to amend the Disclosure Document and DVC Vacation Point schedules to take into account the location and anticipated relative use demand of the added DVC Resort as may be necessary and as it deems necessary or desirable in order to enforce the provisions of this Agreement and the Disclosure Document as permitted under Applicable Law.

6.3  The parties agree that any deletion of a DVC Resort shall be governed by the following:

a. In the event of a deletion of any DVC Resort that results in Vacation Homes or related facilities of such DVC Resort being unavailable for use by Club Members, BVTC shall notify DVD, DVCMC, the Association and all affected Club Members of such unavailability of use within thirty (30) days after the related event of casualty, eminent domain action or automatic or other deletion.

b. BVTC may, in its sole discretion, delete all or a portion of an existing DVC Resort due to casualty where any of the affected Vacation Homes or related facilities are not reconstructed or replaced.

(1)  By execution of this Agreement, DVCMC and the Association agree to obtain and maintain casualty insurance as to all Vacation Homes, related facilities and furnishings located upon the Animal Kingdom Resort in an amount equal to the replacement cost of such Vacation Homes, related facilities and furnishings as required by Chapter 721. BVTC shall not be liable for any costs associated with obtaining or maintaining such insurance.

(2)  DVD, DVCMC, and the Association further agree that any insurance proceeds resulting from a casualty at the Animal Kingdom Resort shall be applied to the reconstruction or replacement of the Vacation Homes or related facilities; or, in lieu thereof, disbursed to affected Club Members at the Animal Kingdom Resort as their share of the non-reconstructed or replaced Unit, in accordance with the Animal Kingdom Resort Documents, resulting in their withdrawal from participation in the DVC Reservation Component so that Club Members will not be requesting reservations for available Vacation Homes on a greater than "one-to-one purchaser to accommodation ratio," as that term is defined in Section 721.05(23), Florida Statutes. The decision whether or not to reconstruct or replace shall be made as promptly as possible under the circumstances.

(3)  Any replacement of Vacation Homes or related facilities of the Animal Kingdom Resort due to casualty shall be made so as to provide Club Members with an opportunity to enjoy a substantially similar vacation experience as was available with the deleted Vacation Homes or related facilities, as determined by BVTC in its sole, absolute and unfettered discretion. In determining whether the replacement Vacation Homes and related facilities will provide a substantially similar vacation experience, BVTC shall consider all relevant factors, including some or all of the following: size, capacity, furnishings, maintenance costs, location (geographic, topographic and scenic), demand and availability for Club Member use, and recreational capabilities. BVTC reserves the right, in its sole discretion, to reject replacement Vacation Homes and related facilities that do not meet its association criteria, including the high standards of quality and customer service established by BVTC for all DVC Resorts from time to time.

c. BVTC may, in its sole discretion, delete all or a portion of any existing DVC Resort where an eminent domain action has taken place and where any of the affected Vacation Homes or related facilities are not replaced.

(1)  In the event of a taking of all or a portion of the Vacation Homes and related facilities of a DVC Resort by eminent domain, DVD, DVCMC, and the Association agree that any proceeds resulting from such taking shall be applied to the replacement or acquisition of additional similar Vacation Homes and related facilities; or in lieu thereof, disbursed to affected Club

Rev: 9 15 06

5

Members at the Animal Kingdom Resort as their share of the non-replaced Unit, in accordance with the Animal Kingdom Resort Documents, resulting in their withdrawal from participation in the DVC Reservation Component so that Club Members will not be requesting reservations for available Vacation Homes on a greater than "one-to-one purchaser to accommodation ratio," as that term is defined in Section 721.05(23), <u>Florida</u> <u>Statutes</u>.

(2)  Any replacement of Vacation Homes or related facilities due to a taking by eminent domain shall be made upon the same basis as replacements made due to casualty as set forth above.

d.  BVTC may, in its sole, absolute and unfettered discretion, delete an existing DVC Resort pursuant to the specific termination rights contained in each individual DVC Resort Agreement. A DVC Resort also will be automatically deleted upon the expiration or earlier termination of the term of its Vacation Ownership Plan.

e.  During any reconstruction, repair or replacement period, or as a result of a decision not to reconstruct or replace (if permitted under the documents establishing the DVC Resort under Applicable Law), Club Members may temporarily request reservations for available Vacation Homes on a greater than "one-to-one purchaser to accommodation ratio," as that term is defined in Section 721.05(23), <u>Florida</u> <u>Statutes</u>. If available, DVCMC and the Association may acquire business interruption insurance for securing replacement Vacation Homes or related facilities or expend Association funds to secure replacement Vacation Homes or related facilities during any reconstruction, replacement or acquisition period.

f.  In the event that a DVC Resort is deleted, all Club Members at the deleted DVC Resort will no longer be able to participate in the DVC Reservation Component so as to maintain no greater than a "one-to-one purchaser to accommodation ratio," as that term is defined in Section 721.05(23), <u>Florida</u> <u>Statutes</u>. A Club Member at a deleted DVC Resort will not be able to make reservations at other DVC Resorts unless the Club Member owns an Ownership Interest at a non-deleted DVC Resort; however, the Club Member will continue to have reservation rights in the resort where the Club Member owns his or her Ownership Interest in accordance with the terms of the resort's Vacation Ownership Plan.

6.4  Without first receiving the express written consent of DVD, BVTC shall not offer any external exchange programs to Club Members other than as contemplated under this Agreement.

## VII. BVTC Fees

7.1  In consideration for providing the services contemplated under this Agreement and in lieu of charging individual transaction fees to Club Members, BVTC shall be entitled to receive an amount equal to the rental proceeds, if any, in excess of the amount paid to the Association under the Animal Kingdom Resort Documents resulting from the rental of unreserved Vacation Homes (in accordance with the reservation priorities set forth in the Animal Kingdom Resort Documents) equal to the costs incurred by BVTC to provide the services contemplated under this Agreement plus 5% of the amount of the costs to provide the services contemplated under this Agreement. BVTC shall provide DVCMC with an annual accounting of the costs that it incurs in the performance of the services contemplated under this Agreement. DVCMC shall receive, hold and remit these proceeds due to BVTC in accordance with the terms of the Animal Kingdom Resort Documents. The proceeds contemplated to be remitted to BVTC pursuant to this Section shall be payable in arrears and shall be due on January 1st of the next year and past due on January 31st of that year. BVTC's right to receive these proceeds shall cease upon the termination of this Agreement.

7.2  In lieu of individual membership fees, the Association, as the "corporate member" on behalf of all Club Members at the Animal Kingdom Resort, shall remit to BVTC each calendar year, an amount equal to $1.00 for each Club Member at the Animal Kingdom Resort. This "corporate membership fee" shall be payable in arrears and shall be due on January 1st of the next year and past due on January 31st of that year. The fee shall be based upon the number of Club Members owning Ownership Interests at the Animal Kingdom Resort as of December 31st of the year for which the fee is due. Upon the termination of this Agreement, BVTC shall be entitled to receive a prorated "corporate membership fee" through the termination date and based upon the number of Club Members owning Ownership Interests at the Animal Kingdom Resort as of the effective date of termination.

7.3  A Club Member's failure to pay his or her Annual Dues shall not relieve the Association from its obligations to timely pay the entire amount of proceeds or fees due to BVTC hereunder.

7.4  By execution of this Agreement, DVCMC and the Association authorize BVTC to prohibit Club Members who are delinquent in the payment of their Annual Dues (with respect to any Ownership Interests owned by such Club Members) or any other sums due DVCMC or the Association from accessing the DVC Reservation Component or checking in to a Vacation Home at a DVC Resort reserved through the DVC Reservation Component as permitted under and in accordance with Applicable Law and until such time as the delinquency is paid in full.

Rev: 9 15 06

## VIII. Termination, Suspension and Remedies

8.1  Termination of this Agreement can occur as follows:

a.  This Agreement will automatically terminate upon:

(1)  the declaration of bankruptcy or insolvency of any of DVD, DVCMC or the Association according to Applicable Law or if any general assignment shall be made of DVD's, DVCMC's or the Association's property for the benefit of creditors; provided, however, that BVTC shall have the right, in its sole discretion, to continue the Agreement as to the parties that have not been declared bankrupt or insolvent or made the subject of a general assignment for the benefit of creditors; or

(2)  the deletion of the Animal Kingdom Resort entirely in accordance with Section 6.3 above.

b.  The parties may terminate participation in this Agreement:

(1)  by the mutual written agreement of the parties, effective upon the date agreed to by the parties; or

(2)  in the event of a material breach of any of the terms, conditions, covenants, representations or warranties contained in this Agreement upon written notice to the breaching party stating the grounds for such termination, unless the breaching party cures the asserted breach to the reasonable satisfaction of the party giving such notice within thirty (30) days of the date of notice.

c.  BVTC may immediately terminate its participation in this Agreement, by giving written notice to DVD, DVCMC and the Association, upon BVTC's determination, in its sole, absolute and unfettered discretion, that DVD, DVCMC or the Association have failed to manage, operate and maintain the Animal Kingdom Resort in a manner consistent with the high standards of quality and customer service established by BVTC for all DVC Resorts from time to time, including the employment or termination by DVD and/or Association of the Animal Kingdom Resort's management company without BVTC's consent.

8.2  Unless sooner terminated as provided in this Agreement, the term of this Agreement shall expire on January 31, 2057, or upon the earlier termination of the Vacation Ownership Plan for the Animal Kingdom Resort. In the event that the Vacation Ownership Plan is extended beyond January 31, 2057, pursuant to the terms of the Animal Kingdom Resort Documents and at BVTC's election, the term of this Agreement shall automatically be extended for the additional term unless sooner terminated as provided in this Agreement.

8.3  Upon termination of this Agreement, the following events shall occur:

a.  DVD shall immediately discontinue the offering of Ownership Interests with appurtenant rights in the DVC Reservation Component in accordance with the terms of this Agreement to prospective purchasers; and

b.  DVD, DVCMC and the Association shall immediately cease using and thereafter abstain from using all personal property belonging to BVTC and related to the operation and functioning of the DVC Reservation Component, including all computer hardware or software or intellectual property. DVD, DVCMC and the Association shall return same to BVTC all personal property belonging to BVTC within fifteen (15) days after termination of this Agreement, subject to any transition periods required under Chapter 721. No property right in or privilege to use BVTC materials is created by this Agreement which will extend beyond the expiration or termination of this Agreement. The terms of this Section shall survive the termination of this Agreement.

8.4  Upon termination of this Agreement, BVTC shall honor all reservations and reservation privileges of Club Members from other DVC Resorts reserving Vacation Homes at the Animal Kingdom Resort that are confirmed or accrued prior to termination and shall honor all reservations and reservation privileges of Club Members at the Animal Kingdom Resort reserving Vacation Homes at other DVC Resorts that are confirmed or accrued prior to termination of this Agreement. DVCMC and the Association shall honor all confirmed reservations and reservation privileges of Club Members from other DVC Resorts reserving Vacation Homes at the Animal Kingdom Resort that are confirmed or accrued prior to termination. The terms of this Section shall survive the termination of this Agreement.

8.5  Notwithstanding any provisions contained in this Agreement to the contrary, BVTC reserves the right to elect to suspend the participation of the Animal Kingdom Resort as a DVC Resort under this Agreement rather than electing to terminate this Agreement. The terms and conditions governing such suspension shall be determined by BVTC in its sole, absolute and unfettered discretion. Upon the termination of such suspension period, the Animal Kingdom Resort shall be entitled to resume participation as a DVC Resort under this Agreement subject to any terms and conditions established by BVTC.

8.6  In the event that DVD, DVCMC or the Association fails to perform its services under this Agreement and such failure results in a Club Member with a confirmed reservation at the Animal Kingdom Resort being wrongfully denied access to a Vacation Home, then DVD, DVCMC or the Association shall immediately correct such denial of access at its own expense.

Rev: 9 15 06

7

8.7 Each party acknowledges that damages cannot adequately compensate the other parties for a breach of any of the provisions of this Agreement, and, therefore, the parties agree that each party shall be entitled to a remedy of specific performance or injunctive relief, as appropriate, in the event of a breach or threatened breach of any such provisions by any other party, in addition to any other appropriate legal or equitable remedies.

8.8 Each party agrees to indemnify and hold harmless the other parties from and against all claims, demands, obligations, deficiencies, judgments, damages, suits, losses, penalties, expenses, costs (including attorneys' and other professionals' fees) and liabilities of any kind, type or nature whatsoever directly or indirectly resulting from, arising out of or in connection with this Agreement or the operation of its business as a result of any acts or omissions by it or any of its directors, officers, partners, employees, representatives, agents, brokers, salespersons or associates.

## IX. Assignment

9.1 BVTC reserves the right, and DVD, DVCMC and the Association acknowledge BVTC's right, to assign BVTC's rights and duties under this Agreement to a wholly owned subsidiary of BVTC, the parent corporation of BVTC, or a corporation under common ownership or control with BVTC. Upon such assignment and assumption, BVTC shall be released from all obligations hereunder. Thirty (30) days advance notice of the assignment shall be delivered to the other parties.

9.2 DVD reserves the right, and DVCMC, BVTC and the Association acknowledge DVD's right, to assign DVD's rights and duties under this Agreement to a wholly owned subsidiary of DVD, the parent corporation of DVD or a corporation under common ownership or control with DVD. Upon such assignment and assumption DVD shall be released from all obligations hereunder. Thirty (30) days advance notice of the assignment shall be delivered to the other parties.

9.3 DVCMC reserves the right, and DVD, BVTC and the Association acknowledge DVCMC's right, to assign DVCMC's rights and duties under this Agreement to a wholly owned subsidiary of DVD, the parent corporation of DVCMC or a corporation under common ownership or control with DVCMC. Upon such assignment and assumption DVCMC shall be released from all obligations hereunder. Thirty (30) days advance notice of the assignment shall be delivered to the other parties.

9.4 The parties hereby agree that the Association shall not have the right to assign its rights and duties under this Agreement to any third party other than DVCMC.

## X. General

10.1 Except as may be otherwise provided herein, any notice, demand, request, consent, approval or communication under this Agreement shall be in writing and shall be deemed duly given or made: (i) when deposited, postage prepaid, in the United States mail, certified or registered mail with a return receipt requested, addressed to the party at the address shown above; (ii) when delivered personally to the party at the address specified above; (iii) when deposited with a reliable overnight courier service, fee prepaid, with receipt of confirmation requested, addressed to the party as specified above; or (iv) when delivered by facsimile transmission with confirmed receipt of transmission. A party may designate a different address for receiving notices hereunder by notice to the other parties.

10.2 The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement. All references in this Agreement to particular recitals and sections are references to recitals and sections of this Agreement. The recitals set forth at the beginning of this Agreement are true and correct and are incorporated herein by this reference.

10.3 In the event that any clause or provision of this Agreement is held to be invalid by any court of competent jurisdiction, the invalidity of such clause or provision shall not affect any other provision of this Agreement. Failure of any party to insist on strict compliance with the provisions of this Agreement shall not constitute waiver of that party's right to demand later compliance with the same or other provisions of this Agreement.

10.4 This Agreement constitutes the entire understanding and agreement among the parties concerning the subject matter of this Agreement. This Agreement may be modified only by a writing executed by the parties with the same formality with which this Agreement has been executed. All understandings among the parties are merged into this Agreement, and there are no representations, warranties, covenants, obligations, understandings or agreements, oral or otherwise, in relation thereto among the parties other than those incorporated herein.

10.5 This Agreement shall be governed by, and shall be construed in accordance with, the laws of the State of Florida. The parties hereby waive any right they may have under any Applicable Law to a trial by jury with respect to any suit or legal action which may be commenced by or against the other concerning the interpretation, construction, validity, enforcement or performance of this Agreement or any other agreement or instrument executed in connection with this Agreement. In the event any such suit or legal action is commenced by any party, the other parties hereby agree, consent and submit to the personal jurisdiction of the Circuit Court

Rev: 9 15 06

8

of the Ninth Judicial Circuit of Florida in and for Orange County, Florida, with respect to such suit or legal action, and each party also hereby consents and submits to and agrees that venue in any such suit or legal action is proper in said court and county, and each party hereby waives all personal rights under applicable law or in equity to object to the jurisdiction and venue in said court and county. Such jurisdiction and venue shall be exclusive of any other jurisdiction and venue.

10.6   This Agreement and all of its provisions shall be binding upon and inure to the benefit of the parties and their successors and assigns. In no event shall the terms and conditions of this Agreement be deemed in any way to inure to the benefit of any person or party not expressly made a party hereto except for permitted successors or assigns to parties hereto.

10.7   In the event that BVTC shall be delayed, hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, act of God, or any other reason beyond BVTC's control, then performance of such act shall be excused for the period of the delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.

10.8   The recitals set forth at the beginning of this Agreement are true and correct and are incorporated herein by this reference.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the Effective Date.

WITNESSES:

Print Name:  Jeannette Greene

Print Name:  Leigh A Nieman

Print Name:  Jeannette Greene

Print Name:  CL NIELSEN


Print Name:  Jeannette Greene

Print Name:  C.L. NIELSEN

Print Name:  Katherine Dellarosa

Print Name:  Jeannette Greene


DISNEY VACATION DEVELOPMENT, INC., a Florida corporation
By:
Name: Ted L. Watson
As its: Vice President


DISNEY VACATION CLUB MANAGEMENT CORP.,
a Florida corporation
By:
Name: Leigh Anne Nieman
As its:  Assistant Secretary


DISNEY'S ANIMAL KINGDOM VILLAS CONDOMINIUM
ASSOCIATION, INC., a Florida not-for-profit corporation

By:
Name: Lawrence Smith
As its:  Treasurer


BUENA VISTA TRADING COMPANY, a Florida corporation

By:
Name: John McGowan
As its:  Secretary


J:\DATA\Compliance\DVC RESORTS\ANIMAL KINGDOM VILLAS\POS Docs\Resort Agrmt\Resort Agmt 9 15 2006CLN.doc

This instrument prepared by
and return to:

John M. McGowan, Esquire
c/o Compliance Department
Disney Vacation Development, Inc.
200 Celebration Place
Celebration, FL 34747
(407) 566-3073

## MEMORANDUM OF GROUND & IMPROVEMENTS LEASE
## DISNEY'S ANIMAL KINGDOM VILLAS

**THIS MEMORANDUM OF GROUND & IMPROVEMENTS LEASE** (this "**Memorandum**") is effective the 18th day of January, 2007, by and between **WALT DISNEY WORLD HOSPITALITY & RECREATION CORPORATION**, a Florida corporation, whose address is Post Office Box 10,000, Lake Buena Vista, Florida 32830 ("**WDWHRC**"), and **DISNEY VACATION DEVELOPMENT, INC.**, a Florida corporation, whose address is 200 Celebration Place, Celebration, Florida 34747 ("**DVD**").

### W I T N E S S E T H :

**WHEREAS**, WDWHRC and DVD have executed that certain Ground & Improvements Lease (the "Ground Lease") effective the 5th day of March, 2007 under which WDWHRC has demised to DVD a leasehold interest in that certain property situated in Orange County, Florida, more specifically described in Exhibit A, attached hereto and incorporated herein by this reference ("**Demised Land**");

**WHEREAS**, WDWHRC has granted DVD in the Ground Lease an option to lease in phases that certain property in Orange County, Florida, more particularly described in Exhibit B attached hereto and incorporated herein by this reference (the "**Option Land**");

**WHEREAS**, WDWHRC and DVD have agreed to execute this Memorandum and record it in the Public Records of Orange County, Florida, in order to place the public on notice of the existence of the Ground Lease and in order to protect the interests of those parties claiming under DVD, as more specifically described below:

**NOW, THEREFORE**, notice is hereby given to the public of the following matters:

1.      The term of the Ground Lease expires on January 31, 2057.

2.      The Parties hereby acknowledge that all of the rent due and payable under the Ground Lease has not been paid in full by DVD, although DVD has retained the right to prepay such rent.

3.      WDWHRC has agreed to consent to the submission by DVD of all or a portion of the Demised Land to the leasehold condominium form of ownership of real property provided by Florida law.  Upon such submission, the condominium association for the leasehold condominium ("**Association**") shall automatically assume all of the obligations and interest of DVD under the Ground Lease with respect to the portion of the Demised Land submitted; however, the Association shall not be so substituted for DVD with respect to those obligations imposed upon DVD concerning its initial development activities on the Demised Land regarding construction, use of the Demised Land with respect to DVD's construction of the leasehold condominium and the payment of rent; all as described in the Ground Lease.  In addition, the Association shall not assume or acquire any of the development rights assigned by WDWHRC to DVD pursuant to the Master Declaration of Covenants, Conditions and Restrictions executed by WDWHRC concerning the Demised Land without the prior written consent of WDWHRC.  The leasehold interest shall thereafter be a common element of the condominium as to the portions of the Demised Land submitted.

4.      The Ground Lease specifically contemplates the offering, by DVD to purchasers, of ownership interests in the condominium units as part of a vacation ownership plan.

5.      WDWHRC hereby acknowledges that WDWHRC may not terminate the Ground Lease, as to any portion of the Demised Land submitted to the leasehold condominium form of ownership of real property, as a result of DVD's failure to pay rent in accordance with the terms of the Ground Lease.  WDWHRC has agreed that it will not

Page 1

exercise any of its rights under the Ground Lease to terminate the Ground Lease, so long as the Association complies with the terms of the Ground Lease (other than the payment of rent), the condominium is managed by an affiliate of DVD and DVD is the voting representative of the cotenants of a majority of the units in the condominium. However, nothing herein shall impair the rights of WDWHRC to pursue its remedies for damages and/or specific performance upon breach as provided in the Ground Lease.

6.      DVD has agreed to subordinate its interest in the Ground Lease to all mortgages executed by WDWHRC that encumber the Demised Land; provided, however, that the holder of any such mortgage shall enter into a written agreement with DVD to the effect that in the event of foreclosure or other action taken under the mortgage by the holder of the mortgage, the Ground Lease and the rights of DVD and all persons claiming by, through or under DVD thereunder, shall not be disturbed but shall continue in full force and effect so long as DVD has not committed a material event of default thereunder; provided further, however that in the event and for so long as the Demised Land is encumbered by or otherwise subject to a vacation ownership plan or any interest in a vacation ownership plan, (i) the total amount of principal indebtedness secured by any such mortgage shall not exceed the sum of $1,000,000,000.00, and (ii) the indebtedness secured by such mortgage may be used for any lawful purposes except that no secured funds may be used to finance or retire indebtedness which has been incurred to finance the acquisition of any capital stock of The Walt Disney Company by or on behalf of any third person or party not then affiliated with The Walt Disney Company.

7.      WDWHRC's interest in the Demised Land shall not be subjected to liens of any nature by reason of DVD's construction work, alteration, repair, restoration, replacement or reconstruction of any improvements on the Demised Land or by reason of any other act or omission of DVD (or of any person claiming by, through or under DVD), including mechanic's and materialman's liens. All persons dealing with DVD are hereby placed on notice that such persons shall not look to WDWHRC or to WDWHRC's credit or assets for payment or satisfaction of any obligations incurred in connection with the Construction Work.  DVD has no power, right or authority to subject WDWHRC's interest in the Demised Land to any mechanic's or materialman's lien or claim of lien.

8.      In exchange for the good and valuable consideration given under the Ground Lease, the receipt and sufficiency of which are hereby acknowledged, WDWHRC has irrevocably granted to DVD for a period of twelve (12) years from the effective date of the Lease (the **"Option Period"**) an exclusive option to Lease any or all of the phases of real property comprising the Option Land.

8.1      Exercise of Option. DVD's option to lease any phase of the Option Land pursuant to the terms of the Ground Lease shall be exercisable by written notice from DVD to WDWHRC given prior to the end of the Option Period, which notice shall set forth the phase or phases of the Option Land that DVD desires to exercise its option to lease. Thereafter, such phase(s) shall be considered part of the "Demised Land" and all the terms and conditions of the Ground Lease apply to such phase(s) if the phase(s) were originally part of the Demised Land.  Prior to the end of the Option Period, DVD may exercise its option to lease any or all of the phases of the Option Land, as shown on Exhibit "B", and may exercise such option to lease such phases in any order, in its sole discretion.

8.2      Amendment of Lease. Upon the valid exercise by DVD of the option to lease, at the request of either party, WDWHRC and DVD shall enter into a written supplement to this Memorandum confirming the demise and lease to DVD and the hire and take from WDWHRC of the phase or phases of the Option Land that DVD has exercised its option to lease.

8.3      Non-transferable.  During the Option Period, WDWHRC shall not convey, transfer, assign, alienate, grant, bargain, sell, release, or lease the Option Land without the prior written consent of DVD and any such attempt to convey, transfer, alienate, grant, bargain, sell, release, or lease the Option Land shall be ineffective.

9.      The foregoing is only a summary of certain terms and provisions of the Ground Lease and it is not intended to be a comprehensive description of all of the terms and provisions of the Ground Lease.  In the event of a conflict between the terms and provisions hereof and those of the Ground Lease, the Ground Lease shall in all events control.

**IN WITNESS WHEREOF**, WDWHRC and DVD have executed this Memorandum effective on the date written above.

WITNESSES:                                    "WDWHRC"

**WALT DISNEY WORLD HOSPITALITY & RECREATION CORPORATION,** a Florida corporation

Print Name: Maria A. Maher          By: _____

Print Name: John McGowan            Print Name: Lee Schmudde

                                    As its: Vice - President

                                    "DVD"

                                    **DISNEY VACATION DEVELOPMENT, INC.,** a Florida corporation

Print Name: Jeannette Greene         By: _____

Print Name: CL Nielsen               Print Name: Leigh Anne Nieman

                                    As its: Assistant Secretary

STATE OF FLORIDA ) SS.
COUNTY OF Orange )

The foregoing instrument was acknowledged before me this 19 day of January , 200 7, by Lee Schmudde , Vice President of **WALT DISNEY WORLD HOSPITALITY & RECREATION CORPORATION.**, a Florida corporation, on behalf of the corporation. He is personally known to me.

(NOTARY SEAL)

Notary Signature: Maria A. Maher
Notary Name Printed: Maria A. Maher
NOTARY PUBLIC
Commission No. _____

Notary Public State of Florida
Maria A Maher
My Commission DD520078
Expires 02/19/2010

STATE OF FLORIDA ) SS.
COUNTY OF Osceola )

The foregoing instrument was acknowledged before me this 18th day of January , 200 7, by Leigh Anne Nieman, Assistant Secretary of **DISNEY VACATION DEVELOPMENT, INC.**, a Florida corporation, on behalf of the corporation. She is personally known to me.

(NOTARY SEAL)

J. Greene
My Commission DD282473
Expires February 10, 2008

Notary Signature: _____
Notary Name Printed: _____
NOTARY PUBLIC
Commission No. _____

Page 3

**Exhibit A:** Memorandum of Ground & Improvements Lease - Demised Land



| PROJECT AREA | | DATE: |
|---|---|---|
| ANIMAL KINGDOM LODGE | | 1/10/07 |
| UNIT NAME | | SCALE |
| 5TH FLOOR GROUND LEASE | | 1" = 150' |
| SHEET TITLE | | DRAWN BY: |
| SKETCH OF DESCRIPTION | | JLG |
| COMMENTS | | FILENAME: |
| | | 04JG0615 |

## Exhibit A: Memorandum of Ground & Improvements Lease - Demised Land

### TANGENT TABLE

| LINE# | BEARING | DIST. | LINE# | BEARING | DIST. | LINE# | BEARING | DIST. |
|---|---|---|---|---|---|---|---|---|
| L1 | N 85°54'34" E | 37.30 | L69 | S 30°10'31" W | 1.00 | L137 | N 14°19'29" W | 30.20 |
| L2 | S 04°26'59" E | 2.95 | L70 | S 59°49'29" E | 7.86 | L138 | S 85°40'34" W | 25.00 |
| L3 | N 06°25'35" E | 91.80 | L71 | S 84°19'29" E | 5.87 | L139 | S 05°40'31" W | 30.20 |
| L4 | S 83°34'29" E | 30.20 | L72 | N 05°40'31" E | 4.78 | L140 | N 84°19'29" W | 102.76 |
| L5 | N 16°25'21" E | 25.00 | L73 | N 53°38'30" W | 8.19 | L141 | N 05°40'50" E | 31.03 |
| L6 | N 63°34'49" W | 30.19 | L74 | S 84°19'29" E | 7.91 | L142 | S 05°40'31" W | 4.05 |
| L7 | N 26°25'11" E | 91.80 | L75 | N 05°17'50" E | 6.14 | L143 | S 84°19'29" E | 1.50 |
| L8 | N 52°41'59" W | 104.89 | L76 | S 84°19'29" E | 102.75 | L144 | S 05°40'31" W | 15.00 |
| L9 | S 37°18'01" W | 3.36 | L77 | S 05°40'31" W | 30.40 | L145 | N 84°20'04" W | 15.09 |
| L10 | N 52°41'59" W | 37.30 | L78 | N 85°40'45" E | 22.05 | L146 | S 30°10'31" W | 89.86 |
| L11 | N 37°18'01" E | 76.91 | L79 | N 14°19'29" W | 30.40 | L147 | S 59°49'29" E | 4.86 |
| L12 | S 52°41'59" E | 37.30 | L80 | N 75°40'31" E | 102.76 | L148 | S 30°10'31" W | 9.75 |
| L13 | S 37°18'01" W | 4.45 | L81 | S 14°19'10" E | 31.05 | L149 | N 70°48'24" W | 5.36 |
| L14 | S 52°41'59" E | 104.89 | L82 | N 75°39'28" E | 3.05 | L150 | S 30°10'31" W | 11.75 |
| L15 | N 48°10'31" E | 92.38 | L83 | N 69°24'19" E | 6.57 | L151 | S 10°16'35" E | 2.49 |
| L16 | N 41°49'29" W | 4.45 | L84 | N 25°11'59" W | 1.51 | L152 | N 47°40'31" E | 28.21 |
| L17 | N 48°10'31" E | 37.30 | L85 | N 64°48'51" E | 3.06 | L153 | S 42°19'29" E | 102.75 |
| L18 | S 41°49'29" E | 76.73 | L86 | N 25°11'04" W | 1.50 | L154 | S 47°41'04" W | 27.22 |
| L19 | S 48°10'31" W | 37.30 | L87 | N 64°48'01" E | 8.00 | L155 | S 34°19'29" E | 21.93 |
| L20 | N 41°49'29" W | 3.18 | L88 | S 25°12'52" E | 1.50 | L156 | N 63°40'31" E | 27.22 |
| L21 | S 48°10'31" W | 103.33 | L89 | N 64°47'12" E | 3.06 | L157 | S 26°19'29" E | 102.75 |
| L22 | N 41°49'29" W | 31.05 | L90 | S 25°11'59" E | 1.51 | L158 | S 63°40'31" W | 34.30 |
| L23 | S 48°09'21" W | 3.06 | L91 | N 60°11'43" E | 6.57 | L159 | N 26°19'29" W | 96.88 |
| L24 | S 41°54'19" W | 6.57 | L92 | N 53°56'35" E | 3.04 | L160 | N 33°59'10" W | 30.29 |
| L25 | S 52°41'59" E | 1.51 | L93 | N 36°04'29" W | 31.05 | L161 | N 42°19'29" W | 92.24 |
| L26 | S 37°18'51" W | 3.06 | L94 | N 53°55'31" E | 102.78 | L162 | S 47°40'31" W | 0.75 |
| L27 | S 52°41'04" E | 1.50 | L95 | S 36°04'29" E | 30.40 | L163 | N 42°19'29" W | 6.53 |
| L28 | S 37°18'01" W | 8.00 | L96 | N 43°55'29" E | 22.03 | L164 | N 11°48'23" W | 5.11 |
| L29 | N 52°42'53" W | 1.50 | L97 | N 56°04'08" W | 30.40 | L165 | N 35°29'56" W | 16.82 |
| L30 | S 37°17'11" W | 3.06 | L98 | N 33°55'30" E | 102.75 | L166 | S 30°10'31" W | 26.03 |
| L31 | N 52°41'59" W | 1.51 | L99 | S 56°04'30" E | 31.05 | L167 | N 59°49'29" W | 76.58 |
| L32 | S 32°41'43" W | 6.57 | L100 | N 33°54'28" E | 3.05 | L168 | N 30°10'31" E | 25.99 |
| L33 | S 26°26'35" W | 3.04 | L101 | N 27°39'19" E | 6.57 | L169 | N 59°49'29" W | 2.33 |
| L34 | S 63°34'08" E | 31.05 | L102 | N 66°56'59" W | 1.51 | L170 | N 77°09'33" W | 14.14 |
| L35 | S 26°25'30" W | 102.76 | L103 | N 23°03'51" E | 3.06 | L171 | N 10°14'24" E | 0.77 |
| L36 | N 63°34'23" W | 30.40 | L104 | N 66°56'04" W | 1.50 | L172 | N 77°30'11" W | 6.66 |
| L37 | S 16°25'34" W | 22.05 | L105 | N 23°03'01" E | 8.00 | L173 | N 77°19'29" W | 84.19 |
| L38 | S 83°34'29" E | 30.40 | L106 | S 66°57'53" E | 1.50 | L174 | S 12°40'31" W | 0.75 |
| L39 | N 06°25'31" E | 102.76 | L107 | N 23°02'11" E | 3.06 | L175 | N 77°19'29" W | 5.93 |
| L40 | N 83°34'10" W | 31.05 | L108 | S 66°56'59" E | 1.51 | L176 | N 77°19'29" W | 0.58 |
| L41 | S 06°24'28" W | 3.05 | L109 | N 18°26'43" E | 6.57 | L177 | S 12°40'31" W | 0.77 |
| L42 | S 00°09'19" W | 6.57 | L110 | N 12°11'35" E | 3.06 | L178 | N 85°19'29" W | 18.34 |
| L43 | N 85°33'01" E | 1.51 | L111 | N 77°49'29" W | 31.05 | L179 | N 03°19'29" W | 0.77 |
| L44 | S 04°26'09" E | 3.06 | L112 | N 12°10'31" E | 103.33 | L180 | S 87°02'33" W | 6.56 |
| L45 | N 85°33'56" E | 1.50 | L113 | N 77°49'29" W | 3.18 | L181 | N 03°19'29" W | 0.71 |
| L46 | S 04°26'59" E | 8.00 | L114 | N 12°10'31" E | 37.30 | L182 | S 86°40'31" W | 19.60 |
| L47 | S 85°32'08" W | 1.50 | L115 | S 77°49'29" E | 76.73 | L183 | S 03°19'29" E | 28.80 |
| L48 | S 04°27'49" E | 3.06 | L116 | S 12°10'31" W | 37.30 | L184 | S 86°40'31" W | 77.21 |
| L49 | S 85°33'01" W | 1.51 | L117 | N 77°49'29" W | 4.45 | L185 | N 03°19'29" W | 63.10 |
| L50 | S 09°03'17" E | 6.57 | L118 | S 12°10'31" W | 92.38 | L186 | N 86°40'31" E | 102.75 |
| L51 | S 15°18'25" E | 3.05 | L119 | S 66°56'59" E | 104.90 | L187 | S 03°19'29" E | 27.22 |
| L52 | N 74°40'12" E | 31.05 | L120 | N 23°03'01" E | 3.91 | L188 | S 85°19'29" E | 21.93 |
| L53 | S 15°19'29" E | 102.78 | L121 | S 66°56'59" E | 37.30 | L189 | N 12°40'31" W | 27.22 |
| L54 | S 74°40'31" W | 30.40 | L122 | S 23°03'01" W | 76.74 | L190 | S 77°19'33" E | 102.73 |
| L55 | S 25°19'43" E | 22.03 | L123 | N 66°56'59" W | 37.30 | L191 | S 12°39'12" W | 28.02 |
| L56 | N 54°40'31" E | 30.40 | L124 | N 23°03'01" E | 3.73 | L192 | N 30°10'31" E | 2.48 |
| L57 | S 35°19'29" E | 52.02 | L125 | N 66°56'59" W | 104.90 | L193 | N 59°49'29" W | 7.69 |
| L58 | S 35°17'15" E | 20.95 | L126 | S 33°55'52" W | 91.80 | L194 | N 30°10'31" E | 118.08 |
| L59 | S 54°42'45" W | 10.41 | L127 | N 56°04'08" W | 30.20 | L195 | N 59°49'29" W | 10.72 |
| L60 | S 35°17'15" E | 6.04 | L128 | S 43°55'41" W | 24.98 | L196 | S 54°40'31" W | 3.43 |
| L61 | N 77°21'59" E | 1.19 | L129 | S 36°04'29" E | 30.20 | L197 | N 35°19'34" W | 102.76 |
| L62 | N 09°47'03" W | 0.50 | L130 | S 53°55'32" W | 91.82 | L198 | N 54°40'26" E | 30.20 |
| L63 | S 54°42'45" W | 6.60 | L131 | N 64°48'01" E | 3.44 | L199 | N 25°19'31" W | 24.98 |
| L64 | S 59°47'15" E | 7.85 | L132 | S 24°47'59" E | 37.30 | L200 | S 74°40'31" W | 30.20 |
| L65 | N 30°13'55" E | 1.01 | L133 | S 64°48'01" W | 76.73 | L201 | N 15°19'29" W | 91.82 |
| L66 | S 59°49'29" E | 9.32 | L134 | N 25°11'59" W | 37.30 | L202 | S 04°26'59" E | 4.45 |
| L67 | S 30°10'31" W | 1.42 | L135 | N 64°48'01" E | 4.45 | L203 | S 85°33'26" W | 37.30 |
| L68 | S 59°49'29" E | 11.09 | L136 | S 75°40'31" W | 91.80 | L204 | N 04°26'59" W | 76.73 |

**ACES**
HENRY ... ENERGY SERVICES

SURVEYING AND
MAPPING DEPARTMENT
P.O.B. 10000
LAKE BUENA VISTA
FL 32830-1000
PHONE (407)560-7118
FAX (407)560-7896

| | |
|---|---|
| PROJECT AREA | DATE: 1/10/07 |
| *ANIMAL KINGDOM LODGE* | |
| UNIT NAME | SCALE |
| *5TH FLOOR GROUND LEASE* | n/a |
| SHEET TITLE | DRAWN BY: |
| *SKETCH OF DESCRIPTION* | JLG |
| COMMENTS | FILENAME: 04JG0615 |

Exhibit A:  Memorandum of Ground & Improvements Lease - Demised Land

CURVE TABLE

| CURVE | RADIUS | DELTA | LENGTH | TANG. BRG. |
|-------|--------|-------|--------|------------|
| C1 | 24.55 | 37°49'38" | 16.21 | S 31°37'34" E |
| C2 | 23.41 | 40°31'12" | 16.56 | S 77°14'04" E |
| C3 | 12.59 | 281°45'24" | 61.90 | N 79°51'14" E |
| C4 | 61.83 | 26°44'21" | 28.86 | S 29°58'30" E |
| C5 | 41.14 | 75°36'24" | 54.29 | N 80°45'27" E |
| C6 | 61.29 | 30°41'11" | 32.83 | N 63°33'36" E |
| C7 | 12.68 | 281°53'23" | 62.37 | S 41°55'39" W |
| C8 | 59.90 | 06°58'31" | 7.29 | N 82°16'45" W |
| C9 | 5.59 | 36°36'55" | 3.57 | S 48°01'38" E |
| C10 | 22.24 | 77°38'33" | 30.14 | S 08°54'57" E |
| C11 | 5.35 | 32°33'24" | 3.04 | S 70°02'38" W |
| C12 | 52.07 | 19°07'39" | 17.38 | S 29°20'18" E |
| C13 | 17.14 | 18°55'31" | 5.66 | S 09°56'00" E |
| C14 | 24.04 | 22°05'13" | 9.27 | N 31°21'38" W |
| C15 | 60.83 | 07°02'54" | 7.48 | N 14°14'56" W |
| C16 | 21.37 | 13°29'23" | 5.03 | N 22°22'58" W |
| C17 | 15.53 | 28°57'27" | 7.85 | N 36°41'39" W |
| C18 | 7.50 | 50°39'00" | 6.63 | N 59°49'29" W |
| C19 | 68.00 | 29°27'22" | 34.96 | S 69°31'31" W |
| C20 | 60.90 | 32°01'34" | 34.04 | S 73°43'18" E |
| C21 | 5.69 | 162°08'55" | 16.10 | N 59°49'29" W |
| C22 | 31.21 | 32°20'24" | 17.62 | N 28°29'35" W |



SURVEYING AND
MAPPING DEPARTMENT
P.O.B. 10000
LAKE BUENA VISTA
FL. 32830-1000
PHONE (407)560-7118
FAX (407)560-7896

| | |
|---|---|
| PROJECT AREA *ANIMAL KINGDOM LODGE* | DATE: 1/10/07 |
| UNIT NAME *5TH FLOOR GROUND LEASE* | SCALE n/a |
| SHEET TITLE *SHETCH OF DESCRIPTION* | DRAWN BY: JLG |
| COMMENTS | FILENAME: 04JG0615 |

Page 6

## Exhibit A:  Memorandum of Ground & Improvements Lease - Demised Land

The Fifth Floor Premises shall consist of that portion of the Animal Kingdom Lodge located on and wholly within the perimeter boundary of the property legal described below, and the boundaries of the Fifth Floor Premises are more particularly described as follows (it being the intent of this description to describe the fifth floor of the Animal Kingdom Lodge):

    (1) Upper and Lower Boundaries:  The upper and lower boundaries of the Premises shall be the following boundaries extended to an intersection with the perimeter boundaries.

        (a) The upper boundary of the Premises is the interior unfinished surface of the fifth floor ceiling.
        (b) The lower boundary of the Premises is the interior unfinished surface of the floor slab of the fifth floor.

    (2) Perimeter Boundaries:  The perimeter boundaries of the Premises are the vertical planes along and coincident with the unfinished interior surface of the perimeter walls of the Animal Kingdom Lodge.

    (3) The Fifth Floor Premises are located on and wholly within the following perimeter boundary:

Commence at the West Quarter corner of said Section 34, Township 24 South, Range 27 East, Orange County, Florida, run along the West line of the Southwest 1/4 of said Section 34, S 00°00'19" W, 282.81 feet; thence N 90°00'00" E, 882.34 feet to the Point of Beginning;  thence N 85°54'34" E, 37.30 feet; thence S 04°26'59" E, 2.95 feet; thence N 85°33'01" E, 156.56 feet; thence N 06°25'35" E, 91.80 feet; thence S 83°34'29" E, 30.20 feet; thence N 16°25'21" E, 25.00 feet; thence N 63°34'49" W, 30.19 feet; thence N 26°25'11" E, 91.80 feet; thence N 52°41'59" W, 104.89 feet; thence S 37°18'01" W, 3.36 feet; thence N 52°41'59" W, 37.30 feet; thence N 37°18'01" E, 76.91 feet; thence S 52°41'59" E, 37.30 feet; thence S 37°18'01" W, 4.45 feet; thence S 52°41'59" E, 104.89 feet; thence N 48°10'31" E, 92.38 feet; thence N 41°49'29" W, 4.45 feet; thence N 48°10'31" E, 37.30 feet; thence S 41°49'29" E, 76.73 feet; thence S 48°10'31" W, 37.30 feet; thence N 41°49'29" W, 3.18 feet; thence S 48°10'31" W, 103.33 feet; thence N 41°49'29" W, 31.05 feet; thence S 48°09'21" W, 3.06 feet; thence S 41°54'19" W, 6.57 feet; thence S 52°41'59" E, 1.51 feet; thence S 37°18'51" W, 3.06 feet; thence S 52°41'04" E, 1.50 feet; thence S 37°18'01" W, 8.00 feet; thence N 52°42'53" W, 1.50 feet; thence S 37°17'11" W, 3.06 feet; thence N 52°41'59" W, 1.51 feet; thence S 32°41'43" W, 6.57 feet; thence S 26°26'35" W, 3.04 feet; thence S 63°34'08" E, 31.05 feet; thence S 26°25'30" W, 102.76 feet; thence S 63°34'23" W, 30.40 feet; thence S 16°25'34" W, 22.05 feet; thence S 83°34'29" E, 30.40 feet; thence S 06°25'31" W, 102.76 feet; thence N 83°34'10" W, 31.05 feet; thence S 06°24'28" W, 3.05 feet; thence S 00°09'19" W, 6.57 feet; thence N 85°33'01" E, 1.51 feet; thence S 04°26'09" E, 3.06 feet; thence N 85°33'56" E, 1.50 feet; thence S 04°26'59" E, 8.00 feet; thence S 85°32'08" W, 1.50 feet; thence S 04°27'49" E, 3.06 feet; thence S 85°33'01" W, 1.51 feet; thence S 09°03'17" E, 6.57 feet; thence S 15°18'25" E, 3.05 feet; thence N 74°40'12" E, 31.05 feet; thence S 15°19'29" E, 102.78 feet; thence S 74°40'31" W, 30.40 feet; thence S 25°19'43" E, 22.03 feet; thence N 54°40'31" E, 30.40 feet; thence S 15°19'29" E, 52.02 feet to a point on a non-tangent curve concave Westerly having a radius of 24.55 feet, and a central angle of 37°49'38"; thence from a tangent bearing of S 31°37'34" E run Southerly along the arc of said curve, 16.21 feet; thence S 35°17'15" E, 20.95 feet to a point on a non-tangent curve concave Southwesterly having a radius of 23.41 feet, and a central angle of 40°31'12"; thence from a tangent bearing of S 77°14'04" E run Southeasterly along the arc of said curve, 16.56 feet; thence S 54°42'45" W, 10.41 feet; thence S 35°17'15" E, 6.04 feet; thence N 77°21'59" E, 1.19 feet; thence N 09°47'03" W, 0.50 feet to a point on a non-tangent curve concave Northwesterly having a radius of 12.59 feet, and a central angle of 281°45'24"; thence from a tangent bearing of N 79°51'14" E run Southwesterly along the arc of said curve, 61.90 feet; thence S 54°42'45" W, 6.60 feet to a point on a non-tangent curve concave Westerly having a radius of 61.83 feet, and a central angle of 26°44'21"; thence from a tangent bearing of S 29°58'30" E run Southerly along the arc of said curve, 28.86 feet; thence S 59°47'15" E, 7.85 feet; thence N 30°13'55" E, 1.01 feet; thence S 59°49'29" E, 9.32 feet; thence S 30°10'31" W, 1.42 feet to a point on a non-tangent curve concave Southwesterly having a radius of 41.14 feet, and a central angle of 75°36'24"; thence from a tangent bearing N 80°45'27" E run Southeasterly along the arc of said curve, 54.29 feet; thence S 59°49'29" E, 11.09 feet; thence S 30°10'31" W, 1.00 feet; thence S 59°49'29" E, 7.86 feet to a point on a non-tangent curve concave Southerly having a radius of 61.29 feet, and a central angle of 30°41'11"; thence from a tangent bearing N 63°33'36" E run Easterly along the arc of said curve, 32.83 feet; thence S 84°19'29" E, 5.87 feet; thence N 05°40'31" E, 4.78 feet; thence N 53°38'30" W, 8.19 feet to a point on a non-tangent curve concave Easterly having a radius of 12.68 feet, and a central angle of 281°53'23"; thence from a tangent bearing of S 41°55'39" W run Northerly along the arc of said curve, 62.37 feet; thence S 84°19'29" E, 7.91 feet; thence N 05°17'50" E, 6.14 feet; thence S 84°19'29" E, 102.75 feet; thence S 05°40'31" W, 30.40 feet; thence N 85°40'45" E, 22.05 feet; thence N 14°19'29" W, 30.40 feet; thence N 75°40'31" E, 102.76 feet; thence S 14°19'10" E, 31.05 feet; thence N 75°39'28" E, 3.05 feet; thence N 69°24'19" E, 6.57 feet; thence N 25°11'59" W, 1.51 feet; thence N 64°48'51" E, 3.06 feet; thence N 25°11'04" W, 1.50 feet; thence N 64°48'01" E, 8.00 feet; thence S 25°12'52" E, 1.50 feet; thence N 64°47'12" E, 3.06 feet; thence S 25°11'59" E, 1.51 feet; thence N 60°11'43" E, 6.57 feet; thence N 53°56'35" E, 3.04 feet; thence N 36°04'29" W, 31.05 feet; thence N 53°55'31" E, 102.78 feet; thence S 36°04'29" E, 30.40 feet; thence N 43°55'29" E, 22.03 feet; thence N 56°04'08" W, 30.40 feet; thence N 33°55'30" E, 102.75 feet; thence S 56°04'30" E, 31.05 feet; thence N 33°54'28" E, 3.05 feet; thence N 27°39'19" E, 6.57 feet; thence N 66°56'59" W, 1.51 feet; thence N 23°03'51" E, 3.06 feet; thence N 66°56'04" W, 1.50 feet; thence N 23°03'01" E, 8.00 feet; thence S 66°57'53" E, 1.50 feet; thence N 23°02'11" E, 3.06 feet; thence S 66°56'59" E, 1.51 feet; thence N 18°26'43" E, 6.57 feet; thence N 12°11'35" E, 3.06 feet; thence N 77°49'29" W, 31.05 feet; thence N 12°10'31" E, 103.33 feet; thence N 77°49'29" W, 3.18 feet; thence N 12°10'31" E, 37.30 feet; thence S 77°49'29" E, 76.73 feet; thence S 12°10'31" W, 37.30 feet; thence N 77°49'29" W, 4.45 feet; thence S 12°10'31" W, 92.38 feet; thence S 66°56'59" E, 104.90 feet; thence N 23°03'01" E, 3.91 feet; thence S 66°56'59" E, 37.30 feet; thence S 23°03'01" W, 76.74 feet; thence N 66°56'59" W, 37.30 feet; thence N 23°03'01" E, 3.73 feet; thence N 66°56'59" W, 104.90 feet; thence S 33°55'33" W, 91.80 feet; thence N 56°04'08" W, 30.20 feet; thence S 43°55'41" W, 24.98 feet; thence S 36°04'29" W, 30.20 feet; thence S 53°55'32" W, 91.82 feet; thence S 25°11'59" E, 156.56 feet; thence N 64°48'01" E, 3.44 feet; thence S 24°47'59" E, 37.30 feet; thence S 64°48'01" E, 76.73 feet; thence

Page 7

**Exhibit A:  Memorandum of Ground & Improvements Lease - Demised Land**

N 25°11'59" W, 37.30 feet; thence N 64°48'01" E, 4.45 feet; thence N 25°11'59" W, 156.56 feet; thence S 75°40'31" W, 91.80 feet; thence N 14°19'29" W, 30.20 feet; thence S 85°40'34" W, 25.00 feet; thence S 05°40'31" W, 30.20 feet; thence N 84°19'29" W, 102.76 feet; thence N 05°40'50" E, 31.03 feet to a point on a non-tangent curve concave Southerly having a radius of 59.90 feet, and a central angle of 06°58'31"; thence from a tangent bearing of N 82°16'45" W run Westerly along the arc of said curve, 7.29 feet; thence S 05°40'31" W, 4.05 feet; thence S 84°19'29" E, 1.50 feet; thence S 05°40'31" W, 15.00 feet; thence N 84°20'04" W, 15.09 feet; thence S 30°10'31" W, 89.86 feet; thence S 59°49'29" E, 4.86 feet; thence S 30°10'31" W, 9.75 feet to a point on a non-tangent curve concave Southwesterly having a radius of 5.59 feet, and a central angle of 36°36'55"; thence from a tangent bearing of S 48°01'38" E run Southeasterly along the arc of said curve, 3.57 feet; to a point on a non-tangent curve concave Northwesterly having a radius of 22.24 feet, and a central angle of 77°38'33"; thence from a tangent bearing of S 08°54'57" E run Southwesterly along the arc of said curve, 30.14 feet; to a point on a non-tangent curve concave Northerly having a radius of 5.35 feet, and a central angle of 32°33'24"; thence from a tangent bearing of S 70°02'38" W run Westerly along the arc of said curve, 3.04 feet; thence N 70°48'24" W, 5.36 feet; thence S 30°10'31" W, 11.75 feet to a point on a non-tangent curve concave Westerly having a radius of 52.07 feet, and a central angle of 19°07'39"; thence from a tangent bearing of S 29°20'18" E run Southerly along the arc of said curve, 17.38 feet; thence S 10°16'35" E, 2.49 feet to a point on a non-tangent curve concave Easterly having a radius of 17.14 feet, and a central angle of 18°55'31"; thence from a tangent bearing of S 09°56'00" E run Southerly along the arc of said curve, 5.66 feet; thence N 47°40'31" E, 28.21 feet; thence S 42°19'29" E, 102.75 feet; thence S 47°41'04" W, 27.22 feet; thence S 34°19'29" E, 21.93 feet; thence N 63°40'31" E, 27.22 feet; thence S 26°19'29" E, 102.75 feet; thence S 63°40'31" W, 34.30 feet; thence N 26°19'29" W, 96.88 feet; thence N 33°59'10" W, 30.29 feet; thence N 42°19'29" W, 92.24 feet; thence S 47°40'31" W, 0.75 feet; thence N 42°19'29" W, 6.53 feet to a point on a non-tangent curve concave Easterly having a radius of 24.04 feet, and a central angle of 22°05'13"; thence from a tangent bearing of N 31°21'38" W run Northerly along the arc of said curve, 9.27 feet; thence N 11°48'23" W, 5.11 feet to a point on a non-tangent curve concave Westerly having a radius of 60.83 feet, and a central angle of 07°02'54"; thence from a tangent bearing of N 14°14'56" W run Northerly along the arc of said curve, 7.48 feet; to a point on a non-tangent curve concave Southwesterly having a radius of 21.37 feet, and a central angle of 13°29'23"; thence from a tangent bearing of N 22°22'58" W run Northwesterly along the arc of said curve, 5.03 feet; thence N 35°29'56" W, 16.82 feet to a point on a non-tangent curve concave Southwesterly having a radius of 15.53 feet, and a central angle of 28°57'27"; thence from a tangent bearing of N 36°41'39" W run Northwesterly along the arc of said curve, 7.85 feet; thence S 30°10'31" W, 26.03 feet; thence N 59°49'29" W, 76.58 feet; thence N 30°10'31" E, 25.99 feet; thence N 59°49'29" W, 2.33 feet to a point of curvature of a curve concave Southerly having a radius of 7.50 feet, and a central angle of 50°39'00"; thence run Westerly along the arc of said curve, 6.63 feet; to a point of reverse curvature of a curve concave Northerly having a radius of 68.00 feet, and a central angle of 29°27'22"; thence run Westerly along the arc of said curve, 34.96 feet; thence N 77°09'33" W, 14.14 feet; thence N 10°14'24" E, 0.77 feet; thence N 77°30'11" W, 6.66 feet; thence N 77°19'29" W, 84.19 feet; thence S 12°40'31" W, 0.75 feet; thence N 77°19'29" W, 5.93 feet; thence N 77°19'29" W, 0.58 feet; thence S 12°40'31" W, 0.77 feet; thence N 85°19'29" W, 18.34 feet; thence S 03°19'29" W, 0.77 feet; thence S 87°02'33" W, 6.56 feet; thence N 03°19'29" W, 0.71 feet; thence S 86°40'31" W, 19.60 feet; thence S 03°19'29" W, 28.80 feet; thence S 86°40'31" W, 77.21 feet; thence N 03°19'29" W, 63.10 feet; thence N 86°40'31" E, 102.75 feet; thence S 03°19'29" E, 27.22 feet; thence S 85°19'29" E, 21.93 feet; thence N 12°40'31" E, 27.22 feet; thence S 77°19'33" E, 102.73 feet; thence S 12°39'12" W, 28.02 feet to a point on a non-tangent curve concave Northerly having a radius of 60.90 feet, and a central angle of 32°01'34"; thence from a tangent bearing of S 73°43'18" E run Easterly along the arc of said curve, 34.04 feet; thence N 30°10'31" E, 2.48 feet; thence N 59°49'29" W, 7.89 feet to a point of curvature of a curve concave Easterly having a radius of 5.69 feet, and a central angle of 162°08'55"; thence run Northerly along the arc of said curve, 16.10 feet; thence N 30°10'31" E, 118.08 feet; thence N 59°49'29" W, 10.72 feet to a point on a non-tangent curve concave Easterly having a radius of 31.21 feet, and a central angle of 32°20'24"; thence from a tangent bearing of N 28°29'35" W run Northerly along the arc of said curve, 17.62 feet; thence S 54°40'31" W, 3.43 feet; thence N 35°19'34" W, 102.76 feet; thence N 54°40'26" E, 30.20 feet; thence N 25°19'31" W, 24.98 feet; thence S 74°40'31" W, 30.20 feet; thence N 15°19'29" W, 91.82 feet; thence S 85°33'01" W, 156.56 feet; thence S 04°26'59" E, 4.45 feet; thence S 85°33'26" W, 37.30 feet; thence N 04°26'59" W, 76.73 feet to the Point of Beginning, containing 3.966 Acres, more or less.

04jg0615 DAKV 5th Floor 01 11 07.doc

**Exhibit A: Memorandum of Ground & Improvements Lease - Demised Land**



P.O.C.
WEST QUARTER CORNER,
SEC 34, TWN 24 S, RNG 27 E

CURVE TABLE

| CURVE | RADIUS | DELTA | LENGTH | TANG. BRG. |
|---|---|---|---|---|
| C1 | 7.03 | 164°07'37" | 20.13 | N 59°31'04" W |
| C2 | 32.75 | 31°59'49" | 18.29 | N 28°22'07" W |
| C3 | 14.88 | 120°35'44" | 31.32 | N 03°37'42" E |
| C4 | 27.29 | 59°51'18" | 28.51 | S 55°46'34" E |
| C5 | 41.90 | 81°42'52" | 59.76 | N 79°08'34" E |
| C6 | 4.90 | 40°38'37" | 3.48 | S 48°57'33" E |
| C7 | 23.73 | 70°57'19" | 29.39 | S 08°18'56" E |
| C8 | 4.90 | 41°37'06" | 3.56 | S 62°38'22" W |
| C9 | 58.54 | 30°42'10" | 31.37 | N 75°44'32" W |

West line of the Southwest 1/4
of Section 34-24-27
S 00°00'19" W 707.42'

N 90°00'00" E 1142.71'

P.O.B.

GRAPHIC SCALE
SCALE 1" = 100

TANGENT TABLE

| LINE# | BEARING | DIST. |
|---|---|---|
| L1 | N 30°00'00" E | 18.98 |
| L2 | N 59°31'04" W | 22.48 |
| L3 | N 60°09'30" W | 10.37 |
| L4 | N 85°15'46" E | 7.12 |
| L5 | S 04°44'14" E | 3.05 |
| L6 | S 60°00'00" E | 15.94 |
| L7 | S 60°00'00" E | 37.79 |
| L8 | S 60°00'00" E | 5.07 |
| L9 | S 30°00'00" W | 9.78 |
| L10 | S 30°00'00" W | 30.91 |
| L11 | N 59°54'04" W | 81.50 |

ABBREVIATIONS
SEC=SECTION
TWN=TOWNSHIP
RNG=RANGE
POB=POINT OF BEGINNING
POC=POINT OF COMMENCEMENT

SURVEYOR'S NOTE
CHAPTER 61G17-6 OF THE FLORIDA
ADMINISTRATIVE CODE REQUIRES
THAT THE FOLLOWING STATEMENT
BE PUT ON THIS SKETCH.
"THIS IS NOT A BOUNDARY SURVEY"

BEARINGS ARE BASED ON THE
W. LINE, SW 1/4, SEC. 34-24-27
AS BEING S 00°00'19" W

SURVEYING AND
MAPPING DEPARTMENT
P.O.B. 10000
LAKE BUENA VISTA
FL. 32830-1000
PHONE (407)560-7118
FAX (407)560-7896

| | |
|---|---|
| PROJECT AREA | DATE: 6/15/06 |
| LAKE BUENA VISTA | |
| UNIT NAME | SCALE 1" = 100' |
| ANIMAL KINGDOM LODGE 6TH FLOOR GROUND LEASE | |
| SHEET TITLE | DRAWN BY: JLG |
| SKETCH OF DESCRIPTION | |
| COMMENTS | FILENAME: 04JG0616 |

**Exhibit A:  Memorandum of Ground & Improvements Lease - Demised Land**

The Sixth Floor Premises shall consist of that portion of the Animal Kingdom Lodge located on and wholly within the perimeter boundary of the property legal described below, and the boundaries of the Sixth Floor Premises are more particularly described as follows (it being the intent of this description to describe the sixth floor of the Animal Kingdom Lodge):

    (1) Upper and Lower Boundaries:  The upper and lower boundaries of the Premises shall be the following boundaries extended to an intersection with the perimeter boundaries.

        (a) The upper boundary of the Premises is the interior unfinished surface of the sixth floor ceiling.
        (b) The lower boundary of the Premises is the interior unfinished surface of the fifth floor ceiling.

    (2) Perimeter Boundaries:  The perimeter boundaries of the Premises are the vertical planes along and coincident with the unfinished interior surface of the perimeter walls of the Animal Kingdom Lodge.

    (3) The Sixth Floor Premises are located on and wholly within the following perimeter boundary:

    Commence at the West Quarter corner of said Section 34, Township 24 South, Range 27 East, Orange County, Florida, run along the West line of the Southwest 1/4 of said Section 34, S 00°00'19" W, 707.42 feet; thence N 90°00'00" E, 1142.71 feet to the Point of Beginning;  thence N 30°00'00" E, 18.98 feet; thence N 59°31'04" W, 22.48 feet to a point of curvature of a curve concave Southeasterly having a radius of 7.03 feet, and a central angle of 164°07'37"; thence run Northeasterly along the arc of said curve, 20.13 feet; thence N 29°50'30" E, 117.34 feet; thence N 60°09'30" W, 10.37 feet to a point on a non-tangent curve concave Easterly having a radius of 32.75 feet, and a central angle of 31°59'49"; thence from a tangent bearing of N 28°22'07" W run Northerly along the arc of said curve, 18.29 feet; to a point of compound curvature of a curve concave Southeasterly having a radius of 14.88 feet, and a central angle of 120°35'44"; thence run Northeasterly along the arc of said curve, 31.32 feet; to a point of compound curvature of a curve concave Southwesterly having a radius of 27.29 feet, and a central angle of 59°51'18"; thence run Southeasterly along the arc of said curve, 28.51 feet; thence N 85°15'46" E, 7.12 feet; thence S 04°44'14" E, 3.05 feet; thence S 60°00'00" E, 15.94 feet to a point on a non-tangent curve concave Southwesterly having a radius of 41.90 feet, and a central angle of 81°42'52"; thence from a tangent bearing of N 79°08'34" E run Southeasterly along the arc of said curve, 59.76 feet; thence S 60°00'00" E, 37.79 feet; thence S 30°00'00" W, 99.21 feet; thence S 60°00'00" E, 5.07 feet; thence S 30°00'00" W, 9.78 feet to a point on a non-tangent curve concave Southwesterly having a radius of 4.90 feet, and a central angle of 40°38'37"; thence from a tangent bearing of S 48°57'33" E run Southeasterly along the arc of said curve, 3.48 feet; to a point of compound curvature of a curve concave Northwesterly having a radius of 23.73 feet, and a central angle of 70°57'19"; thence run Southwesterly along the arc of said curve, 29.39 feet; to a point of compound curvature of a curve concave Northerly having a radius of 4.90 feet, and a central angle of 41°37'06"; thence run Westerly along the arc of said curve, 3.56 feet; to a point of compound curvature of a curve concave Northeasterly having a radius of 58.54 feet, and a central angle of 30°42'10"; thence run Northwesterly along the arc of said curve, 31.37 feet; thence S 30°00'00" W, 30.91 feet; thence N 59°54'04" W, 81.50 feet to the Point of Beginning, containing 22805 square feet, more or less.

04jg0616 DAKV 6th floor. doc

**Exhibit B:  Memorandum of Ground & Improvements Lease - Option Land**



Bearings are based on the West line of
the Southwest 1/4 of Sec. 34, Twn 24
S, Rng 27 E, as being S 00°00'19" W.

P.O.C.
WEST QUARTER CORNER,
SEC 34, TWN 24 S, RNG 27 E

7.805 Acres±

P.O.B.

N 90°00'00" E  202.80'

GRAPHIC SCALE
SCALE 1" = 100'

SURVEYOR'S NOTE
CHAPTER 61G17-6 OF THE FLORIDA
ADMINISTRATIVE CODE REQUIRES
THAT THE FOLLOWING STATEMENT
BE PUT ON THIS SKETCH.
"THIS IS NOT A BOUNDARY SURVEY"

### CURVE TABLE

| CURVE | RADIUS | DELTA | LENGTH | TANG. BRG. |
|---|---|---|---|---|
| C1 | 85.00 | 143°29'47" | 212.88 | N 67°01'51" W |
| C2 | 206.92 | 25°29'30" | 92.06 | N 76°27'56" E |
| C3 | 49.00 | 98°11'00" | 83.97 | S 85°36'24" W |
| C4 | 489.24 | 30°30'00" | 260.44 | S 12°34'36" E |
| C5 | 139.00 | 58°53'32" | 142.87 | N 70°11'07" W |
| C6 | 45.00 | 50°04'04" | 39.32 | N 39°04'39" W |
| C7 | 53.00 | 59°26'47" | 54.99 | N 89°08'43" W |

### TANGENT TABLE

| LINE# | BEARING | DIST. |
|---|---|---|
| L1 | N 05°26'40" W | 38.12 |
| L2 | N 39°04'39" W | 35.11 |
| L3 | N 89°08'43" W | 18.77 |
| L10 | S 00°09'32" W | 44.80 |
| L11 | S 13°26'48" E | 78.89 |
| L12 | S 16°37'58" W | 61.20 |
| L13 | S 15°55'43" E | 48.50 |
| L14 | S 75°33'18" W | 70.55 |

ABBREVIATIONS
SEC=SECTION
TWN=TOWNSHIP
RNG=RANGE
POB=POINT OF BEGINNING
POC=POINT OF COMMENCEMENT

ACES
RECOVERY CORE ENERGY SERVICES

SURVEYING AND
MAPPING DEPARTMENT
P.O.B. 10000
LAKE BUENA VISTA
FL. 32830-1000
PHONE (407)560-7118
FAX (407)560-7896

| | |
|---|---|
| PROJECT AREA | DISNEY RESORTS |
| UNIT NAME | DVC AT DAKL |
| SHEET TITLE | SKETCH OF DESCRIPTION |
| COMMENTS | GROUND LEASE BOUNDARY |

DATE: 9/11/06
SCALE 1" = 120'
DRAWN BY: JLG
FILENAME: 04JG0612

**Exhibit B:  Memorandum of Ground & Improvements Lease - Option Land**



CURVE TABLE

| CURVE | RADIUS | DELTA | LENGTH | TANG. | BRG. |
|---|---|---|---|---|---|
| C1 | 85.00 | 143°29'47" | 212.88 | N 67°01'51" | W |
| C2 | 206.92 | 25°29'30" | 92.06 | N 76°27'56" | E |
| C3 | 49.00 | 98°11'00" | 83.97 | S 85°36'24" | W |
| C4 | 489.24 | 30°30'00" | 260.44 | S 12°34'36" | E |
| C5 | 139.00 | 58°53'32" | 142.87 | N 70°11'07" | E |
| C6 | 45.00 | 50°04'04" | 39.32 | N 39°04'39" | W |
| C7 | 53.00 | 59°26'47" | 54.99 | N 89°08'43" | W |
| C8 | 35.00 | 89°42'46" | 54.80 | N 29°41'56" | W |
| C9 | 25.00 | 39°35'35" | 17.28 | N 60°00'50" | E |

TANGENT TABLE

| LINE# | BEARING | DIST. |
|---|---|---|
| L1 | N 05°26'40" W | 38.12 |
| L2 | N 39°04'39" W | 35.11 |
| L3 | N 89°08'43" W | 18.77 |
| L4 | S 80°23'35" E | 57.44 |
| L5 | N 09°36'25" E | 60.12 |
| L6 | N 31°01'11" E | 77.42 |
| L7 | N 80°09'48" E | 73.36 |
| L8 | S 64°27'38" E | 62.78 |
| L9 | S 41°23'44" E | 42.59 |
| L10 | S 00°09'32" W | 44.80 |
| L11 | S 13°26'48" E | 78.89 |
| L12 | S 16°37'58" W | 61.20 |

GRAPHIC SCALE
SCALE 1" = 100'

P.O.C.
WEST QUARTER CORNER,
SEC 34, TWN 24 S, RNG 27 E

7.805 Acres±

SURVEYING AND
MAPPING DEPARTMENT
P.O.B. 10000
LAKE BUENA VISTA
FL. 32830-1000
PHONE (407)560-7118
FAX (407)560-7896

| PROJECT AREA | DATE: |
|---|---|
| DISNEY RESORTS | 9/11/06 |
| UNIT NAME | SCALE |
| DVC AT DAKL | 1" = 120' |
| SHEET TITLE | DRAWN BY: |
| SKETCH OF DESCRIPTION | JLG |
| COMMENTS | FILENAME: |
| GROUND LEASE BOUNDARY | 04JG0612 |

**Exhibit B: Memorandum of Ground & Improvements Lease - Option Land**

A parcel of land lying in Section 34, Township 24 South, Range 27 East, Orange County, Florida, and being more particularly described as follows:

Commence at the West Quarter corner of said Section 34, run along the West line of the Southwest 1/4 of said Section 34, S 00°00'19" W, 218.20 feet; thence N 90°00'00" E, 202.80 feet to the Point of Beginning;  thence N 64°10'08" E, 173.85 feet; thence N 67°54'44" E, 88.21 feet; thence N 67°01'51" W, 101.55 feet to a point of curvature of a curve concave Easterly having a radius of 85.00 feet, and a central angle of 143°29'47"; thence run Northerly along the arc of said curve, 212.88 feet, to a point of reverse curvature of a curve concave Northwesterly having a radius of 206.92 feet, and a central angle of 25°29'30"; thence run Northeasterly along the arc of said curve, 92.06 feet; thence N 43°08'28" W, 140.57 feet; thence N 18°55'14" W, 151.65 feet; thence N 05°26'40" W, 38.12 feet to a point on a non-tangent curve concave Southeasterly having a radius of 49.00 feet, and a central angle of 98°11'00"; thence from a tangent bearing of S 85°36'24" W run Southwesterly along the arc of said curve, 83.97 feet, to a point of compound curvature of a curve concave Northeasterly having a radius of 489.24 feet, and a central angle of 30°30'00"; thence run Southeasterly along the arc of said curve, 260.44 feet, to a point on a non-tangent curve concave Southerly having a radius of 139.00 feet, and a central angle of 58°53'32"; thence from a tangent bearing of N 70°11'07" W run Westerly along the arc of said curve, 142.87 feet; thence N 39°04'39" W, 35.11 feet to a point of curvature of a curve concave Southwesterly having a radius of 45.00 feet, and a central angle of 50°04'04"; thence run Northwesterly along the arc of said curve, 39.32 feet; thence N 89°08'43" W, 18.77 feet to a point of curvature of a curve concave Northeasterly having a radius of 53.00 feet, and a central angle of 59°26'47"; thence run Northwesterly along the arc of said curve, 54.99 feet; thence N 29°41'56" W, 197.54 feet to a point of curvature of a curve concave Easterly having a radius of 35.00 feet, and a central angle of 89°42'46"; thence run Northerly along the arc of said curve, 54.80 feet; thence N 60°00'50" E, 221.46 feet to a point of curvature of a curve concave Southerly having a radius of 25.00 feet, and a central angle of 39°35'35"; thence run Easterly along the arc of said curve, 17.28 feet; thence S 80°23'35" E, 57.44 feet; thence N 09°36'25" E, 60.12 feet; thence N 31°01'11" E, 77.42 feet; thence N 55°55'17" E, 133.12 feet; thence N 80°09'48" E, 73.36 feet; thence S 81°24'09" E, 131.25 feet; thence S 64°27'38" E, 62.78 feet; thence S 52°26'34" E, 129.61 feet; thence S 41°23'44" E, 42.59 feet; thence S 30°54'13" E, 131.24 feet; thence S 59°05'47" W, 100.00 feet; thence N 30°54'13" W, 134.45 feet; thence N 52°26'34" W, 143.67 feet; thence N 81°24'09" W, 137.79 feet; thence S 55°55'17" W, 124.44 feet; thence S 10°37'19" W, 131.92 feet; thence S 18°55'14" E, 141.06 feet; thence S 44°11'35" E, 169.32 feet; thence S 34°28'59" E, 127.01 feet; thence S 00°09'32" W, 44.80 feet; thence S 13°26'48" E, 78.89 feet; thence S 16°37'58" W, 61.20 feet; thence S 62°58'06" W, 116.81 feet; thence S 67°54'44" W, 125.34 feet; thence S 64°10'08" W, 150.04 feet; thence S 38°03'28" W, 140.34 feet; thence S 00°38'18" W, 125.95 feet; thence S 47°03'11" E, 132.04 feet; thence S 82°55'33" E, 142.76 feet; thence N 74°04'17" E, 138.05 feet; thence S 15°55'43" E, 48.50 feet; thence S 74°04'17" W, 147.92 feet; thence N 82°55'33" W, 138.11 feet; thence S 75°53'18" W, 70.55 feet; thence N 47°03'11" W, 173.64 feet; thence N 00°38'18" W, 196.21 feet; thence N 38°03'28" W, 191.69 feet to the Point of Beginning, containing 7.805 Acres, more or less.